# EXHIBIT A-14



RECEIVED

Aug 11 2022 8:52am

Board on Professional
Responsibility

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

### Under Seal

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District
of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

**Disciplinary Docket No.**

**2021-D193**

**UNDER SEAL**

## SEALED RESPONSE TO THE BOARD'S AUGUST 8TH SEALING ORDER INCLUDING A CALL FOR AFFIRMATIVE RELIEF AND INCORPORATED MOTION TO SEAL

Comes now the Respondent and submits proposed redacted filings pursuant to this Board's August 8th Order.  Respondent seeks clarification on the scope of the Order and requests that all of the proceedings be sealed.

### PROCEDURAL BACKGROUND

On August 3 Respondent filed a Motion for Extension of Time to file a response to the Office of Disciplinary Counsel's (ODC's) petition.  Mtn. to Extend (8/3/22).[1]  The motion relied among other things on the existence of a related matter pending under seal with the Court of Appeals ("the sealed matter") and

---

[1] The Motion was later granted by the Hearing Committee over strenuous ODC objection.

impairment of Respondent's ability to defend this case caused by DOJ seizure of most of his electronic devices.  *Id*. at 2-3.  The sealed matter involves extensive discussion of issues related to the jurisdiction of the D.C. Bar over any matter of this nature, various merits issues, and also the propriety of two attempts at serving process as to an ODC subpoena.  *See, e.g.,* Ex. A at 6-8, 14-21 (Respondent's Response to ODC's Motion to Enforce Subpoena).

On August 5, Respondent moved to seal the Motion to Extend and related reply brief.  ODC consented to the request.  Although the motion did not specifically reference the DOJ seizure, it requested that the filings be placed under seal in their entirety.  ODC also moved to seal its opposition to the Motion for Extension.

On August 8th the Board issued an Order granting all motions to seal but ordering redacted versions of all pleadings be filed publicly.  The Order called for redaction of "confidential information" defined as information referring to "the existence of and any proceedings in *In re Confidential* (JBC), D.C. App. No. 21-BS-0059)."

On August 8th, ODC filed a redacted version of its opposition but failed to redact much information pertaining to the sealed Court of Appeals matter as required by the Board's order.  Specifically, ODC failed to redact (false) allegations that Respondent attempted to avoid service of both the subpoena and the Charges

in bad faith, which clearly embraces the service of subpoena issues pending under seal with the Court of Appeals.

## EXPLANATION OF RESPONDENT'S PROPOSED REDACTIONS

### I.     Discussion of Service of Process or Other Factual Matters Currently Under Seal Before the Court of Appeals Should Be Redacted.

As stated above, this Board has allowed redaction of information relating to the sealed matter currently pending before the Court of Appeals.  This Order of the Board should naturally be read to include not only the fact that the sealed matter exists, but the factual substance into which that matter delves.  Interpreting this Order any other way would defeat the purpose of the Court of Appeals considering the matter under seal.  At the very least, portions of the filings on the Motion for Extension that overlap significantly with the information under seal before the Court of Appeals should therefore be kept under seal by this Board.

Specifically, ODC's false allegations that Respondent attempted to avoid service of process in bad faith, and Respondent's response thereto, should be received by this Board under seal.  Those allegations are part and parcel of the service of process issues under seal before the Court of Appeals.

## II.     Information Relating to the Current Criminal Investigation[2] of Respondent Should be Redacted and Received by This Board Under Seal.

Although not specifically referenced in the Motions to Seal, Respondent submits that it would be appropriate to receive nonpublic information relating to the federal criminal investigation of Respondent under seal.  Although federal agents' raid of Respondent's home was widely reported, Respondent's Motion for Extension reveals nonpublic details about his employment, communications between counsel and DOJ, and particular devices seized from Respondent's home. Mtn. at 2-3.  Disclosing this information would prejudice Respondent's rights to privacy and assistance of counsel, and would also trigger unhelpful media efforts to "read between the lines" or even wildly speculate.  Sealing this material will not prejudice the public's legitimate interest in these proceedings because, as stated already, the essential newsworthy fact that federal agents raided Respondent's residence has been long been public knowledge.

## III.    All Proceedings Before the Board Should Remain Sealed Pending Resolution of the Case Before the Court of Appeals.

On August 11, 2022 (tomorrow), Respondent will lodge with the Board a copy of a filing to be made that day in the Court of Appeals in response to the ODC's motion in that Court to unseal its proceedings regarding Respondent. That

---

[2] Respondent denies all wrongdoing (criminal and otherwise) and believes the DOJ investigation of his public service is legally and factually flawed.

filing will ask as cross relief for the Court of Appeals to stay and seal all

proceedings before the Board on the grounds that the Court of Appeals has

exclusive jurisdiction during the pendency of this case before that Court.

Respondent contends in the Court of Appeals that the D.C. Bar presently has no

jurisdiction (and will not have it again until a judgment and remand occur) over the

conduct in question in this case and that the entire matter before the Board should

thus be stayed. This is the most logical form of relief since the Charges are a filing

*void ab initio* given the lack of jurisdiction in the D.C. Bar at this time.  Pending

resolution of the arguments set in front of the Court of Appeals, ODC should not be

able to do an end run around the Court of Appeals' exclusive jurisdiction and

defeat the confidentiality that normally attaches to Bar investigations. This is

particularly true where Disciplinary Counsel conceded in connection with litigation

on the pending Court of Appeals case that exclusive jurisdiction existed only in

that Court (and none below in the Bar) pending resolution of that case, as our filing

with the Court of Appeals tomorrow will make clear, and will be lodged in parallel

tomorrow to the Board as well.  Stay relief in the alternative of this proceeding

pending resolution of the sealed case in the Court of Appeals would also be proper

as a way to avoid parallel proceedings.[3]

_____

[3] The divestiture of jurisdiction problem here at the Bar level and the relative efficiency of
parallel proceedings will be covered in greater detail in the filing we plan to make tomorrow in
the sealed case before the Court of Appeals, lodging a copy here as well.

## RESPONDENT'S PROPOSED FILINGS

Included with this filing are two redacted versions of Respondent's Motion for Extension and Reply.  Exhibit B (Motion) and C (Reply) are redacted according to the requests made in this filing; references to facts currently under seal before the Court of Appeals and to the pending federal investigation of Respondent are thus both redacted.  Respondent proposes that if all proceedings running from the filing of the Charges are not to be placed under seal (our primary position) at the very least this set of redacted versions is the more appropriate response to the Board's August 8th order.

Out of an abundance of caution, and to avoid any perception of failure to comply with the August 8th order, however, Respondent has included a second set of redacted documents.  *See* Ex. D (Motion) – E (Reply).  The second set redacts only clear references to the under-seal Court of Appeals case itself, effectively reading the Board's Order more narrowly.  Respondent submits, however, that these redactions flow from an unnatural and overly literal reading of the August 8th order.  If the Board does not order the affirmative relief covered in the next section, at the very least it should receive Exhibits B & C, and not Exhibits D & E, as the official public version of the Motion for Extension defense filings. Relatedly, if the Court agrees that Exhibits B & C embody the better approach, it should order

Disciplinary Counsel to *re*-redact his own filing consistent with revised instructions to be issued by the Board.[4]

## INCORPORATED MOTION TO SEAL

Respondent respectfully requests that this Board receive the instant filing (i.e., this motion including Exhibit A) under seal.  Under even the strictest reading of the Board's August 8th order, this filing by necessity references information ordered to be received under seal.  And if the Board rejects our primary position that *all* filings in this case should be sealed and issues further guidance on the scope of the August 8th order's redaction provisions, Respondent will be pleased to submit a redacted version of this filing pursuant to that guidance.

## CONCLUSION

For the foregoing reasons, Respondent requests the Board to hold all filings under seal pending resolution of the matters before the Court of Appeals. In the alternative, Respondent requests this Board receive Exhibits B & C as a properly redacted filing pursuant to the August 8th order.  Respondent further requests that this Board strike ODC's redacted filing with instructions to refile in conformity

---

[4] By proposing a preference for Exhibits B&C to be filed rather than Exhibits D&E, Respondent should not be interpreted to be waiving the broader argument made above in Section III. that *all filings* in this case should be placed under seal pending resolution of the sealed cased before the D.C. Court of Appeals.

with the Board's ruling on this pleading, insofar as ODC's redacted filing is at variance with those instructions.

Respectfully submitted this 10th day of August, 2022.

/s/ *Charles Burnham*

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this **_Motion to File Under Seal_** by U.S. First Class Mail with sufficient postage thereon to insure delivery, and by email addressed to:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 10 day of August, 2022.

_/s/ Charles Burnham_
Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202)3866920
charles@burnhamgorokhov.com

DCCA NO. 22-BS-0059

DISTRICT OF COLUMBIA

COURT OF APPEALS

| | |
|---|---|
| In the Matter of | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | Disciplinary Docket |
| **Respondent,** | No. 2021-D193 |
| A Member of the Bar of the District of Columbia Court of Appeals | |

RESPONSE TO MOTION TO COMPEL AND
CROSS-MOTION TO QUASH

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for p*ro hac vice application in
progress

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*\*Motion for pro hac vice admission in
progress*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................. 1

  NATURE AND ORIGIN OF COMPLAINT FROM SENATOR DURBIN ............................ 1

  ODC'S ACTIONS TO DATE .............................................................................. 3

ARGUMENT ...................................................................................................... 6

  PROCEDURAL BACKGROUND ........................................................................ 6

    A.  Enforcement of Subpoenas ........................................................... 6

    B.  Standard of Review ....................................................................... 7

    C.  The Subpoena Was Improperly Served and Should Be Quashed. ................. 7

  I.    THE FIFTH AMENDMENT BARS ENFORCEMENT OF THE SUBPOENA. .......... 8

    A.  Mr. Clark Properly Invoked the Fifth Amendment. ........................................ 9

    B.  Disciplinary Counsel's Subpoena Amounts to an Improper Set of Interrogatories and Thus It Is Not Even Necessary to Reach the Act of Production Doctrine. ............ 11

    C.  Even to the Extent It Is Implicated Here, Mr. Clark Has a Strong and Valid Basis to Claim the Act of Production Privilege ........................................................ 13

  II.    THE SUBPOENA SHOULD BE QUASHED BECAUSE THE CHALLENGED CONDUCT IS NOT SUBJECT TO BAR DISCIPLINE. ........................................... 14

    A.  28 USC § 530B(a) Does Not Confer on the D.C. Bar Unfettered Authority to Investigate or Regulate the Discretionary Actions of DOJ Lawyers. ........................... 15

    B.  Under 28 U.S.C. § 530B and 28 C.F.R. § 77.2, the Bar Has No Jurisdiction Over Respondent Because It Does Not "Ordinarily Apply" Discipline to the Particular Conduct in Question. ..................................................................................... 19

    C.  There Is No Precedent for Disciplining a Lawyer Over a Never-Sent Discussion Draft of a Document Calling for State Investigation. ...................................... 19

    D.  Rule 8.4(d) Does Not Apply ....................................................................... 20

  III.    THE POLITICAL PANDORA'S BOX HERE SHOULD NOT BE OPENED. ........... 21

    A.  Legislators in Georgia and Other States Called for Legislative Reexaminations of Their Electoral Votes. .............................................................................. 22

    B.  Under Disciplinary Counsel's Unrestrained Theory, a Host of Members of Congress Who Are Lawyers Committed Ethical Violations by Questioning the Election. ........................................................................................... 22

    C.  Leaked Media Reports of Mr. Clark's Conduct Reflect That He Held Views Generally Consistent with Those of Three Dissenting Supreme Court Justices and 18 State Attorneys General. ......................................................................... 24

    D.  The View That Unlawful Election Procedures Were Used in at Least Some States Has Been Vindicated in Several Respects. ....................................................... 25

CONCLUSION.................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Bond v. United States*, 572 U.S. 844 (2014) ...................................................................... 16

*Branch v. Smith*, 538 U.S. 254 (2003) .............................................................................. 16

*Brooks v. United States*, 448 A.2d 253 (D.C. 1982) ......................................................... 14

*Butler v. United States*, 890 A.2d 181 (D.C. 2006) ........................................................... 10

*Carter v. United States*, 684 A.2d 331 (D.C. 1996) ...................................................... 9, 11

*CF&I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983) ................ 8

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ............................................... 16

*District of Columbia v. Carter*, 409 U.S. 418 (1973) ...................................................... 17

*Fisher v. United States*, 425 U.S. 391 (1976) ................................................................... 12

*FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300 (D.C. Cir. 1980).............. 8

*Hamer v. Eastern Credit Ass'n, Inc.*, 192 A.2d 127 (D.C. 1963)........................................ 8

*In re Artis*, 883 A.2d 85 (D.C. 2005) ..................................................................... 6, 10, 12, 14

*In re Benjamin*, 698 A.2d 434 (D.C. 1997)......................................................................... 6

*In re Burton*, 472 A.2d 831 (D.C. 1984) .......................................................................... 11

*In re Confidential*, 701 A.2d 842 (D.C. 1997) .................................................................... 7

*In re Hopkins*, 677 A.2d 55 (D.C. 1996)........................................................................... 21

*In re Horowitz*, 482 F.2d 72 (2d. Cir. 1973)..................................................................... 14

*In re Pearson*, 228 A.3d 417 (D.C. 2020)......................................................................... 21

*In re Public Defender Serv.*, 831 A.2d 890 (D.C. 2003) ........................................... 7, 13, 14

*In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078 (E.D.N.Y. 1978) .......... 15

*In re Romansky*, 825 A.2d 311 (D.C. 2003)....................................................................... 20

*In re Sealed Case*, 116 F.3d 550 (D.C. Cir. 1997) ............................................................. 8

*In re Thorup*, 432 A.2d 1221 (D.C. 1981) .......................................................................... 6

*In re Yelverton*, 105 A.3d 413 (D.C. 2014) ...................................................................... 21

*In the Matter of Shorter*, 570 A.2d 760 (D.C. 1990) ........................................................ 20

*Johnson v. United States*, 746 A.2d 349 (D.C. 2000) ....................................................... 10

*Lefkowitz v. Turley*, 414 U.S. 70 (1973).......................................................................... 9, 10

*Mason v. United States*, 244 U.S. 362 (1917)...................................................................... 9

*McLinko v. Commonwealth of Pennsylvania, et al.*, No. 244 M.D. 2021, 2022 WL 257659
(Pa. Commw. Ct. Jan. 28, 2022) ................................................................................... 26

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) ....................... 8

*Ohio v. Reiner*, 532 U.S. 17 (2001)................................................................................... 14

*Pulley v. United States*, 532 A.2d 651 (D.C. 1987) ............................................................. 8

*Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021) ................... 24

*Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020)................................................................. 25

*Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021) .......... 26

*United States v. John Does*, 465 U.S. 605 (1984)............................................................... 12

*Wilson v. United States*, 558 A.2d 1135 (D.C. 1989), *overruled on other grounds*, 684 A.2d
331 (D.C. 1996) .............................................................................................................. 9

## Statutes

5 U.S.C. § 7323.................................................................................................................. 11

18 U.S.C § 371 ............................................................................................................ 11
18 U.S.C. § 1512 ......................................................................................................... 11
18 U.S.C. § 1962 ......................................................................................................... 11
18 U.S.C. § 2383 ......................................................................................................... 11
18 U.S.C. § 2384 ......................................................................................................... 11
26 U.S.C. § 170 ........................................................................................................... 18
28 U.S.C. § 506 ........................................................................................................... 15
28 U.S.C. § 509 ........................................................................................................... 16
28 U.S.C. § 510 ........................................................................................................... 16
28 U.S.C. § 515 ........................................................................................................... 16
28 U.S.C. § 516 ........................................................................................................... 16
28 U.S.C. § 517 ........................................................................................................... 16
28 U.S.C. § 519 ........................................................................................................... 16
28 U.S.C. § 533 ........................................................................................................... 16
28 U.S.C. § 547 ........................................................................................................... 16
28 USC § 530B ....................................................................................... 15, 16, 17, 19
28 U.S.C. § 1257 ......................................................................................................... 17
28 U.S.C. § 1927 ......................................................................................................... 17
42 U.S.C. § 1983 ......................................................................................................... 17
42 U.S.C. § 8285a ....................................................................................................... 17
52 U.S.C. § 20511 ....................................................................................................... 11
D.C. Code § 11-944 .................................................................................................... 17
D.C. Code § 23-1330 .................................................................................................. 17
O.C.G.A. § 21-2-385 ............................................................................................. 27, 28
Pub. L. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ...................................................... 17
Pub. L. 96-132, 93 Stat. 1040 (1979) ........................................................................ 17

**Other Authorities**

OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys*
    (Aug. 2, 1985) ........................................................................................................ 15

**Rules**

Board Rule 2.9 ............................................................................................................... 5
Board Rule 3.14 ............................................................................................................. 7
Board Rule 3.15 ............................................................................................................. 7
Board Rule 3.16 ............................................................................................................. 7
Board Rule 4.1 ......................................................................................................... 5, 18
D.C. Bar Rule XI, § 18 .................................................................................................. 6
D.C. Bar Rule XI, § 8 .................................................................................................... 6
D.C. Rules of Professional Conduct 1.2(e) ................................................................ 10
D.C. Rules of Professional Conduct 8.4(c) ................................................... 19, 20, 21
D.C. Rules of Professional Conduct 8.4(d) ............................................................... 21
Fed. R. Civ. P. Rule 45 ................................................................................................. 8
Superior Court Rule 45 ........................................................................................ 6, 7, 8
Supreme Court Rule 47 ............................................................................................... 18
United States Senate, Rule IX ...................................................................................... 2

## Regulations and Preambles

28 C.F.R. § 16.21 ............................................................................................ 6
28 C.F.R. § 77.2 .................................................................................... 16, 19
64 Fed. Reg. 19,273 (Apr. 20, 1999) ........................................................ 16

## Constitutional Provisions

U.S. Const., art. 1, § 4, cl. 1 ...................................................................... 25
U.S. Const., art. I, § 5 .................................................................................. 2
U.S. Const., art. I, § 8, cl. 17 .................................................................... 17
U.S. Const., art. II, § 1, cl. 2 ..................................................................... 25
U.S. Const., art. II, § 2, cl. 1 ..................................................................... 15
U.S. Const., art. II, § 3 .............................................................................. 15
U.S. Const., amend V ....................................................................... passim

## Other References

147 Cong. Rec. H34 (Jan. 6, 2001)............................................................ 22
151 Cong. Rec. H127 (Jan. 6, 2005)......................................................... 22
Amanda Prestigiacomo, *Democrats Objected to Electoral Vote Certification in 2000, 2004, 2016*, DAILY WIRE (Jan. 4, 2021) ........................................ 23
Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee ............................................................. 22
Daniel Chaitin, *Jan. 6 Committee Member Floats Immunity for Trump Justice Official*, WASH. EXAMINER (Feb. 3, 2022).......................................... 10
DOJ Office of Inspector General Press Release, *available at* https://tinyurl.com/2p9ad5tm s
John Solomon, *Georgia Opens Investigation Into Possible Illegal Ballot Harvesting in 2020 Election* (Jan. 4, 2022) ........................................... 28
Li Zhou, 147 *Republican Lawmakers Still Objected to the Election Results After the Capitol Attack: Congress Has Certified President-Elect Joe Biden as the Winner of the Election—But Some Republicans Still Objected*, Vox (Jan. 7, 2021) .............. 24
Matthew Boyle, *Exclusive—True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART (Aug. 4, 2021) ................................. 27
Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate*, BREITBART (Sept. 25, 2021) ................................................................ 27
Rep. Lofgren, YouTube, *available at* https://tinyurl.com/2n6cu36c ........... 10
*Rep. Raskin Challenges Awarding of Electors*, YOUTUBE (Jan. 8, 2017), *available at* https://tinyurl.com/wa6735ty (Jan 8, 2017) ............................ 23
Trailer, 2000 Mules, https://tinyurl.com/2p86dznj ................................. 28
Trump 2d Impeachment Trial, Day 2 Tr. (Feb. 10, 2021), *available at* https://tinyurl.com/ryd3ktzk .................................................................... 23
Zach Montellaro, *Wisconsin State Supreme Court Lets Ban on Drop Boxes Go Into Effect for Spring Election*, POLITICO (Feb. 11, 2022) ......................... 26

**INTRODUCTION**

The Motion to Compel should be denied and the subpoena quashed on three grounds: (1) Respondent Mr. Clark properly invoked his Fifth Amendment rights, *see infra* Section I; (2) the Bar's disciplinary authority does not extend to the preparation of privileged Executive Branch discussion drafts of letters never sent, *see infra* Section II; and (3) investigating and potentially punishing the preparation of confidential, non-public discussion drafts pertaining to a very contentious political dispute, at the behest of a highly partisan member of the opposite party in a rival branch of government, would embroil the Bar in matters far beyond its charter, and pervert the disciplinary process to purely political ends, *see infra* Section III. Oral argument is requested.

**STATEMENT OF FACTS**

**NATURE AND ORIGIN OF COMPLAINT FROM SENATOR DURBIN**

The Office of Disciplinary Counsel ("ODC") began its investigation of Respondent a week after receiving a letter from Senator Richard Durbin, Chairman of the Senate Judiciary Committee. Senator Durbin has no personal knowledge of the matters complained of. At least one other politically motivated complaint was filed by a collection of third-party detractors but was rightly rejected by ODC for lack of personal knowledge, which should similarly have been fatal to the Durbin complaint as well.

Senator Durbin, a partisan opponent of President Trump, here complains about a confidential and privileged discussion draft of a letter calling for more legislative investigation allegedly prepared by Respondent while he was a senior DOJ official about a matter of intense political controversy. The draft was reportedly the subject of vigorous internal privileged and confidential debate involving legal judgment, first among senior DOJ officials including Respondent, and later played out before the President himself and his most senior legal advisors at the White House and DOJ. After considering the letter, the President appears to have decided

against sending it, and so it was never sent. That was the end of the matter, at least until the phalanx of privileges attending the preparation and discussion of the draft—executive, law enforcement, and attorney-client—were all breached via anonymous leaks to the *New York Times*, and it became fodder for the lawfare element of the political witch hunt currently underway against Respondent.

The crux of the allegations are that Respondent made knowingly false statements of fact about possible election anomalies in the never-sent discussion draft of a letter calling for investigation. The allegations of "knowing falsity" rest on the dogged premise that there was no possible good-faith belief that there were any election irregularities sufficient to suggest a state legislature engage in further investigation. But premises do not equal truth; they are just the position of one side in an intense partisan political controversy that evenly divides Americans.

Being evenly balanced between the political parties, Senator Durbin's Senate Judiciary Committee could not issue subpoenas.[1] Senator Durbin's letter to the ODC consequently spoke only for himself, not the entire Committee. ODC has thus taken up a complaint from a single politically motivated member of one branch of government who is trying to weaponize the bar disciplinary process against a senior official (from a rival political party) at an Executive Branch department over a never-sent privileged and confidential discussion draft of a letter calling for more state legislative process. The complaint, the investigation, and any potential punishment are thus all directed not against conduct but against constitutionally protected thoughts and legal advice deemed contrary to the foundational premise upon which the allegations rest.

To proceed further, ODC would have to distinguish among (1) the true state of the facts; (2) individual perceptions of the facts; (3) opinions about the significance of the perceived facts;

---

[1] *See* Rule IX of the Rules of Procedure of the United States Senate, *available at* https://tinyurl.com/36uuee5f (last visited Feb. 15, 2022), a rule with constitutional imprimatur, U.S. Const., art. I, § 5 ("Each House may determine the Rules of its Proceedings ....").

and (4) legal, policy and prudential judgments about what ought to be done or not done in light of the perceived facts. At the time, there were intense controversies attached to each of these four tiers of inquiry. Those controversies still exist and will persist well into the future—just as they still do with respect to the *Bush v. Gore* controversy arising back in 2000.

## ODC's ACTIONS TO DATE

After docketing Senator Durbin's complaint on October 14, 2021, ODC made immediate resort to a subpoena, bypassing less invasive or aggressive methods of trying to gather information.

ODC's aggression out of the gate stumbled on a series of procedural faults along the way. A first letter purporting to transmit the subpoena to Respondent's former counsel dated October 18, 2021, the so-called "B letter," was never received. *See* Affidavit of Robert A. Driscoll, ¶¶ 4-11 (attached as Exhibit 1). A follow-up "D letter," premised on the lack of any response to the first letter and dated November 9, 2021 and purportedly sent to Respondent's former counsel, was also never received. *See generally* Driscoll Affidavit.

On November 22, 2021, Disciplinary Counsel, Mr. Fox, left a voice mail for Respondent's former counsel saying that no response had been received to either letter and that a motion to compel would be filed that day or early the next morning. *See id*. at ¶ 6. The former counsel, Mr. Driscoll, immediately returned the call and informed Mr. Fox that he had never received anything from him and that he no longer represented Mr. Clark. *See id*. at ¶ 7. Mr. Driscoll then double-checked all incoming email systems including filters and regular mail and confirmed that nothing had been received from Mr. Fox, and so informed Mr. Fox. *See id*. at ¶ 8-9.

Importantly, Mr. Fox never mentioned or discussed a subpoena with Mr. Driscoll, and Mr. Driscoll never made any agreement to accept service of the subpoena on behalf of the Respondent. Thereafter, Mr. Fox attempted to deliver a new "B letter" dated November 22, 2021 and subpoena directly to Respondent. This letter, however, was initially not received either.

Next, Respondent got Covid, and Mr. Fox very kindly accommodated his recovery. Mr. Fox and Respondent later began exchanging emails in which Mr. Fox attempted to deliver the letter and its exhibits via email. This too was beset with delivery problems. Some of the email exchanged between Respondent and Mr. Fox and his assistants was intercepted by each side's spam filters. Mr. Clark thus did not receive the full set of documents comprising the "B letter" and its attachments until January 6, 2022. *See* Aff. of Resp., ¶¶ 4-6 (attached as Exhibit 2).

Respondent agreed to and did respond to ODC's letter and subpoena on January 31, 2022. *See id.* at ¶ 6. But he never agreed to accept service of the subpoena via email.

The subpoena called for Respondent to either produce documents or appear at the Bar offices on the return date (which was never corrected by ODC to the agreed-on January 31, 2022 date) if documents were not to be produced. On Friday January 28, 2022, new counsel for Respondent spoke to Mr. Fox by telephone to say that Respondent would invoke the Fifth Amendment and would not be producing any documents, inquiring if Respondent nevertheless needed to appear. Mr. Fox replied, "no," but that if Mr. Clark claimed the Fifth Amendment against the production of documents, "I promise you I will ratchet up the discipline" and that a motion to compel would be rapidly filed. Mr. Fox followed up with an email at 8:30 PM that Friday evening reiterating that threat. *See* Harry MacDougald Aff. at ¶¶ 5-6 (attached as Exhibit 3).

On January 31, 2022, Mr. MacDougald (one of Mr. Clark's undersigned counsel) delivered to Mr. Fox two lengthy letters responding to the unserved subpoena. The shorter letter invoked, *inter alia*, Mr. Clark's Fifth Amendment privilege against self-incrimination as well as the act of production doctrine, and laid out in detail the basis for a well-founded fear of criminal prosecution and the overlap with a document subpoena issued by the January 6 House Select Committee. The letter thus requested a deferral under Board Rule 4.1, noted the defects in the subpoena's service,

highlighted separation of powers issues, and reserved all other rights, defenses, and objections. The longer letter asserted a series of substantive legal objections to the ODC proceeding with the investigation and attached the full set of letters to the January 6 Committee as exhibits.

Mr. Fox filed this Motion to Compel on February 3, 2022. There was no meet and confer (*see* Board Rule 2.9(a)) or other discussion about Respondents' objections. While the Motion recites that it was served with exhibits by regular mail and email on February 3, 2022, a remarkable series of clerical problems in ODC prevented delivery of the complete motion and exhibits from being accomplished until February 14, 2022. *See* Exhibit 3 ¶¶ 7-15.  When Mr. Fox was first informed of non-deliver, he quickly sent the Motion to Compel to undersigned counsel, informed us that the exhibits were documents we already had, and agreed that the response to his Motion could be filed on February 15, 2022, and a motion to that effect was filed in this Court. *Id*. at ¶ 10.

Mr. Fox produced certain correspondence with Senator Durbin and his staff dated October 14, 2021, which informed the Senator that his complaint had been docketed as an investigation rather than a charge, that the matter was confidential, and that he would automatically furnish the Senator with any response made by Mr. Clark. In his letters to Mr. Fox of January 31, 2022 in response to the subpoena, undersigned counsel vigorously objected to furnishing Mr. Clark's response to Senator Durbin on the grounds that it would breach the confidentiality of the proceedings, as Senator Durbin was not Respondent's client, and that in the supercharged political atmosphere surrounding the underlying issues, doing so would very likely result in a media leak of the information, further fueling the partisan furor raging against Mr. Clark.

Mr. Fox also produced "*Touhy* correspondence" with DOJ (*see* 28 C.F.R. § 16.21 *et seq.*), seeking access to former DOJ officials as witnesses. DOJ replied, agreeing to Mr. Fox's request. However, DOJ failed in multiple respects to comply with its own regulations governing such

matters, as we are just setting before DOJ today and thus which we do not further address here, pending a response by DOJ. Lastly, Mr. Fox also shared two additional *Touhy*-related documents with us on February 11, 2022.

## ARGUMENT

### PROCEDURAL BACKGROUND

#### A. Enforcement of Subpoenas

When conducting an investigation, Disciplinary Counsel may propound "written inquiries" with the explicit limitation that the investigation is subject to "constitutional limitations." D.C. Bar Rule XI, § 8(a). But no subpoena may include inquiries crossing over into the impermissible territory of litigation-like interrogatories. *See In re Artis*, 883 A.2d 85 (D.C. 2005). This Court frames disciplinary proceedings as "adversary, adjudicatory proceedings" related to property rights and which therefore are attended by due process protections. *See In re Benjamin*, 698 A.2d 434, 439 (D.C. 1997) (citing *In re Thorup*, 432 A.2d 1221, 1225 (D.C. 1981)).

Disciplinary Counsel may compel the attendance of witnesses and the production of pertinent books, papers, documents, etc., but only subject to D.C. Superior Court Rule 45. *See* D.C. Bar Rule XI, § 18(a). This Court may, "on proper application," enforce a subpoena. *See id.*, § 18(d).[2] Superior Court Rule 45(b)(1) prescribes the manner for service of subpoenas, requiring delivery to the person named by anyone over the age of 18 years who is not a party to the action and the tendering of certain fees if attendance is demanded (as it originally was in the alternative here). Rule 45(b)(3) requires the one serving the subpoena to certify proof of service showing the

---

[2] However, if there is a challenge to the subpoena, Bar Rule XI, § 18(c) contemplates a Board of Professional Responsibility's Hearing Committee to hear and determine the challenge. We did not bring such a challenge because ODC did not engage in the required meet and confer after we filed the January 31, 2022 letters. ODC simply proceeded immediately to this Court. Especially given the pendency of various investigations—and the ***interim*** nature of the report that Senator Durbin's staff prepared, we are at a loss to explain why ODC considers this matter to be exigent.

date and manner of service and the name of the person served.

Board Rules 3.14 through 3.16 also control subpoenas issued during an investigation, and they allow for Disciplinary Counsel to apply directly to this Court for enforcement. On February 3, 2022, Disciplinary Counsel chose to file a motion to enforce directly with this Court.

Pursuant to Superior Court Rule 45(c)(3)(A), as transplanted here, subpoenas may be quashed on timely motion if they require disclosure of privileged or protected matter not subject to exception or waiver, is unduly burdensome or fails to provide a reasonable time to comply; and under sub-rule (c)(3)(B)(i) if the subpoena requests "confidential research." Parties may also describe their objections, if substantiated, to a subpoena as "overbroad" or amounting to a "fishing expedition." *In re Confidential*, 701 A.2d 842, 842 (D.C. 1997). If there is an assertion of a privilege, etc., then under Superior Court Rule 45(d)(2), the claim must be expressly made.

### B.  Standard of Review

Since Disciplinary Counsel chose to seek enforcement of his subpoena directly with the Court of Appeals, any issues and objections must be decided here in the first instance and not on review. Since the subpoena enforcement involves questions of law, questions of fact, and mixed questions of law and fact, the Court should act in the same vein as a trial court, deciding questions of law and finding facts. *Cf. In re Public Defender Serv.*, 831 A.2d 890, 898-99 (D.C. 2003), which discussed the various roles in the context of a grand jury subpoena. This analysis applies here by analogy as well, especially given the assertion of constitutional and other privileges.

### C.  The Subpoena Was Improperly Served and Should Be Quashed.

The applicable procedure for service of subpoenas is very clear. Superior Court Rule 45(b)(1) requires that the subpoena be served by an adult who is not party to the action, coupled with certified proof of subpoena service and tendered fees (if attendance might be required). There is no certified proof of service by an adult here (and no fees tendered) because the subpoena was

not so served. Service was not waived, no testimony has been given, and objections were timely made, preserving all rights. *See In re Sealed Case*, 116 F.3d 550, 561-62 (D.C. Cir. 1997).

Thus, the service requirement has not been met. And where subpoenas are not properly served, they must be quashed. *See Hamer v. Eastern Credit Ass'n, Inc.*, 192 A.2d 127 (D.C. 1963); *see also Pulley v. United States*, 532 A.2d 651, 653 (D.C. 1987) (citing *CF&I Steel Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 713 F.2d 494 (9th Cir. 1983) (quashing subpoena for failure to tender fees)).

Further, since Superior Court Rule 45 is "virtually identical" to Fed. R. Civ. P. Rule 45, it is instructive to refer to the importance of maintaining the integrity of the service requirement. *See also FTC v. Compagnie De Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1312-13 (D.C. Cir. 1980), which underscored the point:

> By contrast, Federal Rule 45(c), governing subpoena service, does not permit any form of mail service, nor does it allow service of the subpoena merely by delivery to a witness' dwelling place. Thus, under the Federal Rules, compulsory process may be served upon an unwilling witness only in person. Even within the United States, and even upon a United States citizen, service by registered U.S. mail is never a valid means of delivering compulsory process ….

*See also id.* at 1307.

The Supreme Court has repeatedly emphasized the importance of service. *See, e.g., Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (even actual notice via fax of a file-stamped copy of a pleading was not valid service). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant …. Unless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 350-51.

## I.    THE FIFTH AMENDMENT BARS ENFORCEMENT OF THE SUBPOENA.

The Fifth Amendment privilege against self-incrimination:

not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but ***also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal***, where the answers might incriminate him in future criminal proceedings.

*Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (emphasis added).

### A. Mr. Clark Properly Invoked the Fifth Amendment.

In the District, it has long been settled that a court evaluating a Fifth Amendment claim should not speculate about whether criminal prosecution is "likely" but should instead limit its inquiry to whether criminal prosecution is "possible." *Carter v. United States*, 684 A.2d 331, 334-35, 338 (D.C. 1996) (en banc). The *Carter* decision overruled a line of cases requiring courts to assess the probability of prosecution before upholding Fifth Amendment privilege.

Moreover, the Fifth Amendment is to be "liberally construed" and thus is not limited to situations where the compelled disclosures themselves would be incriminating. It is sufficient if the disclosure could possibly supply a "link in the chain" leading to prosecution. *Wilson v. United States*, 558 A.2d 1135, 1141 (D.C. 1989), *overruled on other grounds by Carter*, 684 A.2d 331 (D.C. 1996) (en banc). In a foundational case, the United States Supreme Court described this concept as follows: "A question which might appear at first sight a very innocent one might, by affording a link in a chain of evidence, become the means of bringing home an offense to the party answering." *Mason v. United States*, 244 U.S. 362, 364-66 (1917) (citing 1861 English decision).

Although the Fifth Amendment must normally be asserted on a question-by-question basis, this Court recognizes that the combination of the "possible prosecution" standard and the "link in the chain" doctrine can easily render entire areas of testimony privileged. *See, e.g., Butler v. United States*, 890 A.2d 181, 188 (D.C. 2006) (granting a witness blanket immunity was procedurally flawed but harmless since it was "obvious that *any* testimony" would be incriminating) (italics in original); *Johnson v. United States*, 746 A.2d 349, 356 (D.C. 2000) (same).

ODC's investigation of Mr. Clark presents an obvious Fifth Amendment case. The letter from Senator Durbin that triggered this investigation itself states that "Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against counseling a client to engage, or assisting a client, in conduct **the lawyer knows is criminal or fraudulent**." Exhibit 4 at 2 (internal quotations and brackets omitted) (emphasis added). This allegation of criminal conduct in the triggering complaint, standing alone, is sufficient to justify Mr. Clark's Fifth Amendment invocation. If further reinforcement is needed, Mr. Clark's letter in response to this subpoena detailed many examples of lawyers implicitly or explicitly calling for Mr. Clark's criminal prosecution based on his service in the Justice Department. *See* Exhibit C to Motion to Enforce at 6-8. Notably, the January 6 Select Committee appears to have accepted Mr. Clark's invocation of the Fifth Amendment as to the same subject matter and has publicly pivoted to the topic of whether to grant him immunity.[3]

In contesting the validity of Mr. Clark's Fifth Amendment invocation, Disciplinary Counsel first argues that the Office of Disciplinary Counsel itself cannot charge crimes. Motion at 7. As quoted above, however, the Supreme Court has long held that the Fifth Amendment applies outside of the strictly criminal context, if the disclosures "might incriminate in [] future criminal proceedings." *Lefkowitz*, 414 U.S. at 77. And most importantly, this Court has held repeatedly that Fifth Amendment protection applies in Disciplinary Counsel cases. *See, e.g., In re Artis*, 883 A.2d 85, 103 (D.C. 2005); *In re Burton*, 472 A.2d 831, 845-46 (D.C. 1984).

Disciplinary Counsel then argues that Mr. Clark has not asserted he is "even the subject, much less the target, of any criminal investigation." Motion at 7. Putting aside the obvious point

---

[3] *See, e.g.,* Daniel Chaitin, *Jan. 6 Committee Member Floats Immunity for Trump Justice Official*, WASH. EXAMINER (Feb. 3, 2022), *available at* https://tinyurl.com/bdemy976, (last visited Feb. 15, 2022); https://tinyurl.com/2n6cu36c (Rep. Lofgren, YouTube video) (last visited Feb. 15, 2022).

the criminal investigations are often confidential, no Court has ever held that Fifth Amendment protection is only available to persons known to be under active criminal investigation. Disciplinary counsel cites no cases in support of this argument.

Next, Disciplinary Counsel argues that Mr. Clark has not "specif[ied] what criminal charges [he] might realistically be subject to." *Id.* This argument is unavailing for two reasons. *First*, Mr. Clark has no burden to show that he "might realistically be subject to" criminal prosecution. This standard for Fifth Amendment protection was explicitly rejected by this Court *en banc* in *Carter*, cited above. *Second*, this Court has never required individuals seeking Fifth Amendment protection to identify specific criminal statutes. Disciplinary Counsel cites no case imposing this requirement. In any event, in his counsel's letter to Disciplinary Counsel, Mr. Clark cited an editorial by several prominent law professors that did identify several specific statutes the authors contended could serve as a basis for criminal investigation of former President Trump and "members of his inner circle." Motion, Exhibit 3 at 8 (collected list of statutes below):

> Obstruction of an Official Proceeding (18 U.S.C. § 1512); Conspiracy to Defraud the Government (18 U.S.C § 371); Voter Fraud for Pressuring State Officials Not to Certify the Election (52 U.S.C. § 20511); the Hatch Act (5 U.S.C. § 7323); the Racketeer Influenced and Corrupt Organizations Act (RICO, 18 U.S.C. § 1962(c)); Insurrection (18 U.S.C. § 2383); and Seditious Conspiracy (18 U.S.C. § 2384).

**B. Disciplinary Counsel's Subpoena Amounts to an Improper Set of Interrogatories and Thus It Is Not Even Necessary to Reach the Act of Production Doctrine.**

Disciplinary Counsel also disputes Mr. Clark's invocation of the Fifth Amendment "act of production" privilege. But Disciplinary Counsel's arguments in that vein fail because ODC's subpoena is plainly more than a simple demand for documents.

To be sure, the Fifth Amendment privilege does not ordinarily apply to "pre-existing, voluntarily prepared documents." *Fisher v. United States*, 425 U.S. 391, 408-09 (1976). However, when a given request goes in any way beyond mere production of pre-existing documents, the

Fifth Amendment bar arises. *See*, *e.g., United States v. John Does*, 465 U.S. 605, 610-15 (1984) (compelled oral or written testimony that restates the contents of documents would be privileged).

In *In re Artis*, this Court considered a case where Disciplinary Counsel had issued "interrogatory-like questions" to respondent. 888 A.2d 85 (D.C. 2005). This Court affirmed the respondent's right to assert his Fifth Amendment privilege and did not order the respondent to answer Disciplinary Counsel's "interrogatory-like questions." *Id*. at 99, 101 & n.13.

Here, Disciplinary Counsel incorrectly claims that its subpoena merely seeks "five categories of documents." Motion at 11-12. To the contrary, the subpoena seeks much more than that and is in fact directly analogous to the "interrogatory-like questions" (*i.e.*, those inherently forcing respondent admissions) at issue in *In re Artis.* The emphasized portions of the following subpoena requests make clear that more than simple production of documents is demanded:

- Produce all documents and records … ***of which you were aware*** before January 4, 2021, ***that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state***;

- ***Identify the source*** ***of any document (including contact information for any persons bringing the document to your attention, how it came to your attention, and the date it came to your attention;***

- ***Specify what information*** ***of election fraud came to your attention*** following the announcement of Attorney General Barr on December 1, 2020 that the Department found no evidence of fraud on a scale that could have affected the results of the presidential election;

- Produce any file or collection of materials or correspondence, written or electronic, ***relating to any efforts that you made between the November 3, 2020 presidential election and January 4, 2021***, that relate in any way to any ***efforts you made to persuade*** officials of the United States Department of Justice to intervene in the certification by any state;

- ***Provide the results*** of any legal research ***that you conducted, had conducted, or received before January 4, 2021*** … [t]his information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [*sic*] and Natural Resources Division to investigate allegations of election fraud;

- Provide all written policies and guidelines of the Department of Justice, *of which **you were aware*** and that were in effect between November 3, 2020 and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President;

The emphasized portions of the foregoing list of demands make clear that the subpoena does not simply request "categories of documents." It requires Mr. Clark to make substantive assertions or concessions about such things as: (1) when he became aware of certain documents; (2) how and by whom the documents came to his attention; (3) the relationship between the documents and his "efforts"; (4) the "results" of his legal research and when he conducted it; and (5) which policies he was "aware [of] that were in effect" at certain times. These requests go far beyond the type of "preexisting documents" that fall outside the scope of the Fifth AmendmentThe requests demand substantive admissions from Mr. Clark about facts relating to his *mens rea* and that could obviously be used as a "link in the chain" of some future criminal case. And even if there are *no* responsive documents to a given request, this answer itself could be used as an admission to incriminate Mr. Clark. It is therefore not necessary even to engage in an "act of production" analysis to sustain Mr. Clark's Fifth Amendment invocation.

### C.  Even to the Extent It Is Implicated Here, Mr. Clark Has a Strong and Valid Basis to Claim the Act of Production Privilege.

However, to the extent this Court decides the Fifth Amendment act of production doctrine is implicated here, District law clearly supports Mr. Clark's ability to assert this privilege in response to the subpoena. In *In re Public Defender Service*, this Court held as follows:

> A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect. That is, by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic.
>
> ***
>
> Even where the contents of a subpoenaed document may be incriminating, the act of production privilege is not automatic. The act of production privilege does not apply if the existence and authenticity of a document is a foregone conclusion as

> would be the case if the act of production adds little or nothing to the sum total of the Government's information.

831 A.2d 890, 912 (D.C. 2003) (internal quotations and citations omitted).

Instead of attempting to meet *In re Public Defender Service's* "foregone conclusion" standard, Disciplinary Counsel argues that Mr. Clark has not shown that responding to the subpoena will conclusively prove him guilty of a crime:

> This is far removed from the situation in *Hubble*, where a criminal defendant was required to produce to the grand jury personal financial records **which established his income tax evasion**, or in Public Defender Service, where a grand jury subpoena, if complied with, **might have linked the defendant to a coerced witness statement**.

Motion at 13 (emphasis added). However, there is no requirement that Mr. Clark demonstrate that responding to the subpoena will conclusively prove him guilty of a criminal act. *Ohio v. Reiner*, 532 U.S. 17, 18 (2001) (Fifth Amendment "protects the innocent as well as the guilty"); *see also In re Artis*, 883 A.2d at 99 (noting Board's conclusion, which was affirmed in relevant part, that respondents "should not be obligated to respond to vague and overly broad questions that require him or her to make Bar Counsel's case"). It is sufficient if the subpoena response could furnish a "link in the chain" of possible prosecution, even if meritless. Mr. Clark has met that standard.

## II. THE SUBPOENA SHOULD BE QUASHED BECAUSE THE CHALLENGED CONDUCT IS NOT SUBJECT TO BAR DISCIPLINE.

In the grand jury context, this Court has held that a subpoena must have a "legitimate purpose." *Brooks v. United States*, 448 A.2d 253, 261 (D.C. 1982). *See also In re Horowitz*, 482 F.2d 72, 80 (2d. Cir. 1973) (documents that have "no conceivable relevance" to legitimate object of grand jury investigation need not be produced); *In re Rabbinical Seminary Netzach Israel Ramailis*, 450 F. Supp. 1078, 1084 (E.D.N.Y. 1978) ("The documents requested must be shown to have some general relevance to the subject matter of a legitimate grand jury investigation.").

The same rationale of these grand jury cases applies in the bar discipline context. As

explained below, ODC's subpoena should be quashed because it has no reasonable relation to a legitimate area of bar discipline enforcement.

### A. 28 USC § 530B(a) Does Not Confer on the D.C. Bar Unfettered Authority to Investigate or Regulate the Discretionary Actions of DOJ Lawyers.

Under the U.S. Constitution, the President of the United States, not the Attorney General is its chief law enforcement officer. *See* U.S. Const., art. II, § 3 (the President "shall take Care that the Laws be faithfully executed …."). It is therefore far from obvious that state and local bar authorities can always wield disciplinary jurisdiction over lawyers authorized by virtue of their appointments pursuant to Article II, to exercise executive authority and advise the President, as that could hamper the President's ability to obtain legal advice.

In keeping with the President's authority and right to receive full and frank advice and information, senior federal officers have a reciprocal duty to provide it upon request. *See* U.S. Const., art. II, § 2, cl. 1 (Opinion Clause); 28 U.S.C. § 506 (Assistant Attorney Generals, like Mr. Clark, to be appointed by President with advice and consent of Senate); OLC Opinion, *State Bar Disciplinary Rules as Applied to Federal Government Attorneys* (Aug. 2, 1985) ("Rules promulgated by state courts or bar associations that are inconsistent with the requirements or exigencies of federal service may violate the Supremacy Clause."), *available at* https://tinyurl.com/56bft7sb, *last visited* (Feb. 15, 2022) (hereafter "OLC Opinion").

Where, as here, the face of Disciplinary Counsel's interrogatories show that they seek access to information that ODC has no authority to seek or review, the Court need not reach the constitutional arguments in order to quash the subpoena. We nevertheless reserve them.[4]

---

[4] *See Bond v. United States*, 572 U.S. 844, 855 (2014) ("well-established principle governing the prudent exercise of this Court's jurisdiction [is] that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

That is because even beyond the Fifth Amendment as applied here, there is a more than sufficient basis on which to deny enforcement of the subpoena. For the statute Congress passed purporting to subject Justice Department lawyers to state and local bar rules, 28 U.S.C. § 530B(a), does not authorize *any inquiry* into the internal policy deliberations of the Department of Justice or of any other agency of the federal government that employs lawyers. Nor does the statute, by its terms, authorize the D.C. Bar to oversee the enforcement of internal DOJ and Executive Branch policies governing the conduct of their respective internal operations. *See* 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to *State* laws and rules, and local Federal court rules, governing attorneys in each *State* where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that *State*.") (emphasis added). Relatedly, in 1999 DOJ improperly purported *to extend* the reach of Section 530B(a), by regulation issued under Section 530(B)(b), to the District of Columbia. *See* 28 C.F.R. § 77.2(h).[5]

---

[5] The relevant preamble (hastily assembled via an *interim* final rule) does not even address how the Justice Department could try, via its subordinated rulemaking powers, to extend the statute to the District of Columbia when the statute does not mention the District. The preamble cites to 28 U.S.C. §§ 509, 510, 515(a), 516, 517, 519, 533, and 547. *See* 64 Fed. Reg. 19,273, 19274 (Apr. 20, 1999). But none of these statutes even reference the District of Columbia specifically. And these provisions say nothing about the power of D.C. Bar authorities to sit in oversight of the discretionary actions of Justice Department lawyers. The 1999 rule is thus invalid under step one of the *Chevron* test, which voids regulatory interpretations of any statute that conflict with the statute's plain text, interpreted using "traditional tools of statutory construction." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984). And the canon of interpreting statutes as part of the *corpus juris* (the whole body of the law) is no doubt such a traditional tool of statutory interpretation. *See, e.g., Branch v. Smith*, 538 U.S. 254, 282 (2003) ("courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes."). The plain text is violated here because D.C. is not a "State," *see infra.*

The preamble also mentions (1) Pub. L. 96-132, 93 Stat. 1040, 1044 (1979); and (2) Pub. L. 105-277 (1998), section 102 of the Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act. But both of these provisions are appropriations law limited to one-off fiscal years; they lack general effect. Moreover, the former provision predates Section 530B(a) and the latter provision is silent on 530B(a) and thus cannot be read to amend it. Finally,

All lawyers who practice before this Court and in the federal courts of the District of Columbia are, by statute, subject to the authority of each court to control the conduct of the attorneys who appear there. Significantly, there is an established, but limited, procedure for doing so. *See, e.g.*, D.C. Code § 11-944(a) (contempt for "disobedience of an order or for contempt committed in the presence of the court"); 28 U.S.C. § 1927 (counsel's liability for excessive costs); *see also generally* D.C. Code § 23-1330 (preserving contempt power). The D.C. Bar, by contrast, has no general investigatory authority over the ethics of Department of Justice lawyers. The Constitution reserves that power to the Executive Branch.

Section 530B(a) reflects this division of authority. The District of Columbia is not a "State." All law in the District is federal law and Congress alone defines the nature, scope, and means of enforcement of all federal powers exercised here, including that of the D.C. Bar. U.S. Const., art. I, § 8, cl. 17 ("Seat of the Government"). Specific language is ordinarily required to treat the District as if it were a State. *See, e.g., District of Columbia v. Carter*, 409 U.S. 418, 432-33 (1973) (D.C. not a State for purposes of 42 U.S.C. § 1983). The United States Code is replete with examples where Congress has ***specifically defined*** D.C. to fall within the meaning of the term "State," but only for purposes of that particular statute.[6] Indeed, by contrast, Chapter 31 of part II of title 28 of the United States Code lacks any specialized definition section. Congress thus knows

---

the fact that the statutes DOJ cited to extend Section 530B(a) to District of Columbia Bar rules point to two specific appropriations statutes mentioning the District shows that not even the DOJ of 1999 thought that it would be plausible to argue that D.C. Bar's rules were "local Federal court rules" within the meaning of Section 530B(a) or the preamble would have made that argument.

[6] *See, e.g.*, 28 U.S.C. § 1257(b) ("For the purposes of this section, the term 'highest court of a State' includes the District of Columbia Court of Appeals."); 42 U.S.C. § 8285a(2) ("the term 'State' means any of the several States, the District of Columbia …"); *see also, e.g.*, 26 U.S.C. § 170(c)(1) (applying term "charitable contribution" for tax purposes to include gifts for the use of "States, a possession of the United States … or the United States or the District of Columbia");. And Supreme Court Rule 47 states that "[t]he term "state court," when used in these Rules, includes the District of Columbia Court of Appeals."

how to confer power on District authorities when it wants to. And it expressly withheld it here.

And for good reason. The conduct that Disciplinary Counsel seeks to investigate is not behavior committed in the presence of a court and found by it to have violated its rules of conduct. Mr. Clark was a senior Executive Branch official who served as the head of two of Main Justice's seven litigating divisions, each with nationwide jurisdiction. His client was the Executive Branch, and the power to define the nature and scope of his duties to that client and its member departments and agencies, and to investigate alleged violations of DOJ and other federal rules of lawyer conduct, rest in the first instance with the Executive Branch alone. The same holds true for allegations that an attorney employed by the federal government has violated federal law.

To be clear, this does not mean that Mr. Clark is free of all ethical obligations here. DOJ houses both an Office of Professional Responsibility and an Office of Inspector General ("OIG"). The OIG is investigating the matters Senator Durbin's complaint involves. *See* DOJ Office of Inspector General, *available at* https://tinyurl.com/2p9ad5tm (Jan 25, 2021) (last visited Feb. 15, 2022). That ODC seeks, through this subpoena, to jump ahead of that investigation and, in effect, preempt it (rather than *vice versa*) is clear from ODC's refusal to defer under Board Rule 4.1 until federal authorities with authority over DOJ officials complete their respective investigations.

ODC's rush to assert disciplinary jurisdiction in this case is a clear indication that its investigation is intended to thrust itself into the administration of the federal Executive Branch and to use its subpoena power for partisan purposes. Senator Durbin has no direct knowledge of the facts, and only the Department of Justice knows what information it holds concerning how and to what extent it investigated the 2020 election. It is undisputed that DOJ has denied the Senate Judiciary Committee access to DOJ's investigative records. *See* Exhibit 5 (Letter, ADAG Weinsheimer to Mr. Clark (July 26, 2021)). It is also likely that it will object if Mr. Clark seeks

these records to defend against the allegations of misconduct made by Senator Durbin.

Senator Durbin thus turned to ODC, in the hope that it would lend its subpoena power to the effort to advance the political narrative of his investigation. This Court should reject that end run around the limits on the Senate Judiciary Committee's party balance and quash the subpoena.

**B. Under 28 U.S.C. § 530B and 28 C.F.R. § 77.2, the Bar Has No Jurisdiction Over Respondent Because It Does Not "Ordinarily Apply" Discipline to the Particular Conduct in Question.**

Even if the foregoing jurisdictional hurdle were overcome, 28 U.S.C. § 530B extends state bar disciplinary jurisdiction over federal government lawyers only "to the same extent and in the same manner as other attorneys in that State." Similarly, the regulation subjecting lawyers working for the federal government to local bar disciplinary processes, 28 C.F.R. § 77.2(j)(2) (emphasis added), contains an important exception: it does not apply if the local jurisdiction "would not *ordinarily* apply its rules of ethical conduct to particular conduct or activity by the attorney."

Neither the D.C. Bar, nor any bar in America, "ordinarily" disciplines lawyers over never-sent confidential internal discussions of letters drafted for assessment and consideration. It is unheard of. And neither Mr. Fox nor undersigned counsel have been able to identify any such case anywhere. This alone should be fatal to the Bar's jurisdiction in this case.

**C. There Is No Precedent for Disciplining a Lawyer Over a Never-Sent Discussion Draft of a Document Calling for State Investigation.**

D.C. Rules of Professional Conduct (hereafter "RPC") 8.4(c) prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." The people to whom the draft letter was allegedly delivered, and whose signature would be required thereon, were the Acting Attorney General Jeff Rosen and the Principal Associate Deputy Attorney General Richard Donoghue. They are not minors or seniors with diminished capacity who might easily be misled. They are instead seasoned lawyers who make no claim of having been deceived and no doubt understood the draft letter to

19

be a proposal contingent on facts they were in superior possession of. Instead, they are reported to have vehemently rejected the draft letter, and to have persuaded the President to reject it as well.

Of the species of misconduct prohibited by RPC 8.4(c), dishonesty sometimes appears the most broadly construed. *In the Matter of Shorter*, 570 A.2d 760, 767–68 (D.C. 1990), the lawyer answered questions posed by the IRS honestly, but only answered the questions asked and did not volunteer information not asked for that he knew they would want to know. Though not "legally … characterized as an act of fraud, deceit or misrepresentation," the conduct showed "a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness." And in *In re Romansky*, 825 A.2d 311, 315–17 (D.C. 2003)*,* the lawyer instructed an associate to record time to a client other than the one for whom the work was actually done. Though it was an internal accounting matter that did not operate to the financial detriment of either client, it was held to be dishonest because it simply was not true. But the conduct challenged in this case falls far short of even the highwater marks of RPC 8.4(c)'s reach as reflected in *Shorter* and *Romansky*.

In this case, a privileged and confidential draft of a letter appears to have been discussed amongst strong-willed senior officials who had diverging access to facts, diverging views of the facts, diverging views of the facts' significance, and diverging views of what ought to be done. There appears to have been a frank exchange of views on each of these areas of disagreement—as the rules of privilege and confidentiality are meant to protect and indeed foster. The matter was presented to the ultimate decision maker, President Trump, and after hearing differing views, he decided against the letter, and that was the end of the matter. RPC 8.4(c) thus has no application, and, to the knowledge of the undersigned, has never applied to anything like this situation.

### D.  Rule 8.4(d) Does Not Apply.

In *In re Yelverton*, 105 A.3d 413, 426 (D.C. 2014), this Court held that "[c]onduct violates RPC 8.4(d) when it is (1) improper, (2) bears directly on the judicial process with respect to an

identifiable case or tribunal, ***and*** (3) harms the judicial process in a more than a de minimis way." (emphasis added). And *In re Pearson* is to the same effect, stating the third element in slightly different verbiage to require the conduct to "taint[s] the judicial process in more than a *de minimis* way'" 228 A.3d 417,426 (D.C. 2020), *citing In re Hopkins,* 677 A.2d 55, 59–61 (D.C. 1996)*.*

Not one of these three essential elements is remotely established by what is alleged here. *First*, confidential and privileged internal deliberations and debates over legal theories and arguments are not improper. *Second*, there is no identifiable case or tribunal because the entire discussion appears to have been internal and confidential, and no document was ever filed in any court or tribunal anywhere. *Third*, no judicial process was harmed because nothing was ever filed in any court or tribunal anywhere. RPC 8.4(d) simply does not apply to the conduct in question.

The application of Bar discipline, at the behest of a bitter political adversary of the former President, to a confidential discussion draft of a letter never sent, which simply called for more state legislative investigation, is unprecedented, unfounded, and improper. One must ask why this docket was opened and whether political influence was at play.

## III.   THE POLITICAL PANDORA'S BOX HERE SHOULD NOT BE OPENED.

It should be self-evident that a bar disciplinary process may not be appropriately used as an instrumentality of partisan political warfare. The country is sharply divided over the propriety of the 2020 election. Investigations into and litigation over the conduct of the election rage across many States around the country, with notable decisions finding irregularities and illegality. Absent affirmative misconduct in a particular case or before a particular tribunal, the Bar should not join the victors on the battlefield in the grisly business of dispatching the wounded, especially in a case such as this. Among the many evils that would ensue, the Bar's neutrality would suffer gravely. Presidential Administrations change hands and weeding out frivolous complaints protects the Bar.

**A. Legislators in Georgia and Other States Called for Legislative Reexaminations of Their Electoral Votes.**

In Georgia, a Committee of the State Senate held hearings on election irregularities and found that "[t]he oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified."[7] The Report recommended, *inter alia*, calling a special session of the legislature to consider whether to rescind the certification of Georgia' electors and determine the "proper Electors" for the State of Georgia. *Id*. at p. 15. Other States acted similarly.

**B. Under Disciplinary Counsel's Unrestrained Theory, a Host of Members of Congress Who Are Lawyers Committed Ethical Violations by Questioning the Election.**

Numerous members of Congress over the years, especially on one side of the political divide, have questioned presidential election results. Indeed, the Chair of the House January 6 Select Committee, Bennie Thompson, objected to the certification of the 2000 and 2004 presidential elections.[8] And his fellow January 6 Committee member, Jaime Raskin—both a lawyer and constitutional law professor—objected to certification during the 2016 presidential election. *See Rep. Raskin Challenges Awarding of Electors*, YOUTUBE, *available at* https://tinyurl.com/wa6735ty (Jan 8, 2017) (last visited Feb. 15, 2022). Indeed, Senator Durbin, the sole complainant here, defended Senator Boxer's right to object to certification of the 2004

---

[7] Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee, *available at* https://tinyurl.com/3dzkfmxf (Dec. 17, 2020) (last visited Feb. 15, 2022).

[8] The Congressional Black Caucus objected to the certification of Florida's electoral votes. *See* 147 Cong. Rec. H34 (Jan. 6, 2001). Representative Thompson is a member of that caucus *See also* 151 Cong. Rec. H127 (Jan. 6, 2005).

election, assuming her good faith, even though he opted not to object himself.[9] No leaked, purported facts show Mr. Clark to have done anything other than raise questions inside DOJ and at the White House about the 2020 presidential election's regularity in particular States and counties. *See, e.g.* Trump 2d Impeachment Trial, Day 2 Tr. (Feb. 10, 2021), *available at* https://tinyurl.com/ryd3ktzk (last visited Feb. 15, 2022) (impeachment manager stating that President Trump "turned to Jeffrey Clark, another Department lawyer, who had allegedly expressed support for using the Department of Justice to investigate the election results," going on to say Acting Attorney General Rosen "refuse[d] to reopen investigations"). That is a debatable, internal DOJ decision as to how much or little to investigate, not a disciplinary matter.

Indeed, just as Senator Durbin did with Senator Boxer, Mr. Clark's good faith should be presumed, even if his DOJ superiors and colleagues disagreed with him on the merits, just as every other Senator in 2004 disagreed with Senator Boxer, who stood as the sole Senator challenging the Bush v. Kerry election. Objections and a desire to further investigate the results of presidential elections are simply not the stuff of proper bar complaints, especially not by politically motivated complainants like Senator Durbin, who have no personal knowledge of the underlying conduct.

In this past presidential election, 147 members of the House and Senate (***including 8 Senators*** (*i.e.,* 7 more than in the 2004 election where Senator Durbin defended Senator Boxer's right to object) plus 139 House members) objected to certifying Arizona's or Pennsylvania's

---

[9] *See* Amanda Prestigiacomo, *Democrats Objected to Electoral Vote Certification in 2000, 2004, 2016,* DAILY WIRE (Jan. 4, 2021) ("'Some may criticize our colleague from California for bringing us here for this brief debate,' Durbin said on the Senate floor following Boxer's objection, while noting that he would vote to certify the Ohio electoral votes for Bush. 'I thank her for doing that because it gives members an opportunity once again on a bipartisan basis to look at a challenge that we face not just in the last election in one State but in many States.'"), *available at* https://tinyurl.com/yjyw7x83 (last visited Feb. 15, 2022).

electoral votes.[10] And 35 of those members are lawyers (two of whom are former Supreme Court clerks, Senators Cruz and Hawley, who once were Texas Solicitor General and Missouri Attorney General, respectively). Are those nearly three dozen lawyer-legislators to be subjected to bar discipline in their respective States or in D.C., where they typically made media statements, on the theory that they were lying when they appeared on TV to demand more investigation or make factual claims? That is unthinkable and would plunge this or any state or local bar deep into purely political waters, taking it far afield from its traditional compass. No bar, including this one, is equipped to retry the presidential election and the privileged options debated inside the Executive Branch or with the President himself in the wake of a truly unique election where standard voting rules were jettisoned or changed in the wake of the COVID pandemic. *See* Letter, H. MacDougald to Chair Thompson (Nov. 5, 2021) (attached as Exhibit 6) (by attaching this letter, the executive privilege, deliberative process privilege, and attorney-client privilege arguments are incorporated).

### C. Leaked Media Reports of Mr. Clark's Conduct Reflect That He Held Views Generally Consistent with Those of Three Dissenting Supreme Court Justices and 18 State Attorneys General.

The Court should terminate this matter and preclude the Bar from re-litigating the 2020 election by holding there is no colorable discipline case where three Supreme Court Justices and 18 State Attorneys General raised similar questions about the 2020 election's regularity.

Most important in that regard is *Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732 (2021). There, Justice Thomas dissented from the denial of certiorari because non-legislative state officials had changed the statutory rules for federal elections and the appointment of presidential electors in violation of the Electors and Elections Clauses of the Constitution. *See* U.S. Const., art. 1, § 4, cl. 1; art. II, § 1, cl. 2. Justice Alito wrote a separate dissent joined by

---

[10] See Li Zhou, 147 *Republican Lawmakers Still Objected to the Election Results After the Capitol Attack*, Vox (Jan. 7, 2021), *available as* https://tinyurl.com/4v6w229c (last visited Feb. 15, 2022).

Justice Gorsuch to flag the same infirmity. Both dissents noted the public importance of resolving the questions presented. If three Justices of the Supreme Court took this view and Mr. Clark is alleged to have advanced similar views, bar discipline should be out of the question.

Also relevant, Justices Thomas and Alito dissented in *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020), a 2020 election challenge filed by Texas (and later joined by 17 other States) that complained about similar unconstitutional election-rule changes made in the so-called battleground States. They would have allowed Texas's bill of complaint to be filed, potentially putting the merits of the election challenge before the Supreme Court. And those two Justices, whatever the Court's view of their jurisprudence, surely did not act unethically in the *Texas* case. Mr. Clark was also entitled to presume, if that is what he did, that 18 State Attorneys General were presenting good-faith objections and for that reason to press for the President and DOJ to agree with the position of the State Attorneys General as well. In other words, this Court should not start down Disciplinary Counsel's slippery slope lest it find itself necessarily implying that three Supreme Court Justices and 18 State Attorneys General were all acting beyond the pale of legitimate legal debate, the judicial canons, and the Model Code of Professional Responsibility.

This Court should deny enforcement of the subpoena and act now to register its disapproval of this witch hunt. Doing so would send a strong signal that this Court will not allow the bar discipline process to be perverted for political ends, or to become a tool of persecution, inflicting significant legal costs on a former official like Mr. Clark and chilling the public service of those on either side of the aisle who must come to D.C. to serve varying presidential administrations.

### D. The View That Unlawful Election Procedures Were Used in at Least Some States Has Been Vindicated in Several Respects.

The dogmatic premise of Senator Durbin's complaint that there were no significant irregularities in the 2020 election, accepted by ODC as sufficient to docket this case, has been

refuted by subsequent judicial decisions. In *McLinko v. Commonwealth of Pennsylvania*, *et al.*, No. 244 M.D. 2021, 2022 WL 257659 (Pa. Commw. Ct. Jan. 28, 2022), the Commonwealth Court of Pennsylvania held that Pennsylvania's Act 77, allowance of universal mail-in balloting in Pennsylvania in the 2020 election, was unconstitutional under the Pennsylvania Constitution's strict limitations on absentee balloting. Approximately 2.6 million absentee ballots were thus cast by means held unconstitutional by a Pennsylvania court, well in excess of the margin of Biden victory.[11] *McLinko* thus bears out the views of Justices Thomas, Alito, and Gorsuch.

The Wisconsin Supreme Court, in a 4-3 ruling in *Trump v. Biden*, 394 Wis. 2d 629, 951 N.W.2d 568 *cert. denied*, 141 S. Ct. 1387 (2021), declined to consider whether drop boxes were illegal under Wisconsin law. The three dissenters, all writing separately but all joining the other dissents, concluded in exceptionally strong terms that the drop box procedures in the 2020 election, used by "hundreds of thousands of voters," were clearly illegal, also exceeding the margin of victory. And on January 14, 2022, a Wisconsin trial court ruled that drop boxes ***were illegal*** under Wisconsin law, in apparent accord with the views of the dissenters in *Trump v. Biden*.[12] Of course, the Judges taking ***either position*** were not acting unethically. Being on the losing side in a controversy, internal or external (but especially internal), does not equate to unethical conduct.

Additionally, a post-election audit of the 2020 election in Maricopa County, Arizona conducted by the Arizona Senate found, *inter alia*. substantial defects in signature verification, including the presence of 17,322 duplicates (alone exceeding the margin of victory), and

---

[11] *See* https://tinyurl.com/2p8u55cn (last visited Feb. 15, 2022)

[12] Moreover, on Friday, February 11, 2022, the Wisconsin Supreme Court reportedly voted 4-3 the other way to allow a trial court order banning drop boxes to remain in effect for an April 2022 local election. *See* Zach Montellaro, *Wisconsin State Supreme Court Lets Ban on Drop Boxes Go Into Effect for Spring Election*, POLITICO (Feb. 11, 2022), *available at* https://tinyurl.com/y32cy8xc (last visited Feb. 15, 2022).

intentional and substantial spoliation of digital records on the voting equipment shortly before it was delivered for forensic examination.[13]

While not yet the subject of a judicial decision on the merits, evidence has emerged of a vast scheme to violate Georgia's law against ballot harvesting, O.C.G.A. § 21-2-385(a), which was in effect for the 2020 election. That statute permits only near relatives or cohabitants to mail or deliver absentee ballots. Strong evidence has emerged since 2020 proving this limitation was violated on a large-scale basis in Georgia and other battleground States with similar laws.

An election integrity group, "True the Vote," has collected cell phone location data in key election hotspots around the country including Georgia, Arizona, Wisconsin, Pennsylvania, and Michigan. *See* Matthew Boyle, *Exclusive—True The Vote Conducting Massive Clandestine Voter Fraud Investigation*, BREITBART, *available at* https://tinyurl.com/3bwujuxv (Aug. 4, 2021) (last visited Feb. 15, 2022). "[True the Vote's] document says that [it] has spent the last several months since late last year collecting more than 27 terabytes of geospatial and temporal data—a total of 10 trillion cell phone pings—between Oct. 1 and Nov. 6 in targeted areas in Georgia, Arizona, Michigan, Wisconsin, Pennsylvania, and Texas. The data includes geofenced points of interest like ballot dropbox locations, as well as UPS stores and select government, commercial, and non-governmental organization (NGO) facilities." *Id.*

As a result of a complaint by True the Vote, the Georgia Secretary of State's Office is now investigating the ballot harvesting scheme in Georgia. *See* John Solomon, *Georgia Opens Investigation Into Possible Illegal Ballot Harvesting in 2020 Election* (Jan. 4, 2022), *available at*

---

[13] *See* Michael Patrick Leahy, *Arizona Senate Report on the Maricopa County Election Audit Highlights 49,000 Questionable Votes, Asks AG to Investigate*, BREITBART (Sept. 25, 2021), *available at* https://tinyurl.com/4kh45tup (last visited Feb. 15, 2022). This is the same investigation that the Biden DOJ's Civil Rights Division threatened to derail *in a letter **actually sent** to the State of Arizona*. *See* https://tinyurl.com/2437rmb6 (last visited Feb. 15, 2022).

https://tinyurl.com/yprpt44m (last visited Feb. 15, 2022). True the Vote has identified a confidential whistleblower who claims he was paid $10 per ballot he put into dropboxes.

The expert affidavit of Gregg Phillips, filed April 8, 2021 in *Schmitz v. Barron*, *et al.*, Fulton Super. Ct, Civ. A. No. 2020CV342969, describes his geotracking analysis of 1.2 trillion mobile device signals showing 240 unique devices making multiple runs to and from drop boxes. Mr. Phillips concludes that "[a]round 7% of the total votes in Fulton County, GA (or 36,000 of the total votes in Fulton) were influenced by this ballot harvesting scheme after taking into consideration the amount of targeted devices and the frequency of drop box visits." Exhibit 7 at ¶ 46. If correct, this was a systematic violation of O.C.G.A. § 21-2-385(a) and exceeded the margin of victory. *See id*. This pattern of conduct is further documented in dropbox surveillance video collected by local governments and obtained by True the Vote. Filmmaker and conservative commentator Dinesh D'Souza has announced a movie called "2,000 Mules". While information on the film is currently quite limited, the trailer claims to show "never before seen security footage" of ballot harvesters. The video shows these alleged harvesters (termed "mules" by the filmmakers) stuffing what appear to be multiple ballots or even sets of ballots into ballot boxes, with some then "snapping photos [on their phones] to get paid." https://tinyurl.com/2p86dznj (last visited Feb. 15, 2022).

There was ample evidence before January 4, 2021 that could cause a reasonable attorney to be skeptical of some parts of the 2020 election. Further evidence has emerged since then, and in some States it has even ripened into trial and appellate court decisions revealing that the elections in Wisconsin and Pennsylvania were conducted unlawfully, at least in part.

## CONCLUSION

ODC has no proper role investigating Respondent here and, at the very least, it should await the conclusion of federal and state investigations before trying to do so. For the foregoing reasons, ODC's motion should be denied and the cross-motion to quash should be granted.

Respectfully submitted this 15th day of February 2022.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com


Harry W. MacDougald*
Georgia Bar No. 453076
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

**Motion for pro hac vice admission in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy

of this *Response to Motion to Compel and Cross-Motion to Quash* by U.S. First Class Mail with

sufficient postage thereon to insure delivery, and by email addressed to:

Hamilton P. Fox
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This 15th day of February 2022.

/s/ *Charles Burnham*

Charles Burnham
DC Bar No. 1003464

1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

# Exh. 1

# Affidavit of Robert N. Driscoll

**DCCA NO. _____**

## DISTRICT OF COLUMBIA

## COURT OF APPEALS

**In the Matter of**

**CONFIDENTIAL (J.B.C.), ESQ.**

**Respondent,**

**A member of the Bar of the District
of Columbia Court of Appeals**

**Disciplinary Docket**

**No. 2021-D193**

## AFFIDAVIT OF ROBERT N. DRISCOLL

Personally appeared before the undersigned officer, duly authorized to administer oaths, Robert N. Driscoll, who, after being duly sworn, testified and stated as follows:

1.

My name is Robert N. Driscoll. I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 2004 and the Commonwealth of Massachusetts since 1994. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeals for the First, Seventh, Tenth and D.C. Circuits, various U.S. District Courts, and the District of Columbia

Court of Appeals. I am a member of the law firm McGlinchey Stafford PLLC, a national firm with approximately 155 lawyers in offices in 15 cities, including Washington, D.C.

3.

I represented Respondent in connection with investigations by various congressional committees, including the January 6 Select Committee, and briefly in connection with the above-referenced disciplinary matter. All of my representation of Respondent ended on October 25, 2021.

4.

My first contact with any member of the DC Bar Office of Disciplinary Counsel regarding any potential disciplinary issue related to Respondent came on October 14, 2021, at 4:57 PM. At that time, I received a voice mail from Hamilton P. Fox, Disciplinary Counsel for the District of Columbia Bar, which stated as follows: "Mr. Driscoll, my name is Hamilton Fox. I am the disciplinary counsel for the District of Columbia. I am calling you on the assumption that you represent [Respondent]. Uh, would you give me a call please? Uh, my direct dial telephone number is [redacted]."

5.

The next day, on October 15, 2021, at 11:29 AM, I called Mr. Fox. We spoke for a few minutes. He indicated that the D.C. Bar had received a complaint from a

third party about Respondent, and that Mr. Fox would forward it to me and that Respondent could respond if we wished to. No mention was made of a subpoena, or of accepting service of a subpoena. No agreement was made between me and Mr. Fox regarding service of any process or subpoena nor any deadline for responding.

6.

On November 22, 2021, at 10:37 AM, I received a voicemail from Mr. Fox which said as follows: "Uh Bob this is Phil Fox over at the Office of Disciplinary Counsel. Uh, it has not escaped my attention that I've had no response whatsoever to either what we call the B-letter that I sent to you, uh to [Respondent] care of you, or the subpoena. Uh, nor have we had a response to what we call the D-letter, which is our procedure for the follow-up, which was due on Friday. So, we are preparing motions to compel. Um, if you don't want to go that route uh give me a call, [redacted]. I suspect we'll have the motions uh certainly by tomorrow – filed by tomorrow morning, if not today. Thanks."

7.

I called Mr. Fox at 10:40 AM on November 22, 2021, immediately after listening to his voice mail. I told him that I had not received anything from the Office of Disciplinary Counsel at all, that I no longer represented Respondent, and that Respondent was now represented by Harry MacDougald.

8.

I then made immediate and urgent efforts to check all incoming mail and email to confirm I had not received anything from Mr. Fox – I had not. Indeed, I have never received any written correspondence of any kind, (mail, email or electronic message) from the Office of Disciplinary Counsel.

9.

Once I had doubled-checked for mail and searched my email system (including filters) to confirm I had not received any correspondence of any kind regarding Respondent, I called Mr. Fox again at 11:19 AM on November 22, 2021, and confirmed to him that I had searched all electronic records and regular mail, and that I had received no letter or any other document from the Office of Disciplinary Counsel regarding Respondent by email, regular mail, or other means.

10.

The totality of my communications with Mr. Fox before withdrawing from representing Respondent were the voice mail described in paragraph 4 above and the telephone conversation described in paragraph 5 above.

11.

At no point did I ever agree on behalf of Respondent to accept service of a subpoena from Mr. Fox, nor agree on any due dates for responses to any such subpoena. Indeed, I was unaware of the existence of any subpoena related to

Respondent until contacted by his successor counsel regarding this matter, and I

certainly did not agree to accept service of a subpoena or agree to a deadline for

any response.

Robert N. Driscoll

Sworn to and subscribed before me, this 11 day of February, 2022.

_____ (seal)
Notary Public
My commission expires: 11-30-2023

5

# **Exh. 2**

# **Affidavit of Jeffrey B. Clark**

DCCA NO. 22-BS-0059

DISTRICT OF COLUMBIA

COURT OF APPEALS

| | |
|---|---|
| **In the Matter of** | |
| **CONFIDENTIAL (J.B.C.), ESQ.** | **Disciplinary Docket** |
| **Respondent,** | **No. 2021-D193** |
| **A member of the Bar of the District of Columbia Court of Appeals** | |

## AFFIDAVIT OF JEFFREY B. CLARK

Personally appeared before the undersigned officer, duly authorized to administer oaths, Jeffrey B. Clark, who, after being duly sworn, testified and stated as follows:

1.

My name is Jeffrey B. Clark.  I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 1997. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for all Circuits, the U.S. District Court for Southern District of Alabama, the District of Columbia, District of Nebraska, and Eastern District of Texas, as well as the Court of Federal Claims. I am the Respondent in the above-referenced matter.

3.

I was previously represented in this matter by Robert N. Driscoll. However, that

engagement terminated on October 25, 2021. Between October 25, 2021 and mid-January 2022,

I was seeking counsel to represent me in this matter.

4.

I began corresponding directly with Hamilton Fox, the D.C. Bar Disciplinary Counsel in

late November 2021 into early December 2022, especially after discovering that emails notifying

me of documents from the DC Bar being available on a file sharing service had been caught in

my spam filter. As a result, I had not received or been able to retrieve the material Mr. Fox's

assistant had been trying to send me. I emailed Mr. Fox about this problem on December 2,

2021, and he replied the same day. *See* Exh. 1.

5.

On December 3, 2021, I tested positive for Covid, and let Mr. Fox know about that via

email shortly thereafter. He very graciously gave me time to recover, which took the month of

December and required a hospital trip to receive monoclonal antibodies.

6.

When I had recovered from Covid, I had an email dialog with Mr. Fox and one of his

assistants. Delivery problems persisted such that I did not receive a complete copy of Mr. Fox's

letter transmitting the subpoena and its attachments until January 6, 2022. Mr. Fox and I agreed

that I would respond to the subpoena on January 31, 2022.

7.

At no point did I agree to accept legal service of the subpoena by email.

Jeffrey B. Clark

Sworn to and subscribed before me, this 15 day of February, 2022.

Notary Public
My commission expires: 04/30/2023

KIRAN R. SHRESTHA
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
REGISTRATION #7130618
MY COMMISSION EXPIRES APRIL 30, 2023

3

# Clark Affidavit

# Exh. 1

Subject: RE: [EXT]DC Bar Correspondence
From: Jeffrey Clark - To: Phil Fox - Cc: Harry MacDougald - Date: December 2, 2021 at 11:29 AM

Thank you Mr. Fox and I wish you are at your professional best in the argument.

Jeff Clark

**From:** Phil Fox <███████dcodc.org>
**Sent:** Thursday, December 2, 2021 11:24 AM
**To:** Jeffrey Clark <████████████████████>
**Cc:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Subject:** RE: [EXT]DC Bar Correspondence

I am preparing for an argument at 2:00 today.  I have asked my secretary to resend the material, but I am confident that you have most of it since it is the public record stuff from the Judiciary Committee.  I'll get back to you after the argument.  For future reference, my direct dial number is  202/454-1728.

**From:** Jeffrey Clark <████████████████████>
**Sent:** Thursday, December 2, 2021 11:12 AM
**To:** Phil Fox <███████dcodc.org>
**Cc:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Subject:** [EXT]DC Bar Correspondence
**Importance:** High

Mr. Fox,

Apologies.  After I discovered a few days ago that materials from some kind of dropbox-like site were sitting in my spam folder and emailing with Ms. Thornton, I was hoping to give you a call yesterday, but the January 6 Committee is setting unrealistic deadlines.  Despite the fact that my lawyer has a hearing in Atlanta on Friday, they are insisting on a second deposition on Saturday, and I need to use the time between now and then to get ready.

Juggling a lot on my end and so don't have the to-spam emails in front of me but my understanding is that they indicated the dropbox-type access expired on 11/29.  So it would be best if you re-sent them to me, if that is not too much to ask.  Given the spam problem, I authorize you to send anything you need to, to me to this email address as direct attachments, but maybe with a CONFIDENTIAL header on it, assuming the file size is not too large that they will go through as ordinary attachments.  If there is a file-size issue, please re-ripen the dropbox-type access but send me an email here, since your test on that (when the sending email address was yours and not the more general email address) worked, to let me know to check my spam box.  When I can free up some time, I'll figure out how to put that general address you use to keep confidentiality into my trusted senders or whatever the Outlook term is for that in the program.

Also, I will need to get separate counsel for this and to contact my malpractice carrier to inquire re how that works as no claim has ever been filed against me in my 25-year career, so I am not familiar with any of these processes. My lawyer for the Committee interaction may be able to help me for a bit but I think I should retain someone who regularly practices ethics law to assist me and that will take some time to find and get retention/insurance arrangements worked out with, particularly given that the political issues involved impact the pool of lawyers that I can attract.  I've copied my lawyer for Committee matters, Mr. Harry MacDougald here, for the limited temporary purpose of helping me as I search for ethics counsel.

I hope you will bear with me. The legal issues here are far from ordinary.

Thank you very much Mr. Fox.

Respectfully submitted,

Jeff Clark

## Exh. 3

## Affidavit of Harry W. MacDougald

DCCA NO. 22-BS-0059

DISTRICT OF COLUMBIA

COURT OF APPEALS

| | |
|---|---|
| In the Matter of | |
| CONFIDENTIAL (J.B.C.), ESQ. | Disciplinary Docket |
| Respondent, | No. 2021-D193 |
| A member of the Bar of the District of Columbia Court of Appeals | |

## AFFIDAVIT OF HARRY W. MACDOUGALD

Personally appeared before the undersigned officer, duly authorized to administer oaths, Harry W. MacDougald, who, after being duly sworn, testified and stated as follows:

1.

My name is Harry W. MacDougald.  I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the State of Georgia since 1985. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for the 11th and D.C. Circuits, and the Northern and Southern U.S. District Courts in Georgia, and all Georgia trial and appellate courts. I am a partner in Caldwell, Carlson, Elliott & DeLoach, LLP in Atlanta, Georgia.

3.

I represent the Respondent in connection with the January 6 Select Committee and in connection with the above-referenced disciplinary matter. I did not begin representing

Respondent in the above-referenced matter until January, 2022, though I was copied on some emails between the Respondent and Disciplinary Counsel beginning December 2, 2021 while Respondent was looking for other counsel to represent him in this matter.

4.

At no point did I ever agree on behalf of the Respondent to accept service of a subpoena from Mr. Fox, nor agree on any due dates for responses to any such subpoena.

5.

On the afternoon of January 28, 2022, I had a telephone conversation with Phil Fox, D.C. Bar Disciplinary Counsel. I told Mr. Fox we would not be producing any documents in response to the subpoena and whether, in light of that, asked if the Respondent needed to appear at the Bar offices in response to the subpoena. Mr. Fox replied that Respondent was not required to appear but that we "would be in court very quickly" on a motion to compel. He indicated that asserting the act of production privilege would be frivolous and that doing so would not stand Respondent in good stead when it came time for imposing disciplinary sanctions. He added "I promise you I will ratchet up" the sanction to be imposed if we asserted the Fifth.

6.

At 8:30 PM Friday evening, January 28, 2022, Mr. Fox sent me an email, attached hereto as Exh. 1, in which he reiterated this threat as follows:

> Just to be clear, because our proceedings are not criminal, if we bring charges, we will contend that any assertion of the privilege against self-incrimination can be construed against Mr. Clark on the merits and may be considered in aggravation of any sanction. We have not yet decided whether to bring charges, but a frivolous assertion of the privilege may lead to an additional charge or may the basis of an independent specification of charges in the event that we conclude not to bring charges on the underlying matters.

7.

On the morning of Saturday February 5, 2022, I received an email from Mr. Fox's assistant, Angela Thornton, which attached a letter from Mr. Fox dated February 3, 3022 purporting to transmit his motion to compel and the exhibits thereto. However, Ms. Thornton's email included only the letter, and not the motion or any of its exhibits. See Exh. 2.

8.

I promptly replied to Ms. Thornton and said that I didn't see the motion. Ms. Thornton replied "Motion? No motion with this email, just the letter addressed to you from Mr. Fox." I replied as follows:

> The first sentence of the letter says: "Accompanying this letter is a Motion to Compel that we filed with the Court of Appeals today."
>
> That is the motion after which I am inquiring.
>
> Thanks for any help you can provide on that.

*Id*.

9.

After about an hour with no response from Ms. Thornton, I emailed her again at 11:05 AM, saying the following:

> Ms. Thornton:
>
> The letter you sent me this morning from Mr. Fox is dated 2/3, and states it is being transmitted to me on 2/3 via email.  However, I do not have an email from 2/3 from Mr. Fox, or a letter from Mr. Fox sent to me that day, much less a copy of the motion it says is enclosed.
>
> And today, your email transmitting the letter did not include the motion either.
>
> I did receive some document production via a file share type of thing, but there was no motion in there, either.

It's possible I have missed something as I was in court all day Thursday and had outpatient surgery yesterday, but searching my emails I don't have anything from Mr. Fox on 2/3. Perhaps someone else in your office sent it?

In any event, we would appreciate your sending us the motion at your earliest convenience and letting me know one way or the other whether I have overlooked its prior transmittal from your office.

Thanks in advance.

*Id*.

10.

Ms. Thornton never responded to three emails to her asking for a copy of the motion. Therefore, at 5:20 PM I emailed this conversation to Mr. Fox, informed him I still did not have the motion, and asking if he could please email it to me. Mr. Fox responded promptly, and we exchanged numerous emails on the topic. *See* Exh. 3. The upshot of those emails was that I received an email with the motion attached, but never received an email with the exhibits. Mr. Fox was clearly exerting himself to deliver the documents to me, and indicated he had emailed the exhibits, but I never got them. He identified the exhibits, which were documents that I already had. He added that he would send the motion and exhibits via FedEx on Monday. *Id*. at p. 2.

11.

By mid-afternoon Friday February 11, 2022, I still had not received the motion by regular mail, nor had I received any of the exhibits via email, nor had I received a FedEx delivery as Mr. Fox had indicated the previous Saturday would be forthcoming. I therefore emailed Mr. Fox to let him know I still had not received the exhibits and would he mind putting the material on a file sharing site for download. Mr. Fox replied that he would look into it but "I am pretty sure that we sent the complete package by FedEx last Monday and that we have the receipt." *See* Exh. 4.

4

12.

In response to that information, two assistants and I looked in every office in our firm and queried everyone in the office but we could not find any such FedEx package. We also had someone check on the 16th floor of the two other buildings in our office park to seek if perhaps the package had been misdelivered, but we could not find it that way either. *Id*.

13.

I kept Mr. Fox apprised of these efforts as they unfolded and asked him if he could identify who had signed for the package, or perhaps give me the tracking number and we would check that ourselves. *Id*. At first he indicated that would have to wait until Monday, but among several emails passing between us that afternoon, Mr. Fox forwarded me the FedEx airbill for the delivery. *See* Exh. 5. This email was actually received before my last reply to Mr. Fox asking for the tracking number in Exh. 4, but I did not see it until after I sent that reply because I was looking around the office trying to find the package. Once I saw the airbill, which has the tracking number on it, I entered that tracking number into the FedEx package tracking webpage. The result was that there was no such tracking number in the FedEx system. I then had two assistants search for the tracking number on the FedEx website with the same result. I relayed that information to Mr. Fox. *See* Exh. 6. For reasons unknown to me, it appears this package tracking number never made it into the FedEx system.

14.

On February 14, 2022, Mr. Fox's assistant. Ms. Thornton sent me a DropBox link from which I was able to download Mr. Fox's letter of February 3, 2022 (which I had first received February 5, 2022), and the motion with all of its exhibits. This was the first time I had received the complete package of the motion and all of its exhibits.

15.

On February 15, 2022, I received delivery of a FedEx package bearing the same airbill number as the one Mr. Fox emailed me on February 11 that is attached to Exh. 6. The airbill was filled out on February 7, but the FedEx tracking history shows that it first entered the FedEx system on February 14, 2022. Exh. 7.

Harry W. MacDougald

Sworn to and subscribed before me, this 15 day of February, 2022.

_____
Notary Public
My commission expires: _____

YVETTE ANN RIX
Notary Public, State of Georgia
Fulton County
My Comm. Expires June 4, 2024

# MacDougald Affidavit

# Exh. 1

**Subject: Re: [EXT]Jeffrey Clark**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: January 28, 2022 at 8:30 PM

Just to be clear, because our proceedings are not criminal, if we bring charges, we will contend that any assertion of the privilege against self-incrimination can be construed against Mr. Clark on the merits and may be considered in aggravation of any sanction. We have not yet decided whether to bring charges, but a frivolous assertion of the privilege may lead to an additional charge or may the basis of an independent specification of charges in the event that we conclude not to bring charges on the underlying matters.

Get Outlook for iOS

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, January 28, 2022 3:34 PM
**To:** Phil Fox
**Subject:** RE: [EXT]Jeffrey Clark

Any time is fine including tonight or this weekend. My direct rings over to my cell, which is 404-388-8622.

Best,

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <████dcodc.org>
Date: January 28, 2022 at 3:32:32 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Jeffrey Clark


I am in the middle of a meeting.  How long will you be available?


---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, January 28, 2022 3:32 PM
**To:** Phil Fox <████dcodc.org>
**Subject:** [EXT]Jeffrey Clark


Mr. Fox:


Can you give me a call at the number below regarding Mr. Clarke's response to your subpoena? Maybe 5 min.

Thanks.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

# MacDougald Affidavit

# Exh. 2

Subject: RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary

From: hmacdougald@ccedlaw.com - To: Angela Thornton - Cc:  - Date: February 5, 2022 at 11:05 AM

Ms. Thornton:

The letter you sent me this morning from Mr. Fox is dated 2/3, and states it is being transmitted to me on 2/3 via email.  However, I do not have an email from 2/3 from Mr. Fox, or a letter from Mr. Fox sent to me that day, much less a copy of the motion it says is enclosed.

And today, your email transmitting the letter did not include the motion either.

I did receive some document production via a file share type of thing, but there was no motion in there, either.

It's possible I have missed something as I was in court all day Thursday and had outpatient surgery yesterday, but searching my emails I don't have anything from Mr. Fox on 2/3. Perhaps someone else in your office sent it?

In any event, we would appreciate your sending us the motion at your earliest convenience and letting me know one way or the other whether I have overlooked its prior transmittal from your office.

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: hmacdougald@ccedlaw.com <hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 10:09:17 AM
To: Angela Thornton ██████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

The first sentence of the letter says "Accompanying this letter is a Motion to Compel that we filed with the Court of Appeals today."

That is the motion after which I am inquiring.

Thanks for any help you can provide on that.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Angela Thornton <████████████████████
Date: February 5, 2022 at 10:07:03 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Motion? No motion with this email, just the letter addressed to you from

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 10:06 AM
**To:** Angela Thornton <██████████████>
**Subject:** [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't see the motion

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Angela Thornton <██████████████>
Date: February 5, 2022 at 9:11:50 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Dear Mr. MacDougald, please see letter attached from Mr. Fox, Disciplinary Counsel.  If there are questions or concerns, please don't hesitate to let us know.  Thank you.

Regards,

Angela

# MacDougald Affidavit

# Exh. 3

Subject: Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:   - Date: February 5, 2022 at 6:12 PM

The attachments, actually exhibits, are all things you have: the November letter and subpoena to Clark; the email chain, which is also attached to one of your January 31 letters, about the difficulty we had then in getting all the materials to Clark; and your letter asserting the Fifth. I will make sure a hard copy of everything is sent to you on Monday. I don't understand why we are having such difficulty transmitting this stuff. We have been doing virtually everything electronically for two years, and I am unaware of any other case where we have had these problems.

Get Outlook for iOS

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 6:01:41 PM
**To:** Phil Fox <██████dcodc.org>
**Subject:** RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I got the email transmitting the motion and saying the attachments would come separately, but haven't seen those yet.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <██████dcodc.org>
Date: February 5, 2022 at 5:59:48 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Azadeh Matinpour <██████████████████> Angela Thornton <██████████████> Jason Horrell <██████████████>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I just resent everything—first the motion and then the motion with the attachments.  Nothing bounced back.  Did you get them?

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 5:39 PM
**To:** Phil Fox <██████dcodc.org>
**Subject:** RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Thanks - much appreciated.

Have a good rest of your weekend.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600

Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Phil Fox <█████dcodc.org>
Date: February 5, 2022 at 5:36:28 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't know without looking, but I am not going to take advantage of your failure to receive it.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 5:35 PM
**To:** Phil Fox <█████dcodc.org>
**Subject:** Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I received the letter this morning but no motion.

I know it's not your job to help me read the rules, but I'll go ahead and ask - is it correct that we have a 7 calendar day response time for responding to motions?

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Phil Fox <█████dcodc.org>
Date: February 5, 2022 at 5:32:30 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

It is just the letter and the motion. If I can't get it to you, we will FedEx it Monday. I will try again.

Get Outlook for iOS

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>

**Sent:** Saturday, February 5, 2022 5:28:53 PM
**To:** Phil Fox < ████ dcodc.org >
**Subject:** Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary
Docket No. 2021-D193


No sir, I have not seen it yet. I got this one, but I haven't seen the other
one  with the motion. I checked my online spam folder as well. Not sure
what's going on with that. Is it a particularly large attachment?


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: Phil Fox < ████ dcodc.org >
Date: February 5, 2022 at 5:25:43 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  Re: [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary
Docket No. 2021-D193


Did you get the email with the motion that I just sent you?


Get Outlook for iOS

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 5:20:02 PM
**To:** Phil Fox < ████ dcodc.org >
**Subject:** Fwd: RE: [EXT]Re: in re Clark/Disciplinary Counsel
- Disciplinary Docket No. 2021-D193


Mr. Fox:


Please see the correspondence below. No response to three
emails to Ms. Thornton asking for the motion. I still do not
have the motion referred to in your letter of 2/3, which I
just received this morning.


If you could please send me the motion at your earliest
convenience, I'd appreciate it.


Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: hmacdougald@ccedlaw.com
<hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 11:05:33 AM
To: Angela Thornton <██████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary Counsel -
Disciplinary Docket No. 2021-D193



Ms. Thornton:


The letter you sent me this morning from Mr.
Fox is dated 2/3, and states it is being
transmitted to me on 2/3 via email.  However, I
do not have an email from 2/3 from Mr. Fox, or
a letter from Mr. Fox sent to me that day, much
less a copy of the motion it says is enclosed.


And today, your email transmitting the letter did
not include the motion either.


I did receive some document production via a
file share type of thing, but there was no motion
in there, either.


It's possible I have missed something as I was
in court all day Thursday and had outpatient
surgery yesterday, but searching my emails I
don't have anything from Mr. Fox on 2/3.
Perhaps someone else in your office sent it?


In any event, we would appreciate your sending
us the motion at your earliest convenience and
letting me know one way or the other whether I
have overlooked its prior transmittal from your
office.


Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: hmacdougald@ccedlaw.com
<hmacdougald@ccedlaw.com>
Date: February 5, 2022 at 10:09:17 AM
To: Angela Thornton <█████████████████
Subject:  RE: [EXT]Re: in re Clark/Disciplinary
Counsel - Disciplinary Docket No. 2021-D193




The first sentence of the letter says
"Accompanying this letter is a
Motion to Compel that we filed with
the Court of Appeals today."


That is the motion after which I am
inquiring.


Thanks for any help you can provide
on that.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach,
LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: Angela Thornton
<█████████████████
Date: February 5, 2022 at 10:07:03
AM
To: Harry MacDougald
<hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Re: in re
Clark/Disciplinary Counsel -
Disciplinary Docket No. 2021-D193

Motion? No motion with this email, just the letter addressed to you from Mr. Fox.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Saturday, February 5, 2022 10:06 AM
**To:** Angela Thornton <████████████>
**Subject:** [EXT]Re: in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

I don't see the motion

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Angela Thornton <████████████>
Date: February 5, 2022 at 9:11:50 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  in re Clark/Disciplinary Counsel - Disciplinary Docket No. 2021-D193

Dear Mr. MacDougald, please see

letter attached from Mr. Fox, Disciplinary Counsel. If there are questions or concerns, please don't hesitate to let us know. Thank you.

Regards,

Angela

# MacDougald Affidavit

# Exh. 4

**Subject: RE: [EXT]Service Copy of Motion**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc: Angela Thornton - Date: February 11, 2022 at 5:14 PM

That will have to wait until next week.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 5:13 PM
**To:** Phil Fox <███████dcodc.org>
**Subject:** RE: [EXT]Service Copy of Motion

I received an email from Ms. Thornton sent at 11 AM transmitting your letter of today's date and attachments consisting of correspondence between you and Mr. Weinsheimer dated Feb 7 and 8 respectively, for which you have my thanks.

If you or Ms. Thornton can give us the tracking number for the FedEx package we can look up who signed for it.

Both me and my assistant checked all the offices in our suite and asked everyone who is still here and no sign of it. Our office manager has not seen it either. We also checked the 16th floor of the other two buildings in our office park and nothing there either - one of them is vacant anyway. There's no one at home in the other suites on our floor so we don't know if it might have gone to one of them by mistake. So the next available step is to let us know who signed for it or give us the tracking number so we can check ourselves.

Thank you in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <███████dcodc.org>
Date: February 11, 2022 at 4:59:31 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  RE: [EXT]Service Copy of Motion

I don't.  Angela might next week.  Did you receive the email and attachments that we sent you this morning?

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 4:58 PM
**To:** Phil Fox <███████dcodc.org>

**Subject:** RE: [EXT]Service Copy of Motion

Do you have a name of who signed for it?

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <███████dcodc.org>
Date: February 11, 2022 at 4:41:38 PM
To:
Subject:  RE: [EXT]Service Copy of Motion


We'll look into that, but I am pretty sure that we sent the complete package by FedEx last Monday and that we have the receipt.

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Friday, February 11, 2022 4:31 PM
**To:** Phil Fox <███████dcodc.org>
**Subject:** [EXT]Service Copy of Motion

Mr. Fox:

While our building's mail has not yet arrived today (even though it's a 17 story building), I still have not received the mail service copy of your motion to compel, and never did receive the emails transmitting the exhibits.

Would you mind perhaps using a file sharing service like DropBox or the like to get the full set to me electronically?

Thanks in advance.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

# MacDougald Affidavit

# Exh. 5

**Subject: FW: In re Clark - DDNo. 2021-D193**

From: Phil Fox - To: hmacdougald@ccedlaw.com - Cc:  - Date: February 11, 2022 at 4:48 PM, Attachments: 2021-D193 fedex
shipping bill 02072022.pdf

Here is the information about the FedEx shipment.  We will still look at an alternative way to transmit documents.

---

**From:** Angela Thornton <████████████████>
**Sent:** Monday, February 7, 2022 1:47 PM
**To:** Phil Fox <███████dcodc.org>; Jason Horrell <█████████████    Azadeh Matinpour
<████████████>
**Subject:** In re Clark - DDNo. 2021-D193

David sent the letter and the motions with all attachments to Resp's Counsel, via fedex.  Fedex shipping label is attached.  It will be delivered tomorrow morning

Angela

MUR 1

**FedEx Express**
Package
US Airbill

FedEx Tracking Number: 8148 8013 6300

**1 From** *Please print and press hard.*

Date 2/7/2022

Sender's FedEx Account Number

Sender's Name Hamilton P. Fox, III   Phone 202-638-1501

Company OFFICE OF DISCIPLINARY COUNSEL

Address 515 5TH ST NW

Dept./Floor/Suite/Room

City WASHINGTON   State DC   ZIP 20001-2710

**2 Your Internal Billing Reference** 2021-D103
*First 24 characters will appear on invoice.*

**3 To**

Recipient's Name Harry W. MacDougald   Phone 404.843.4109

Company Caldwell Carlson Elliott & DeLoach LLP

Address Two Ravinia Drive Suite1600

Dept./Floor/Suite/Room

Address
*We cannot deliver to P.O. boxes or P.O. ZIP codes.*

City Atlanta   State GA   ZIP 30346

0133821617

**6** Ship it. Track it. Pay for it. All online.
Go to fedex.com.

fedex.com 1.800.GoFedEx 1.800.463.3339

---

Form ID No. 0215

Sender's Copy

Packages up to 150 lbs.
*For packages over 150 lbs., use the FedEx Express Freight US Airbill.*

**4 Express Package Service** *To most locations.*

*Packages up to 150 lbs.*

**Delivery Commitment**

*FedEx Priority Overnight*

2 or 3 Business Days

☑ FedEx First Overnight
Earliest next business morning delivery to select locations. Delivery by 8:30 a.m. to most locations.

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5 Packaging** *Declared value limit $500.*

☑ FedEx Envelope*   ☐ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

**6 Special Handling and Delivery Signature Options** *Fees may apply. See the FedEx Service Guide.*

☐ Saturday Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☑ No Signature Required
Package may be left without obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

**Does this shipment contain dangerous goods?**
*One box must be checked.*

☑ No
☐ Yes
As per attached Shipper's Declaration.
☐ Yes
Shipper's Declaration not required.
☐ Dry Ice
Dry Ice, 9, UN 1845 ___ x ___ kg
☐ Cargo Aircraft Only

*Dangerous goods (including dry ice) cannot be shipped in FedEx packaging or placed in a FedEx Express Drop Box.*

**7 Payment** *Bill to:*

☑ Sender
Acct. No. in Section 1 will be billed.
☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

Enter FedEx Acct. No. or Credit Card No. below.

Total Packages 1   Total Weight 0.8332 lbs.   Total Declared Value* $ .00

611

# MacDougald Affidavit

# Exh. 6

Subject: Re: FW: In re Clark - DDNo. 2021-D193

From: hmacdougald@ccedlaw.com - To: Phil Fox - Cc:  - Date: February 11, 2022 at 5:30 PM

Phil:

Thank you for sending the FedEx Airbill.

Three people in my office including me and two assistants have put the tracking number from the airbill into the FedEx tracking number search box and we get this response:  "No record of this tracking number can be found at this time, please check the number and try again later. For further assistance, please contact Customer Service."

The airbill is filled out to not require a signature for delivery.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <██████dcodc.org>
Date: February 11, 2022 at 4:48:29 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Subject:  FW: In re Clark - DDNo. 2021-D193

Here is the information about the FedEx shipment.  We will still look at an alternative way to transmit documents.

---

**From:** Angela Thornton <████████████████>
**Sent:** Monday, February 7, 2022 1:47 PM
**To:** Phil Fox <██████dcodc.org>; Jason Horrell <██████████████ Azadeh Matinpour <██████████>
**Subject:** In re Clark - DDNo. 2021-D193

David sent the letter and the motions with all attachments to Resp's Counsel, via fedex.  Fedex shipping label is attached.  It will be delivered tomorrow morning

Angela

# MacDougald Affidavit

# Exh. 7



FedEx Tracking

Track Another Shipment      Help

814880136300

ADD NICKNAME





# Delivered
# Tuesday, February 15, 2022 at 8:06 am



**DELIVERED**

Signature release on file

GET STATUS UPDATES

OBTAIN PROOF OF DELIVERY

**FROM**

WASHINGTON, DC US

**TO**

GA US

**MANAGE DELIVERY**  ⌄

Travel History          Shipment Facts

## Travel History

**TIME ZONE**
Local Scan Time          ⌄

**Tuesday, February 15, 2022**

| | | |
|---|---|---|
| 8:06 AM | GA | Delivered<br>Package delivered to recipient address - release authorized |
| 6:15 AM | MARIETTA, GA | On FedEx vehicle for delivery |
| 5:39 AM | ATLANTA, GA | At destination sort facility |
| 3:48 AM | MEMPHIS, TN | Departed FedEx hub |
| 12:17 AM | MEMPHIS, TN | Shipment arriving On-Time |
| 12:05 AM | MEMPHIS, TN | Arrived at FedEx hub |

Monday, February 14, 2022

| 9:21 PM | WASHINGTON, DC | Left FedEx origin facility |
| 4:13 PM | WASHINGTON, DC | Picked up |

Expand History ⌄

## Shipment Facts

| **TRACKING NUMBER** | **SERVICE** | **WEIGHT** |
| 814880136300 | FedEx First Overnight | 0.5 lbs / 0.23 kgs |

| **TOTAL PIECES** | **TOTAL SHIPMENT WEIGHT** | **TERMS** |
| 1 | 0.5 lbs / 0.23 kgs | Shipper |

| **SHIPPER REFERENCE** | **PACKAGING** | **SPECIAL HANDLING SECTION** |
| 2621 D193 | FedEx Envelope | Deliver Weekday |

| **SHIP DATE** | **SHIPMENT-FACTS.COD-DETAIL** | **STANDARD TRANSIT** |
| 2/14/22 ⓘ | $0.00 | 2/15/22 before 8:30 am ⓘ |

| **ACTUAL DELIVERY** | | |
| 2/15/22 at 8:06 am | | |

# Exh. 4

# Senator Durbin Letter to Office of Disciplinary Counsel, October 7, 2021

RICHARD J. DURBIN, ILLINOIS, CHAIR

PATRICK J. LEAHY, VERMONT
DIANNE FEINSTEIN, CALIFORNIA
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
CORY A. BOOKER, NEW JERSEY
ALEX PADILLA, CALIFORNIA
JON OSSOFF, GEORGIA

CHARLES E. GRASSLEY, IOWA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JOSHUA D. HAWLEY, MISSOURI
TOM COTTON, ARKANSAS
JOHN KENNEDY, LOUISIANA
THOM TILLIS, NORTH CAROLINA
MARSHA BLACKBURN, TENNESSEE

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

October 7, 2021

Office of Disciplinary Counsel
District of Columbia Court of Appeals
515 5th Street NW
Building A, Suite 117
Washington, D.C. 20001

**Re:    Request for Disciplinary Investigation of Jeffrey Bossert Clark**

To the Disciplinary Counsel:

As the Chair of the U.S. Senate Judiciary Committee, I write to express my grave concern about actions taken by Jeffrey Bossert Clark that may constitute serious professional misconduct under the D.C. Rules of Professional Conduct. Since January 2021, the Committee has been investigating allegations that Mr. Clark aided then-President Trump's efforts to enlist the U.S. Department of Justice (DOJ) in overturning the results of the 2020 Presidential election. After months of reviewing documents and interviewing key former DOJ personnel with firsthand knowledge of Mr. Clark's actions, the Committee has released the attached interim staff report (the "Report"). Based on the Report's findings, I respectfully request that the Office of Disciplinary Counsel open an investigation to determine whether Mr. Clark, who is a member of the D.C. Bar, violated applicable D.C. Rules of Professional Conduct and should be subject to disciplinary action.

As further detailed in the Report, Mr. Clark attempted to enlist DOJ in President Trump's efforts to overturn the results of the presidential election without evidence or legal authority. In furtherance of this goal, Mr. Clark:

- violated, blatantly and on multiple occasions, longstanding DOJ policies designed to insulate the Department's investigations and prosecutions from partisan political influence by meeting with President Trump;

- continually pressed DOJ leadership to publicly announce that there was corruption in the 2020 general election and to urge swing-state legislatures to convene special legislative sessions to appoint alternate slates of electors, despite being repeatedly told by DOJ leadership that his election fraud claims were baseless and that DOJ lacked legal authority to pursue his proposed course of action; and

- attempted to coerce then-Acting Attorney General Jeffrey Rosen into agreeing to his proposals by threatening Mr. Rosen with the prospect of replacing him as Attorney General.

Lawyers admitted to the D.C. Bar swear an oath "to support the Constitution of the United States."[1] It should go without saying that attempts to subvert a free and fair election do not support the Constitution.

The D.C. Bar defines misconduct as "[a]cts or omissions by an attorney…which violate the attorney's oath of office or the rules or code of professional conduct currently in effect."[2] Mr. Clark's actions implicate several D.C. Rules of Professional Conduct. First, by using his official capacity as an Acting Assistant Attorney General to push DOJ to take official action based on verifiable falsehoods, Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against "counsel[ing] a client to engage, or assist[ing] a client, in conduct the lawyer knows is criminal or fraudulent." While Rule 1.2(e) allows "lawyers to discuss the consequences of any proposed course of conduct with a client" and "assist a client to make a good-faith effort to determine the validity, scope, meaning, or application of the law," Mr. Clark's actions do not fit into this exemption. To the contrary, as the Report demonstrates, he repeatedly pressed DOJ leadership to take the extraordinary and unlawful step of intervening in states' appointment of electors based on false claims of election fraud. Rule 1.0(f) defines knowledge as "actual knowledge," which "may be inferred from circumstances." The American Bar Association's Standing Committee on Ethics and Professional Responsibility has further clarified that actual knowledge "may be inferred from the circumstances, including a lawyer's willful blindness to or conscious avoidance of facts." ABA Formal Op. 491 (2020). As the Report establishes, Mr. Clark should have known, and was given every opportunity to know, that the election fraud claims he pushed were false.

Mr. Clark also appears to have violated at least four of the prohibitions in Rule 8.4 regarding professional misconduct. First, the verifiable falsehoods at the core of Mr. Clark's efforts implicate Rule 8.4(c)'s prohibition of "conduct involving dishonesty, fraud, deceit, or misrepresentation." Second, his repeated requests that Acting Attorney General Rosen endorse these falsehoods, and his suggestion that he would decline an offer to replace Rosen as Acting Attorney General if Rosen agreed to pursue his proposal, implicate Rule 8.4(a)'s prohibition against knowingly assisting or inducing someone to violate the Rules of Professional Conduct. Third, Rule 8.4(e) prohibits a lawyer from "stat[ing] or imply[ing] an ability to influence improperly a government agency or official," and Mr. Clark attempted to improperly influence both DOJ's own leadership and several state legislatures. Finally, as a senior DOJ official who sought to improperly use DOJ's law enforcement powers on behalf of a political candidate and to overturn the election results, the totality of Mr. Clark's efforts implicate Rule 8.4(d)'s prohibition of "conduct that seriously interferes with the administration of justice." Other Rules may be similarly implicated.

Mr. Clark's misconduct does more than speak to his fitness as a lawyer; his activities, which were part of a broader course of conduct by President Trump and his allies to overturn the election, have had severe ramifications for the rule of law. When a government lawyer,

---

[1] Attorney Oath of Admission to the District of Columbia Bar, *available at* https://www.dccourts.gov/sites/default/files/divisionspdfs/committee%20on%20admissions%20pdf/Attorney_Oath_Statement_Roll_of_Attorneys.pdf.
[2] Rules Governing the District of Columbia Bar, Rule XI, Section 2(b).

particularly one entrusted with a high level of leadership in the nation's foremost law enforcement agency, commits serious violations of professional conduct, such actions undermine the integrity of our justice system and erode public confidence in it. Public confidence is further eroded when serious misconduct comes to light only to be met with no consequences. Therefore, I submit this letter of complaint to respectfully request that the Office of the Disciplinary Counsel initiate an investigation and take appropriate disciplinary proceedings pursuant to Rule XI of the Rules Governing the District of Columbia Bar.

I appreciate your prompt attention to this sensitive matter. The Committee is available for further consultation as needed.

Sincerely,

Richard J. Durbin
Chair, U.S. Senate Committee on the Judiciary

Enclosure

cc:    The Honorable Charles E. Grassley
       Ranking Member, U.S. Senate Committee on the Judiciary

# Exh. 5

# Bradley Weinsheimer Letter to Jeffrey B. Clark, July 26, 2021



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*
Associate Deputy Attorney General

*Washington, D.C. 20530*

July 26, 2021

Jeffrey B. Clark
Lorton, VA
Via email to Counsel

Dear Mr. Clark:

The Department of Justice (Department) understands that you have been requested by the U.S. House of Representatives Committee on Oversight and Reform (House Oversight Committee), and the U.S. Senate Judiciary Committee to provide transcribed interviews to the Committees relating to your service as Assistant Attorney General for the Environment and Natural Resources Division and Acting Assistant Attorney General for the Civil Division.  In these interviews, you are authorized to provide information you learned while at the Department as described more fully below.

According to information provided to you and the Department by the House Oversight Committee, its focus is on "examining President Trump's efforts to pressure the Department of Justice (DOJ) to take official action to challenge the results of the presidential election and advance unsubstantiated allegations of voter fraud."[1]  The House Oversight Committee has stated that they wish to ask you questions "regarding any efforts by President Trump and others to advance unsubstantiated allegations of voter fraud, challenge the 2020 election results, interfere with Congress's count of the Electoral College vote, or overturn President Biden's certified victory."[2]

Based upon information provided to you and to the Department from the Senate Judiciary Committee, the Department understands that the scope of that Committee's inquiry is very similar to that of the House Oversight Committee.  The letter to the Department dated January 23, 2021, explained that the Senate Judiciary Committee is conducting oversight into public reporting about "an alleged plot between then-President Donald Trump and [you] to use the Department of Justice to further Trump's efforts to subvert the results of the 2020 presidential election"—events that the letter described as raising "deeply troubling questions regarding the Justice Department's role" in those purported efforts.[3]  In addition, the Senate Judiciary

---

[1] Letter from Carolyn B. Maloney, Chairwoman, House Committee on Oversight and Reform, to Jeffrey B. Clark, June 14, 2021.

[2] *Id.*

[3] Letter from Richard J. Durbin et al., Senate Judiciary Committee, to Monty Wilkinson, Acting Attorney General, Dep't of Justice, January 23, 2021, at 1, https://www.judiciary.senate.gov/press/dem/releases/senate-judiciary-committee-democrats-seek-answers-about-dojs-role-in-trumps-scheme-to-overturn-the-2020-election.

Committee has represented to the Department that the scope of its interview will cover your knowledge of attempts to involve the Department in efforts to challenge or overturn the 2020 election results. This includes your knowledge of any such attempts by Department officials or by White House officials to engage in such efforts. The Committee has further represented that the time frame for its inquiry will begin following former Attorney General William Barr's December 14, 2021, resignation announcement.

Department attorneys, including those who have left the Department, are obligated to protect non-public information they learned in the course of their work. Such information could be subject to various privileges, including law enforcement, deliberative process, attorney work product, attorney-client, and presidential communications privileges. The Department has a longstanding policy of closely protecting the confidentiality of decision-making communications among senior Department officials. Indeed, the Department generally does not disclose documents relating to such internal deliberations. For decades and across administrations, however, the Department has sought to balance the Executive Branch's confidentiality interests with Congress's legitimate need to gather information.[4]

The extraordinary events in this matter constitute exceptional circumstances warranting an accommodation to Congress in this case. Congress has articulated compelling legislative interests in the matters being investigated, and the information the Committees have requested from you bears directly on Congress's interest in understanding these extraordinary events: namely, the question whether former President Trump sought to cause the Department to use its law enforcement and litigation authorities to advance his personal political interests with respect to the results of the 2020 presidential election. After balancing the Legislative and Executive Branch interests, as required under the accommodation process, it is the Executive Branch's view that this presents an exceptional situation in which the congressional need for information outweighs the Executive Branch's interest in maintaining confidentiality.

The Executive Branch reached this view consistent with established practice. Because of the nature of the privilege, the Department has consulted with the White House Counsel's Office in considering whether to authorize you to provide information that may implicate the presidential communications privilege. The Counsel's Office conveyed to the Department that President Biden has decided that it would not be appropriate to assert executive privilege with respect to communications with former President Trump and his advisors and staff on matters related to the scope of the Committees' proposed interviews, notwithstanding the view of former President Trump's counsel that executive privilege should be asserted to prevent testimony regarding these communications. *See Nixon v. Administrator of General Servs.*, 433 U.S. 425, 449 (1977) ("[I]t must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support

---

[4] *See* Letter for Rep. John Linder, Chairman, Subcommittee on Rules and Organization, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs at 2 (Jan. 27, 2000) ("Linder Letter") ("In implementing the longstanding policy of the Executive Branch to comply with Congressional requests for information to the fullest extent consistent with the Constitutional and statutory obligations of the Executive Branch, the Department's goal in all cases is to satisfy legitimate legislative interests while protecting Executive Branch confidentiality interests.").

2

invocation of the privilege accordingly."); *see also id.* (explaining that the presidential communications privilege "is not for the benefit of the President as an individual, but for the benefit of the Republic") (internal citation omitted).

Therefore, given these extraordinary circumstances, including President Biden's determination on executive privilege, and having reviewed the scope of the Committees' requested interviews, the Department authorizes you to provide unrestricted testimony to the Committees, irrespective of potential privilege, so long as the testimony is confined to the scope of the interviews as set forth by the Committees and as limited in the penultimate paragraph below.[5]  This accommodation is unique to the facts and circumstances of this particular matter and the legislative interests that the Committees have articulated.

Consistent with appropriate governmental privileges, the Department expects that you will decline to respond to questions outside the scope of the interview as outlined above and instead will advise the Committees to contact the Department's Office of Legislative Affairs should they seek information that you are unable to provide.

Please note that it is important that you not discuss Department deliberations concerning investigations and prosecutions that were ongoing while you served in the Department.  The Department has a longstanding policy not to provide congressional testimony concerning prosecutorial deliberations.  If prosecutors knew that their deliberations would become "subject to Congressional challenge and scrutiny, we would face a grave danger that they would be chilled from providing the candid and independent analysis essential to just and effective law enforcement or, just as troubling, that they might err on the side of prosecution simply to avoid public second-guessing."  Linder Letter.  Discussion of pending criminal cases and possible charges also could violate court rules and potentially implicate rules of professional conduct governing extra-judicial statements.  We assume, moreover, that such Department deliberations are not within the scope of the requested testimony as defined by the Committees.

Accordingly, consistent with standard practice, you should decline to answer any such questions and instead advise the Committees to contact the Department's Office of Legislative Affairs if they wish to follow up on the questions.  Responding in such a way would afford the Department the full opportunity to consider particular questions and possible accommodations that may fulfill the Committees' legitimate need for information while protecting Executive Branch confidentiality interests regarding investigations and prosecutions.

Sincerely,

Bradley Weinsheimer

---

[5] You are not authorized to reveal information the disclosure of which is prohibited by law or court order, including classified information and information subject to Federal Rule of Criminal Procedure 6(e).

3

# Exh. 6

# MacDougald Letter to Rep. Bennie G. Thompson, November 5, 2021

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1800
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

November 5, 2021

Hon. Bennie G. Thompson, Chairman
January 6th Select Committee
U.S. House of Representatives
Longworth House Office Building
Washington, DC 20515

Dear Representative Thompson:

I have been retained to represent Jeffrey Clark in the investigative matters pending before your Committee.[1]

Despite disparaging and misleading media narratives, Mr. Clark is not a politician and has never sought notoriety or press attention beyond what was necessary to discharge his duties. Indeed, despite serving more than four years during the Bush Administration's Justice Department from 2001-2005 and more than two years during the Trump Administration's Justice Department from 2018-2021, he was never once during those six-plus years of service asked to come before a congressional committee for

---

[1] This letter focuses on the issues surrounding the executive privilege, though there are additional legal objections, including those of a structural constitutional nature, that we will interpose in good faith as well to Mr. Clark testifying, should doing so become necessary. We also reserve all of Mr. Clark's individual rights under the Bill of Rights, though invocation of those rights is also not necessary at this time, as executive privilege and related privileges should be a sufficient threshold ground not to testify in response to the subpoena as it is currently framed.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 2

oversight purposes, even though he litigated and supervised highly controversial cases.[2]
He had a winning record, recovered billions of dollars for the fisc, successfully defended
numerous agency rulemakings of extreme complexity, and personally briefed and
argued many cases—exemplary service.  He was confirmed in October 2018 with
bipartisan support in the Senate—just one part of his distinguished 25-year legal career.

Now, after his most recent, 26-month-plus tenure in government ending in
January 2021, he wants nothing more than to return to ordinary life and law practice,
without being subjected to selective anonymous leaks and press attacks.  Yet he finds
himself involuntarily caught up in a novel conflict that includes both significant inter-
branch[3] and cross-presidential[4] features to which we must provide a response.

The main purpose of this letter is this:  Because former President Trump was
properly entitled, while he held office, to the confidential advice of lawyers like Mr. Clark,
Mr. Clark is subject to a sacred trust—one that is particularly vital to the constitutional
separation of powers.  As a result, any attempts—whether by the House or by the current
President—to invade that sphere of confidentiality must be resisted.  Nothing less will
comport with both Mr. Clark's obligations to former President Trump and with Mr.
Clark's ethical obligations as an attorney.  The general category of executive privilege,
the specific categories of the presidential communications, law enforcement, and
deliberative process privileges,[5] as well as attorney-client privilege and the work product
doctrine, all harmonize on this point.  Most importantly, core matters of constitutional
principle hang in the balance.

---

[2] For instance, Mr. Clark was integral to defending former President Trump's decision to withdraw from
the Paris Climate Agreement, to resisting improper judicial interference with the Census, to crafting and
then personally defending, in litigation, the first major reform in four decades of the National
Environmental Policy Act's regulations, and to shepherding through the judicial process various agency
actions protecting the southern border with Mexico against incursions.  This work was unpopular in some
political quarters but at all times was consistent with law and with his client agencies' policy decisions.

[3] A single House of Congress vs. former President Trump.

[4] President Biden vs. former President Trump, *i.e.*, the current President vs. the immediately past President.

[5] Indeed, Mr. Clark's work was integral to the United States' win in the Supreme Court's most recent
deliberative process case, *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 3

Mr. Clark's position as a legal advisor to the President late in 2020 and early 2021 was particularly sensitive because he was a Senate-confirmed Justice Department leader with significant high-profile litigation and governmental experience, making it natural for a President to seek out and consult his views.[6] We trust that members of Congress of all stripes would agree that it is indisputable that American Presidents need to be able to consult, as they see fit, with their Senate-confirmed appointees. The principle goes both ways. Whomever succeeds President Biden, for instance, should not be able to expose to public scrutiny advice provided to President Biden by his advisors. Establishing precedent to the contrary would deeply chill the vigorous Executive Branch and energetic President the Founders envisioned. *See* Federalist Paper No. 70 (Hamilton) (Mar. 18, 1788) ("Energy in the executive is a leading character in the definition of good government."), *available at* https://tinyurl.com/3ep7fhz9. Without that energy and ability to be candid, presidential advisors would be reduced to bland, tasteless creatures, and the prospect of innovative advice would be stifled.

For these reasons, as amplified below, and with due respect to the Committee, Mr. Clark has come with me today, to present this letter of objection. Mr. Clark will, of course, abide by a future judicial decision(s) appropriately governing all underlying disputes with finality, but for now he must decline to testify as a threshold matter because the President's confidences are not his to waive.

1.      Since August 2, 2021, when a pivotal letter was sent on behalf of former President Trump to Mr. Clark (Attachment), there have been several cardinal developments:

(1) On September 23, 2021, this Committee subpoenaed senior White House officials Mark Meadows and Daniel Scavino, senior Pentagon official Kashyap Patel, and

---

[6] Beginning in November 2018, Mr. Clark headed one of the Justice Department's seven litigating Divisions (the approximately 112 year-old Environment & Natural Resources Division, which has existed for most of the 151 years of the Justice Department's history).  And later, in light of his excellent service in the Environment Division during the last Administration, Mr. Clark was also tapped by the Attorney General in the Fall of 2020 to run a second of those seven litigating Divisions as the Acting Assistant Attorney General for the Civil Division.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 4

Stephen Bannon, making especially clear to Mr. Clark that executive privilege had
been invoked in light of the violation of a condition set forth in the August 2, 2021,
letter from former President Trump's counsel, as explained in more detail below;

(2) On or about October 7, 2021, former President Trump invoked executive privilege
and instructed these four presidential advisors not to comply with the Committee's
requests;[7]

(3) Additionally, on September 29, 2021, the Committee had subpoenaed 11 other
individuals to appear for questioning; and, most importantly,

(4) The former President took the critical step of bringing suit against the Committee,
among others, in *Trump v. Thompson*, Civ. A. No. 21-2769 (D.D.C. Oct. 18, 2021). In this
case, President Trump asserts executive privilege and is objecting to the Committee's
request to the Archivist of the United States to produce records of his administration.

The August 2 letter from your former colleague, Georgia Congressman Douglas A.
Collins, stated to Mr. Clark that "President Trump continues to assert that the non-public
information the Committees seek is and should be protected from disclosure by the
executive privilege," and that this "executive privilege applicable to communications
with President Trump belongs to the Office of the Presidency, not to any individual
President, and President Biden has no power to unilaterally waive it." Attachment at 1.

The Collins letter also quoted the Supreme Court's recognition that "the privilege
is not for the benefit of the President as an individual, but for the benefit of the Republic."
*Id.* (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 449 (1977)). That decision
provides that the purpose of the privilege is to "give his advisers some assurance of
confidentiality," so that the "President [can] expect to receive the full and frank
submission of facts and opinions upon which effective discharge of his duties depends."
*Id.* Additionally, the August 2 letter noted that an earlier July 26, 2021 letter to Mr. Clark

---

[7] See Jacqueline Alemany, *et al.*, *Trump Lawyer Tells Former Aides Not to Cooperate with Jan. 6 Committee*,
WASH. POST (Oct. 7, 2021), *available at* https://www.washingtonpost.com/politics/2021/10/07/trump-lawyer-
tells-former-aides-not-cooperate-with-jan-6-committee/.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 5

from the current Justice Department had selectively edited a quotation out the *Nixon* decision, leaving off the key sentence that "***the privilege survives the individual President's tenure.***" Attachment at 2 (quoting *Nixon*, 433 U.S. at 449) (emphasis added). *See also* Prof. Saikrishna Prakash, *Trump Is Right: Former Presidents Can Assert Executive Privilege*, Wash. Post. (Oct. 29, 2021), *available at* https://tinyurl.com/ykcpz94w.

I concur with that assessment by the former President and his counsel. Were any successor occupant of the office of President able to waive claims of executive privilege asserted by his or her predecessors, the principal purpose of the privilege would be defeated, to the detriment of the Executive Branch, to the separation of powers, and to the proper functioning of government as envisioned by the Constitution, relevant judicial precedent, and long traditions of inter-branch accommodation. This is particularly true when, as here, President Biden's purported waivers over recent months may have been informed by partisan political purposes. This is suggested by the haste with which Mr. Biden prejudged Mr. Bannon's invocation of the privilege on behalf of former President Trump.[8] Executive privilege has fundamental importance to and constitutional significance in the operation of government. Waivers of executive privilege should therefore be considered only with a gravity and solemnity commensurate with their deployment, and should not be influenced by workaday political grievances or by grudges lingering from past political controversies, even bitter ones.

---

[8] See Katherine Fung, *Biden's Comments Could Fumble DOJ Prosecution of Steve Bannon: Here's How*, NEWSWEEK (Oct. 21, 2021) ("referring to those, like Bannon, who have refused to comply with the subpoena to testify before the January 6 committee [and] asked if they should face prosecution, Biden said, 'I do, yes.'"); Donald Judd & Rachel Janfaza, *Biden Says DOJ Should Prosecute Those Who Defy January 6 Committee Subpoenas*, CNN (Oct. 16, 2021) (same); *see also id.* (quoting Press Secretary Jen Psaki as arguing, contrary to law, that ultimate decisions would be made by the Justice Department because "[t]hey're an independent agency ...."), *available at* https://www.newsweek.com/bidens-comments-could-fumble-doj-prosecution-steve-bannon-heres-how-1641428. While President Biden later acknowledged he had been wrong to make the statement, the damage in the public mind had already been done. *See* Kaanita Iyer, *Biden Says He Was Wrong to Suggest Those Who Defy Subpoenas from January 6 Committee Should Be Prosecuted*, CNN, *available at* https://edition.cnn.com/2021/10/21/politics/january-6-joe-biden-town-hall/index.html (Oct. 22, 2021). For, as the Committee is aware, the President is the chief law enforcement officer of the United States and the Constitution does not mention the Attorney General by name. The Constitution simply contemplates that there will be a "principal Officer in each of the executive departments." U.S. Const. art. II, sec. 2. Nor do any statutes establish the Department of Justice as an "independent agency."

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 6

2.      Other former Department of Justice officials who received the Collins letter
have apparently interpreted its concluding paragraph to mean that the former President
had waived the privilege on a blanket basis or somehow otherwise greenlighted their
testimony to Committees looking into assertedly similar issues prior to this Committee
beginning its work.  We disagree with that interpretation. No fair reading of the Collins
letter can conclude that it waives any privileges as to an official like Mr. Clark, *especially
after* the key contingency set out in the letter had been triggered:

> Nonetheless, to avoid further *distraction and without in any way otherwise
> waiving the executive privilege* associated with the matters the executive
> privilege associated with the matters the Committees are purporting to
> investigate, President Trump will agree not to seek judicial intervention to
> prevent your testimony or the testimony of the five other former Department
> officials … who have already received letters from the Department similar to
> the July 26, 2021 letter you received, *so long as the Committees do not seek
> privileged information from any other Trump administration officials or
> advisors.*

Attachment at 2 (emphasis added). The condition in the emphasized language has been
triggered because the Committee sought privileged information from multiple other
Trump administration officials or advisors before Mr. Clark was subpoenaed on October
13, 2021.

Our position is simple and is dictated by the plain text of the letter.  The Collins
letter does not waive privilege as to Mr. Clark.  Even before the contingency triggered by
your Committee seeking information from other Trump Administration officials had
occurred, at best the Collins letter indicated that former President Trump would agree
himself not to seek judicial intervention on the pre-contingency state of the facts.  That is
not remotely the same as authorizing testimony or waiving executive privilege.  All
portions of the Collins letter prior to the concluding paragraph clearly invoked privilege.
Nor could Mr. Collins' indicating that the former President would not file suit at an
earlier time act to relieve Mr. Clark of his ethical obligations.

And surely, once the Committee issued subpoenas to Messrs. Meadows, Scavino,
Patel and Bannon on September 23, the assertion of executive privilege set forth in all of

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 7

the other paragraphs of that letter applied with special force to Mr. Clark.  This is because
Congress *has, in fact, sought* privileged information from Messrs. Meadows, Scavino,
and Patel as they are all, no doubt, "other Trump administration officials."  In short, even
former President Trump's statement that he would not go to court in August 2021 was
expressly conditional, and the Committee's issuance of the Meadows, Scavino, and Patel
subpoenas has caused the failure of that condition. Therefore, especially after the
triggering of the contingency, the letter simply cannot be read as an unconditional waiver
as to Mr. Clark or the others named in the final paragraph.

Accordingly, particularly under the present circumstances, the Collins letter
expressly informs Mr. Clark that President Trump is asserting and not waiving executive
privilege with respect to the Committee's pursuit of information from Mr. Clark.
President Trump's assertion of his privileges with respect to the Committee's subpoena
to Mr. Clark is confirmed in *Trump v. Thompson, et al*, U.S.D.C. D.C. 1:21-cv-02769-TSC,
by footnote 2 of his brief in support of his application for a preliminary injunction:

> The Committee also sought testimony and documents from several individuals,
> some of whom were serving in the Trump Administration in January and others
> who were not. To preserve all privileges applicable to him and the Presidency,
> President Trump sent a letter to a number of these individuals, instructing them
> to preserve any and all relevant and applicable privileges, including without
> limitation the presidential communications and deliberative process privileges
> and attorney-client privilege, all to the extent allowed by law.

*Id.*, Doc. 5, p. 1, n.2. The Committee of course has actual notice of this contention since it
is a party to that litigation.

Mr. Clark thus has no choice but to comply with President Trump's assertion of
executive privilege and related privileges.

3.     Since September 7, 2021, staff on the Select Committee has been in contact
with Mr. Clark's former attorney, Robert Driscoll, about the possibility of Mr. Clark
giving a transcribed interview to the Committee regarding communications with and
advice given to former President Trump during the last few months of his
Administration.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 8

In good faith and while he was engaging in legal research and keeping apprised of related actions by the Committee and other parts of Congress, Mr. Clark had been requesting and reviewing documents from the Department of Justice pursuant to 28 C.F.R. § 16.300. And, if the federal judicial system orders Mr. Clark directly or produces final and clearly applicable precedent in (a) related case(s) indicating that Mr. Clark must testify, he would resume that process consistent with other legal strictures. But in line with our research and study, events subsequent to September 7 have convinced me that the only proper course of action for Mr. Clark now is to stand on the privilege position articulated to him on August 2 by former President Trump and affirmed in his October 19, 2021 filing in *Trump v. Thompson.*

This is for three reasons: (1) first and foremost because former President Trump, as noted, took heavy step of invoking the privilege in federal court litigation on October 18 against the Committee in its official capacity, indicating that the inter-branch accommodation process had broken down; (2) because the September 23 subpoenas to Messrs. Meadows, Scavino, and Patel unmistakably triggered the contingency in the Collins letter, seemingly removing the basis for any potential accommodation agreement with the Committee premised on it cabining the scope of its inquiry; and (3) because the former President acted to invoke the privilege as to those advisors and Mr. Bannon.

4.      I am aware that other former top officials in the Department of Justice have provided testimony to Congress, despite the former President's assertion of privilege and despite the failure of the conditions in the Collins letter. As the privilege was not theirs to waive, at least without greater clarity (such as a court order with finality or a comprehensive arrangement entered into between former President Trump and Congress, where the latter agreed not to seek "privileged information from any other Trump administration officials or advisors"), it is unclear to me how their testimony could be consistent with former President Trump's assertion of executive privilege. Former President Trump holds that privilege, not them. Be that as it may, in the present circumstances, the fact that other former officials may have testified, rightly or wrongly at the time, does not change Mr. Clark's obligations in light of the recent positions taken by former President Trump in the Collins letter and in *Trump v. Thompson.* Indeed, D.C. Bar Ethics Opinion #288 has advised that, even in response to a congressional subpoena (and therefore, by parity of reasoning, in response to a voluntary request as well), a "lawyer has a professional responsibility to seek to quash or limit the subpoena on all

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 9

available, legitimate grounds to protect confidential documents and client secrets." *See also* American Bar Association's Committee on Ethics and Professional Responsibility, Formal Opinion 94-385 (1994).

It is improper to put Mr. Clark in a vise between this Committee and its claimed enforcement powers on the one hand and his constitutional and ethical obligations on the other, especially while there is a pending lawsuit to determine President Trump's privilege objections. To apply such pressure to Mr. Clark is to present him with a potential Hobson's choice in a manner not countenanced by the long history of inter-branch accommodation over Congressional requests for information from the Executive Branch. The Constitution is the ultimate source of our law and this Committee is bound to respect government-wide constitutional boundaries, including respecting the prerogatives of the coequal Executive Branch.

Additionally, the claim made by Senate counsel at the outset of the relevant testimonies of at least one of these other Department of Justice officials, namely, that the Collins letter was a "letter of nonobjection … on behalf of former President Trump,"[9] if it were ever correct there (and it is not because nothing in the letter waives privilege or states a general principle of non-objection), is obviously incorrect as to Mr. Clark at the present time. The Collins letter quite explicitly (1) asserts that the former President has not waived claims of executive privilege; (2) asserts the privilege; and (3) at most, even from this Committee's potential perspective, fixes conditions that as to Mr. Clark are no longer met.

In light of the foregoing, I have advised my client that, at this time and based on these most up-to-date factual developments, he is duty-bound not to provide testimony to your Committee covering information protected by the former President's assertion of executive privilege. Accordingly, beyond showing up today to present this letter as a sign of his respect for a committee of the House of Representatives, albeit one not formed in observance of the ordinary process of minority participation, Mr. Clark cannot answer deposition questions at this time. No adverse inferences can or should be drawn from Mr. Clark accepting my advice. His doing so defends the Republic's interest in the

---

[9] Transcript, *available at* https://www.judiciary.senate.gov/imo/media/doc/Rosen%20Transcript.pdf at 6-7 (Aug. 7, 2021).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 10

separation of powers.  As noted, Mr. Clark is not a politician but he is a strong defender of the Constitution, stemming from his political beliefs as an unapologetic conservative—beliefs protected by the First Amendment.

5.      In addition to the foregoing, I must also point out that the vast majority of the document requests in the subpoena sent to Mr. Clark are duplicated in the requests for documents sent by the Committee to the National Archives presently at issue in the *Trump v. Thompson* litigation. It is entirely proper, therefore, to defer compliance with the Committee's subpoena to Mr. Clark until that litigation is resolved.

Moreover, the documents subpoenaed from Mr. Clark are instead largely in the possession of the Department of Justice or the Archives. Mr. Clark left his work papers at the Department of Justice when he resigned in anticipation of the January 20, 2021 inauguration of President Biden.  Based on prior actions, beginning with those of the House Oversight Committee, we also believe that your Committee has access to Mr. Clark's government records, making the imposition on us of organizational work, such as Bates-stamping documents, unduly burdensome. If the Committee could please confirm this one way or the other, it may obviate any claim of demonstrably critical need for Mr. Clark to re-produce documents the Committee already has, should that become necessary at some future point.

6.      Accordingly, I respectfully urge the Committee to recognize that the best and most regular course in light of the latest developments would be to pause the request for the testimony of Mr. Clark (likely along with the requests for the testimony of Messrs. Meadows, Scavino, and Patel, who would seem similarly situated) pending resolution of the *Trump v. Thompson* litigation.  That will provide important guidance from the Article III branch of government to referee this inter-branch dispute, including, among other things, the entwined issue of whether the current President can purport to waive the former President's executive privilege over the former President's objection. As Justice Powell remarked in concurrence in *Nixon*, "[t]he difficult constitutional questions lie ahead." 433 U.S. at 503. *See also id.* at 491 (Blackmun, J., concurring) (noting that historically some presidential transitions had been "openly hostile," and hoping that the statute under consideration there "did not become a model for the disposition of the papers of each president who leaves office at a time when his successor or the Congress is not of his political persuasion."). A pause, as we here request, would also show proper

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 11

comity both to Executive Branch's interests (considered holistically and not as defined
myopically to embrace only the views of the current President) and to the Judicial
Branch's role in resolving cases and controversies. As *Nixon* indicates, "[t]he
confidentiality necessary to this exchange [of advice and confidences between a President
and an advisor] cannot be measured by the few months or years between the submission
of the information and the end of the President's tenure; the privilege is not for the benefit
of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449.

7.      I am also compelled to note the disconnect between the scope and purpose
of the Committee's authorizing resolution and the information sought from Mr. Clark.
The Committee's scope revolves around events at the Capitol on January 6, 2021. The
Committee would not appear to be seeking to question Mr. Clark about January 6, 2021
and no media reporting has connected him to those events. Mr. Clark had nothing to do
with the January 6 protests or the incursion of some into the Capitol.  He has informed
me he worked from home that day to avoid wrestling with potential street closures to get
to and from his office at Main Justice.  Nor did Mr. Clark have any responsibilities to
oversee security at the Capitol or have the ability to deploy any Department of Justice
personnel or resources there.  Indeed, Acting Attorney General Rosen testified ***almost 6
months ago*** that a January 3, 2021 Oval Office meeting involving him and Mr. Clark, *inter
alia*, did not relate to January 6.  *See* House Oversight and Reform Committee Holds
Hearing     on     Jan.     6     Riot     at     U.S.     Capitol,     *available     at*
https://www.youtube.com/watch?v=719UGi8dNng, beginning at circa the one-hour, 15-
minute mark (Rep. Connolly) (streamed May 12, 2021).[10]  That should alone be sufficient
for Mr. Clark to be excluded from a January 6 inquiry.

Indeed, just about a week after January 6, Mr. Clark gave an "exit interview" to a
reporter for *Bloomberg Law* that condemned the individuals who forcibly went into the
Capitol and engaged in violence, noting that some of them may have been moved by mob
psychology (Mr. Clark specifically remembers referencing Gustave Le Bon), besmirching
by mere association the far more numerous peaceful protesters exercising their First

---

[10] Q. Rep. Connolly: "Did you meet with the President at the White House on January 3rd?"  A. Former
Acting AG Rosen:  "I did."  Q. Rep. Connolly:  "You did, but you decline to tell us what the nature of that
conversation was about, is that correct?"  A. Former Acting AG Rosen:  "I can tell you it did not relate to
the planning and preparations for the events on January 6th."

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Hon. Rep. Bennie G. Thompson
November 5, 2021
Page 12

Amendment rights.  As a clear example of mainstream media bias, however, the report later published about that interview omitted Mr. Clark's remarks on January 6, even though the reporter had *repeatedly* sought Mr. Clark's views on the topic during the course of the interview.[11]

      For all of these reasons, the information and testimony sought by the Committee as applied to Mr. Clark in particular are outside the scope of the Committee's charter and are neither proper subjects of the Committee's subpoena, nor any subsequent attempt to enforce the subpoena.

      Finally, I would kindly request a response to the objections set out in this letter, which may include a proposal to me by the Committee as to a more limited scope of inquiry narrowed to January 6—something that I would be happy to engage on to try to reach an agreement.  And for the avoidance of all doubt, we reiterate that, during continued discussions and at all times, we reserve all other objections as may be applicable under the circumstances.  *See supra* n.1.

          Respectfully,

          Caldwell, Carlson, Elliott & DeLoach, LLP

          Harry W. MacDougald

Enc.
cc:    Jeffrey Bossert Clark

---

[11] *See* Ellen Gilmer, *Top Official Steps Down from DOJ's Environment, Civil Divisions*, BLOOMBERG LAW (Jan. 14, 2021), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/top-official-steps-down-from-dojs-environment-civil-divisions?context=article-related.

**From:** Doug Collins <doug@northgeorgialawyers.com>
**Date:** August 2, 2021 at 6:20:20 PM EDT
**To:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Subject:** Letter for Mr. Jeff Clark

Please find the attached letter for your client Mr. Jeff Clark.

Thank you for your cooperation.

**Douglas A. Collins**
**Oliver & Weidner, LLC**
**854 Washington St. Suite 300**
**Clarkesville, GA 30523**
**706-754-9000**
**NorthGeorgiaLawyers.com**

==========================================================
NOTICE: In an ideal world, perhaps disclaimer clauses in lawyer emails would not be necessary; but this is not an ideal world, so here goes. This e-mail and all attachments are CONFIDENTIAL and intended SOLELY for the recipients as identified in the "To", "CC" and "BCC" lines of this e-mail. If you are not an intended recipient, your receipt of this e-mail and its attachments is the result of an inadvertent disclosure or unauthorized transmittal. Sender reserves and asserts all rights to confidentiality, including all privileges which may apply. Pursuant to those rights and privileges, immediately DELETE and DESTROY all copies of the e-mail and its attachments, in whatever form, and immediately NOTIFY the sender of your receipt of this e-mail. DO NOT review, copy, or rely on in any way the contents of this e-mail and its attachments. NO DUTIES ARE INTENDED OR CREATED BY THIS COMMUNICATION. If you have not executed a fee contract or an engagement letter, this firm does NOT represent you as your attorney. Most legal rights have time limits, and this e-mail does not constitute advice on the application of limitation periods unless expressly stated above. You are encouraged to retain counsel of your choice if you desire to do so. All rights of the sender for violations of confidentiality and privileges applicable to this e-mail and any attachments are expressly reserved.
==========================================================

JAMES C. WEIDNER

ERNEST H. "BUCKY" WOODS, III

DOUGLAS A. COLLINS

WILLIAM R. OLIVER
(OF COUNSEL)



TEL. (706) 754-9000
FAX: (706) 754-0098

854 WASHINGTON STREET
SUITE 300
P.O. BOX 2017
CLARKESVILLE, GA 30523

NorthGeorgiaLawyers.com

August 2, 2021

Mr. Jeff Clark:

We represent former President Donald J. Trump and write concerning requests sent to you by the U.S. House of Representatives Committee on Oversight and Reform and the U.S. Senate Judiciary Committee to provide transcribed interviews on matters related to your service as Deputy Attorney General and Acting Attorney General during President Trump's administration. We also understand that, as set forth in its July 26, 2021, letter to you, the U.S. Department of Justice stated that President Biden decided to waive the executive and other privileges that protect from disclosure non-public information concerning those matters and has authorized you to provide such information.

Please be advised that the Department's purported waiver and authorization are unlawful, and that President Trump continues to assert that the non-public information the Committees seek is and should be protected from disclosure by the executive privilege. The executive privilege applicable to communications with President Trump belongs to the Office of the Presidency, not to any individual President, and President Biden has no power to unilaterally waive it. The reason is clear: if a President were empowered unilaterally to waive executive privilege applicable to communications with his or her predecessors, particularly those of the opposite party, there would effectively be no executive privilege. To the extent the privilege would continue to exist at all, it would become yet another weapon to level the kind of unjustifiable partisan political attacks the Democrat-controlled administration and Committees are seeking to level here.

As the Supreme Court held in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) – where, like here, the then-current administration did not support a former President's assertion of executive privilege – the executive privilege is crucial to Executive Branch decision-making:

> Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.

*Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977).  The Department's July 26 letter to you quoted this decision but left out the very next sentence in the opinion: "**Therefore, the privilege survives the individual President's tenure.**" Id. at 448-49 (quoting, and adopting, Brief for the Solicitor General on Behalf of Federal Appellees) (emphasis added).

Here, it is clear that even though President Biden and the Department do not know the nature or content of the non-public information the Committees seek, they have not sought or considered the views of the President who does know as to whether the confidentiality of that information at issue should continue to be protected.  Such consideration is the minimum that should be required before a President waives the executive privilege protecting the communications of a predecessor.  *See* Office of Legal Counsel Memorandum on Applicability of Post-Employment Restrictions in 18 U.S.C. § 207 to a Former Government Official Representing a Former President or Vice President in Connection with the Presidential Records Act, June 20, 2001, at 5 ("[A]lthough the privilege belongs to the Presidency as an institution and not to any individual President, the person who served as President at the time the documents in question were created is often particularly well situated to determine whether the documents are subject to a claim of executive privilege and, if so, to recommend that the privilege be asserted and the documents withheld from disclosure.").

Nonetheless, to avoid further distraction and without in any way otherwise waiving the executive privilege associated with the matters the Committees are purporting to investigate, President Trump will agree not to seek judicial intervention to prevent your testimony or the testimony of the five other former Department officials (Richard P. Donoghue, Patrick Hovakimian, Byung J. "BJay" Pak, Bobby L. Christine, and Jeffrey B. Clark) who have already received letters from the Department similar to the July 26, 2021 letter you received, so long as the Committees do not seek privileged information from any other Trump administration officials or advisors. If the Committees do seek such information, however, we will take all necessary and appropriate steps, on President Trump's behalf, to defend the Office of the Presidency.

Sincerely yours,
OLIVER & WEIDNER, LLC

Douglas A. Collins

<u>**Exh. 7**</u>

<u>**Expert Affidavit of Gregg Phillips, from**</u>
<u>**Schmitz v. Barron, Fulton County,**</u>
<u>**Georgia Superior Court Case No.**</u>
<u>**2020CV342969**</u>

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| WARREN M. SCHMITZ, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action File No.** |
| v. | ) | |
| | ) | **2020CV342969** |
| RICHARD L. BARRON, IN HIS | ) | |
| OFFICIAL CAPACITY AS FULTON | ) | |
| COUNTY DIRECTOR | ) | |
| REGISTRATION & ELECTIONS AND | ) | |
| FULTON COUNTY BOARD OF | ) | |
| REGISTRATION AND ELECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**AFFIDAVIT OF GREGG PHILLIPS IN SUPPORT OF VERIFIED AMENDED
PETITION TO CONTEST RESULTS OF HOUSE DISTRICT 52 ELECTION**

Personally appeared before me, the undersigned notary public, duly authorized by law to

administer oaths, Gregg Phillips, who being duly sworn, deposes and states as follows:

1.

My name is Gregg Phillips.

2.

I am over the age of 21 years, and I am under no legal disability which would prevent me

from giving this testimony.  I have personal knowledge of the facts recited herein.

3.

This Affidavit is given in support of the Verified Amended Petition to Contest Results of

House District 52 Election filed in the above-styled action on November 25, 2020 (the "Petition").

4.

{00594334. }

Exhibit C to Amended and Restated Complaint

I have personal knowledge of the facts contained in this Affidavit, and am legally competent and can testify to such facts.

5.

Rep. Deborah Silcox and Shea Roberts competed in the November 3, 2020 General Election for HD 52 (the "Election").  The certified totals of the Election showed Ms. Roberts ahead by 377 votes, with a final tally of 17,069 votes for Ms. Roberts and 16,692 for Rep. Silcox.

6.

I own a data security company called OpSec Group where I am the managing partner. In addition, I am the CEO and Founder of CoverMe Services, a Georgia based healthcare technology company focused on the use of complex algorithms in healthcare finance.

7.

I have more than three decades of experience administration, program integrity, project management, healthcare, elections, and data driven decision making.

8.

My company has developed formulas to assess the fit, risk and reliability of data analytics across multiple industries.

9.

My group and I use detailed analytical approaches to investigate complex issues, evaluate the risk in decisions, and build measured solutions.

10.

We observe, research and interpret results using applications and data known to law enforcement, program integrity, quality control, and election professionals.

{00594334. }

Exhibit C to Amended and Restated Complaint

11.

My approach to analytics is measured and balanced and common practice in this industry.

12.

I am an expert in using large data sets in fraud control, quality control and identity resolution in voting related cases and analysis.

13.

Previously, I have testified in 10 trials as an expert witness. Our approach and algorithms have been used in high profile voter rights cases argued in the Supreme Court of the United States. In addition, our methods and algorithms have been used in the resolution of 43 million individual cases.

14.

I am not being compensated nor have been offered anything of value in exchange for this affidavit or potential testimony.

15.

In November, the OPSEC team developed a hypothesis that ballot trafficking is occurring in relation to certain non-profit organizations and drop boxes in Georgia.

16.

OPSEC purchased commercially available data worth approximately $200,000.00 for use in the analysis performed.

17.

I leveraged commercially available historic and near real time behavioral mobility data to assist a client organization, True the Vote, in analyzing patterns of election fraud in the form of ballot harvesting in key battleground states, including Georgia.

{00594334. }

Exhibit C to Amended and Restated Complaint

18.

Specifically, I used commercially available data, in addition to proprietary formulas, algorithms, and intellectual property developed by me.

19.

From this data and that gathered through our research, I was then able to develop and test the hypothesis to reach the conclusions.

20.

First, I geofenced all 27 identified organizations offices back to October 1, 2020 and harvested all devices observed on or near the premises inside the geofences established by our analytical team.

21.

Then, I observed 1.2 trillion mobile device signals over a period of 97 days from 10/1/2020 through 1/5/2021.

22.

To execute this project, I processed 25 terabytes of raw data in order to harvest 17,000 unique mobile devices.

23.

From the 17,000 unique mobile devises, I was further able to pinpoint the total number unique targeted mobile devices to 279. By applying certain quality management techniques, I was able to eliminate another 37 devices causing unacceptable levels of false positives. The final number of unique devices targeted was 240.

24.

{00594334.}

Exhibit C to Amended and Restated Complaint

Geofencing was used around suspected ballot harvesting organizations which then allowed the expert to use device-centric mobile advertising IDs and behavioral data analytics to pin 240 target devices and further establish a pattern of travel in and out of these locations.

25.

Geofencing was also used to create virtual perimeters around 36 Fulton County drop boxes and 309 drop boxes in the Atlanta metro area from 10/1/20 through Election Day 1/5/21.

26.

Geofencing perimeters were used to identify the presence of the 240 targeted devices as close as 18 inches from 28 drop boxes in a single day.

27.

This is the same type of data analytics and algorithms that are used by law enforcement and the intelligence community across the country and around the world.

28.

A total of eight metro-Atlanta counties were analyzed during this process.

29.

Fulton County comprised more than one-half of the drop box visits by the 240 targeted devices.

30.

Analysis of hotline, whistleblower and media reports resulted in the identification of 28 organizations whose addresses revealed a high level of activity involving the 240 targeted devices.

31.

From there, I was able to match these devices within 100 feet of an organization and 100 feet of ten or more drop boxes, which gave me a total of 240 Unique Devices of Interest.

{00594334. }

Exhibit C to Amended and Restated Complaint

32.

I then looked at devices that were both found at an organization and then also at any given drop box in Fulton County, GA and across the metro-Atlanta area.

33.

In order to make sure that my team ruled out any false positives, false negatives, or any accidental matches (such as firefighters or police officers), we ran this data from October to January.

34.

Upon doing this, we found that this vote trafficking was only done in October and December.

35.

This helped to rule out anyone who maybe worked nearby a drop box location as this trafficking only occurred in the month leading up to each election.

36.

For purposes of HD-52, this vote trafficking was executed in the month of October alone.

37.

To corroborate this data, we had the determine where the ballots were coming from that were being deposited into these drop boxes.

38.

The first hypothesis was UPS stores.

39.

To test this hypothesis, my team geofenced 18 UPS stores under the theory that this was the starting point of where these target devices would go and physically pick up ballots.

{00594334.}

Exhibit C to Amended and Restated Complaint

40.

The behavioral cellphone data then corroborated this data showing 240 devices were within the virtual boundaries, established by the geofences, of one or more targeted organizations, two or more UPS stores, and 10 or more drop boxes with the period of starting October 1, 2020 and extending through November 3, 2020.

41.

From each respective UPS store, each target device was then tracked as heading back to the location of their respective organization, or "stash houses", as we refer to them as.

**Accuracy of Cell Phone Data**

42.

The data tracks movement of each device as often as every four (4) seconds and as close at eighteen (18) inches to any respective specific location, inside or outside of a geofence within the purchased jurisdiction.

43.

For reference, this is the same type of data and tracking mechanisms that are used to help identify terrorists throughout the world, human trafficking criminals, and drug traffickers at the border.

44.

The specific cell phone data are signals that can be tracked back four (4) years.

45.

There are approximately 27,000 cell phone applications that track, save and market location data.

**Conclusions for HD-51 and HD-51**

{00594334.}

Exhibit C to Amended and Restated Complaint

46.

Around 7% of the total votes in Fulton County, GA (or 36,000 of the total votes in Fulton) were influenced by this ballot harvesting scheme after taking into consideration the amount of targeted devices and the frequency of drop box visits.

47.

For HD-51, estimated 1,700-2,000 votes influenced by harvesting.

48.

For HD-52, estimated 1,700-2,000 votes influenced by harvesting.

49.

I have come to the conclusion that this exact vote trafficking scheme affected the results of the 2020 November General Election for House District 52 in Georgia.

**FURTHER AFFIANT SAYETH NOT**.


[SIGNATURE ON FOLLOWING PAGE]

{00594334. }

Exhibit C to Amended and Restated Complaint

*Gregg Allen Phillips*
_____
GREGG PHILLIPS

SUBSCRIBED TO AND SWORN BEFORE ME
ON THIS __8th__ DAY OF APRIL, 2021 IN THE
PRESENCE OF:

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____10/18/2024_____

**Patricia A Glasper**
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 12-9064-1
Expires October 18, 2024

Notarized online using audio-video communication

{00594334. }

Exhibit C to Amended and Restated Complaint

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY



RECEIVED

Aug 4 2022 8:21am

Board on Professional
Responsibility

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District
of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket No.

2021-D193

### MOTION FOR EXTENSION OF TIME

Comes now Jeffrey B. Clark, Respondent in the above-entitled matter, and hereby moves for a 21-day extension of time within which to file his answer or responsive pleadings to the Specification of Charges filed against him by the Office of Disciplinary Counsel.  Disciplinary Counsel opposes this request.

The answer or responsive pleadings are currently due on August 11, 2022, as the Charges were served on July 22, 2022. And Disciplinary Counsel had previously agreed with our computation that the current deadline is August 11. This Motion is thus timely filed under Rule 13.11 of the Rules of the Board of Professional Responsibility.

Respondent seeks a 21-day extension due to the need to coordinate the preparation of the answer or responsive pleadings and the overall response to the Charges among his counsel and in coordination with his employment obligations.

In particular, Charles Burnham has multiple briefing deadlines and several substantive hearings in the months of August and September; Robert Destro has multiple professional obligations prior to Labor Day, including a previously-scheduled speaking appearance in Pennsylvania from August 30-September 1, 2022. And Mr. Destro will need a block of prior time to prepare for that highly technical appearance.

Finally, Mr. Clark is still in the early days of new employment. 



The requested extension will not cause any undue delay in the progress of this case.

Disciplinary Counsel declined to agree to a 28-day extension. As a result, Respondent and his counsel worked together to reduce the requested extension to 21 days so as to compromise as best as possible with Disciplinary Counsel.

Wherefore, Respondent respectfully requests that he be granted a 21-day extension within which to file his answer or other responsive pleadings in this case. This would make the new deadline **September 1, 2022**.

Respectfully submitted this 3 day of August, 2022.

[Signatures on next page]

/s/ *Charles Burnham*

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com


Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before
DCCA in progress*

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

\**Motion for pro hac vice admission
before DCCA in progress*

4

## CERTIFICATE OF SERVICE

I hereby certify that I have on August 3, 2022 served counsel for the

opposing party and the executive attorney by email addressed to:

Hamilton P. Fox              James T. Phalen
Jason R. Horrell             Executive Attorney
D.C. Bar                     Office of the Executive Attorney
Building A, Room 117         430 E. Street, NW Suite 138
515 5th Street NW            Washington, DC 20001
Washington DC 20001          casemanagers@dcpbr.org
foxp@dcodc.org


                             /s/ Charles Burnham
                             Charles Burnham
                             DC Bar No. 1003464
                             1424 K Street, NW
                             Suite 500
                             Washington DC 20005
                             (202) 386-6920
                             charles@burnhamgorokhov.com

# DISTRICT OF COLUMBIA COURT OF APPEALS

# BOARD ON PROFESSIONAL RESPONSIBILITY

## Under Seal

| | |
|---|---|
| In the Matter of | |
| **JEFFREY B. CLARK** | **Disciplinary Docket No.** |
| A Member of the Bar of the District of Columbia Court of Appeals | **2021-D193** |
| Bar No. 455315 | |
| Date of Admission: July 7, 1997 | |

RECEIVED

Aug 5 2022 4:30pm

Board on Professional Responsibility

## REPLY IN SUPPORT OF MOTION FOR EXTENSION OF TIME

Comes now Jeffrey B. Clark, Respondent in the above-entitled matter, and submits this Reply in support of his motion for an extension of time to respond to the Specification of Charges filed against him.

Disciplinary Counsel attempts to justify his opposition to the motion for an extension of time with a diatribe against what he has chosen to portray as Mr. Clark's "dilatory tactics."



**I.**

1.





2.



Disciplinary Counsel next accuses Respondent of "evading service" of the Specification of Charges. No evidence is offered to support this attempt to besmirch Respondent, and indeed it is false. Disciplinary Counsel made the same false

_____

accusation in an email to one of Respondent's attorneys on July 21, 2022 as follows: "I sent a process server to serve Clark yesterday. He refused to open the door and said he had to check with his lawyer. Are we really going to play this game? I can always apply to the Court for permission to serve him by alternative means." In response, Respondent's counsel informed Disciplinary Counsel that his story was not correct:

> 2. The only communication between Mr. Clark and the process server yesterday was by phone. When the process server declined to identify the papers that he was wanting to serve, Mr. Clark asked to speak with his counsel. There was no refusal to open a door and no communication through a closed door. The last time you wanted to serve something through a process server you coordinated it through me without any problem, so I don't know why you didn't go that route this time.

*See* Exh. A attached hereto, email chain between Mr. Fox and Mr. MacDougald, attached hereto; Exh. B attached hereto (Declaration of Jeffrey B. Clark). In fact, Mr. Clark was accompanied by two witnesses (whom we can produce to the Board if necessary) when he voluntarily accepted service by agreement on the morning of July 22, 2022 near his workplace on Capitol Hill in the District. Within an hour, Mr. Fox's office blasted a copy of the complaint to six national reporters. *See* Exh. C attached hereto, an email from a Reuters reporter forwarding an email from Lawrence Bloom of the Office of Disciplinary Counsel transmitting a copy of the Charges to six reporters, one at Bloomberg, two at CNN, two at Reuters, and one at

American Lawyer Media.[5]

After finishing his mistaken recounting of the facts, Disciplinary Counsel

finally turns to taking up the grounds for the Motion for an Extension of Time. ■

[black redaction blocks]

---

[5] The attempt to serve Mr. Clark on July 20, 2022 – without any prior notice to counsel for Mr. Clark nor any attempt arrange for acceptance of service – came quite coincidentally the day before the highly publicized July 21, 2022 hearing of the January 6 Committee. The filing of the charges was reported in the national news on the day service was made. *See*, *e.g.* Google search results for "Jeffrey Clark Bar charges": https://tinyurl.com/2p85nzzn (Approx. 6.5 million results on August 4, 2022)..

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

Disciplinary Counsel has rushed to file the Charges, rushed to serve Mr. Clark the day before a prime time hearing of the January 6 Committee, and lastly rushed to blitz the Charges out to reporters. Indeed, without explaining the timing for why he was asking, Reuters reporter David Thomas reached out to undersigned counsel, Mr. MacDougald (email reprinted in the footnote below), at 9:26 *am* EDT  the morning of July 20, 2022. This suggests that someone in ODC may have leaked to Mr. Thomas that service of public charges against Mr. Clark would be attempted later that same day.[6]

Disciplinary Counsel has now refused a routine courtesy in an effort to exploit Respondent's predicament and purported to justify it by groundlessly blaming Respondent for Disciplinary Counsel's own mistakes and ███████ choices. ODC's relations with the press are further cause for concern. This goes beyond the denial of a "courtesy" to opposing counsel—it is downright unfair. ████████████

███████████████████████████████████████████

---

[6] "To Harry MacDougald, My name is David Thomas and I am a reporter with Reuters. I understand you are representing Jeffrey Clark during his investigation by the D.C. Office of Disciplinary Counsel.  I believe my colleagues reached out to you in March about how former colleagues of Clark's are cooperating with the disciplinary counsel's investigation:     https://www.reuters.com/world/us/exclusive-two-former-us-officials-help-ethics-probe-trump-ally-clark-source-says-2022-03-29/ I was wondering if you had any comment now regarding that investigation. If you could get back to me at your soonest convenience, I would greatly appreciate it." *See* Exh. D, attached hereto.



The legal and strategic issues in this case are complex and momentous for the Respondent and precedential for the D.C. Bar as a whole, notwithstanding Disciplinary Counsel's attempt here to paint a simple extension request as if it were unethical conduct or sharp practice.

## CONCLUSION



Respondent respectfully requests that under these circumstances he be granted an additional 21 days in which to respond to the Charges.

Respectfully submitted this 5th day of August, 2022.

/s/ Charles Burnham

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* Motion for pro hac vice admission before DCCA in progress

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with a copy of this ***Reply in Support of Motion for Extension of Time*** by email addressed to:

Hamilton P. Fox
Jason R. Horrell
D.C. Bar
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org

This this 5 day of August, 2022.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202)3866920

charles@burnhamgorokhov.com

11

Subject: RE: [EXT]Re: Clark

From: hmacdougald@ccedlaw.com - To: Phil Fox - Cc: Angela Thornton, Azadeh Matinpour, Jason Horrell - Date: July 21, 2022 at 12:34 PM

He'll be there ██████████████████████████████████████████

Regards,

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <foxp@dcodc.org>
Date: July 21, 2022 at 12:22:00 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Angela Thornton <thorntona@dcodc.org>, Azadeh Matinpour <matinpoura@dcodc.org>, Jason Horrell <horrellj@dcodc.org>
Subject:  RE: [EXT]Re: Clark



**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Thursday, July 21, 2022 12:17 PM
**To:** Phil Fox <FoxP@dcodc.org>
**Cc:** Angela Thornton <thorntona@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>; Jason Horrell <horrellj@dcodc.org>
**Subject:** [EXT]Re: Clark

<span style="color:red">**Exhibit A**</span>

Phil:

1. ████████████████████████████████████████████████████
██████████ Mr. Clark will accept service of your papers tomorrow morning at 9:15 AM in front of the Hunan Dynasty Restaurant at 215 Pennsylvania Ave., SW, Washington, DC 20003. We also require your assurance that press will not be there. Please let me know if these points are agreeable.

2. The only communication between Mr. Clark and the process server yesterday was by phone. When the process server declined to identify the papers that he was wanting to serve, Mr. Clark asked to speak with his counsel. There was no refusal to open a door and no communication

through a closed door. The last time you wanted to serve something through a process server you coordinated it through me without any problem, so I don't know why you didn't go that route this time.

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109

From: Phil Fox <foxp@dcodc.org>
Date: July 21, 2022 at 11:04:24 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Angela Thornton <thorntona@dcodc.org>, Jason Horrell <horrellj@dcodc.org>, Azadeh Matinpour <matinpoura@dcodc.org>
Subject: Clark

I sent a process server to serve Clark yesterday. He refused to open the door and said he had to check with his lawyer. Are we really going to play this game? I can always apply to the Court for permission to serve him by alternative means.

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

<u>Under Seal</u>

| | |
|---|---|
| In the Matter of | |
| **JEFFREY B. CLARK** | **Disciplinary Docket No.** |
| A Member of the Bar of the District of Columbia Court of Appeals | **2021-D193** |
| Bar No. 455315 | |
| Date of Admission: July 7, 1997 | |

## DECLARATION OF
## JEFFREY B. CLARK

Personally appeared before the undersigned officer, duly authorized to administer oaths, Jeffrey B. Clark, who, after being duly sworn, testified and stated as follows:

1.

My name is Jeffrey B. Clark. I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

2.

I am an attorney licensed to practice law in the District of Columbia since 1997. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for all Circuits, the U.S. District Court for the District of Columbia, as well as several

other Districts, and the Court of Federal Claims. I am the Respondent in the above-referenced matter.

3.

On the evening of July 20, 2022, I received a phone call from a man who stated he was trying to serve me with papers. I asked him who he was serving the papers for, and he identified the D.C. Bar. I asked him what the papers were exactly. He managed to note it was something from the Office of Disciplinary Counsel but it was clear that fully understanding the nature of the papers was something he could not do accurately. I then told him that I would like to speak to at least one of my lawyers before agreeing to accept service. I was still physically at work at my new job in the District of Columbia, which is in the Capitol Hill area, when this conversation took place — not at my home in Lorton, Virginia. I told him I would call him back depending on the advice I received from my lawyers.

4.

I have seen the filing by Disciplinary Counsel for the D.C. Bar in response to my Motion for an Extension of Time which states, in reference to service of the Specification of Charges, that "When a process server went to Mr. Clark's home to serve him with the petition and specification of charges, Mr. Clark refused to admit him." *See* Response, p. 3. This is not true. I had no communication with the first process server who called me on July 20 other than over the phone, as described

above. I never knew that day — nor do I know now — whether the process server actually went to my home. I was not at home when he called, so I would not have heard anyone ring the doorbell or knock on the door if he did do that before dialing me. Nor do I know what time the process server might have relayed to Mr. Fox that he went to my home, so I do not know if he had gone to my home before I left for work that morning or never went to my home at all. There was no note or card left at my door when I left for work on July 20 or when I got home that evening. When I saw certain email traffic between Mr. Fox and one of my lawyers wrongly asserting I had refused to answer the door to a process server, I asked my other family members if a man (or anyone) had knocked at the door that afternoon or evening and they had turned such a person away.  My family members all told me "no."  Nor did the first process server I spoke to by phone even tell me he had gone to my home or ask me to step outside my home in Virginia (I would have told him I was not there) or ask me to open the door to my home.  I got the distinct impression from the first process server I spoke to that he first wanted me to agree to accept service that night and tell him where to drive to for service purposes, but as noted, I insisted I wanted to speak to counsel first, so I did not give him a location.  In sum, even if the first process server did come to my house unbeknownst to me and my family at home without me at the time, I certainly did not refuse to admit the first process server to

my house. I never communicated with him at all except over the phone as described above.

5.

After consulting with my counsel starting the evening of July 20 and running into about midday on July 21, my lawyer, Mr. MacDougald, made arrangements with Mr. Fox for personal service on me, and I agreed to accept service on July 22, 2022. As a result, I met the second process server (who, based on his voice and manner of speech, seemed to be a different person than the first process server) at the agreed time and place, which was the morning of July 22 at a location on Capitol Hill.  I was then voluntarily served on July 22, consistent with the prior arrangements that were made on July 21. I had two interns from my place of employment with me at the time who are witnesses to this event.

6.

Had Disciplinary Counsel approached my counsel to arrange for service in the first instance, his baseless smear that I had attempted to evade service of the Charges could have and should have been avoided. At all prior times since I retained counsel for this matter, Mr. Fox or one of his subordinates have called or emailed counsel first before trying to contact me.  I do not know why Mr. Fox followed a different procedure as to a represented party in this instance.

4

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 4, 2022.

_____/s/ Jeffrey B. Clark_____
Jeffrey B. Clark

**Subject: FW: Public Specification of Charges (Clark)**

From: Lynch, Sarah N. (Reuters) - To: JEFFREY.B.CLARK@GMAIL.COM, hmacdougald@ccedlaw.com - Cc:  - Date: July 22, 2022
at 10:08 AM, Attachments: Spec. Jeffrey B. Clark.pdf

Jeff & Harry,

Do you have any response to these charges?
Please email if possible.
I am in court, covering the Bannon trial, so unable to take calls at this time.

Best,
Sarah

202 579 0289

---

**From:** Lawrence Bloom <blooml@dcodc.org>
**Sent:** Friday, July 22, 2022 10:01 AM
**To:** David McAfee <dMcAfee@bloombergindustry.com>; Katelyn Polantz
<katelyn.polantz@warnermedia.com>; Scarcella, Mike (Reuters) <Mike.Scarcella@thomsonreuters.com>;
Lynch, Sarah N. (Reuters) <Sarah.N.Lynch@thomsonreuters.com>; Tierney Sneed
<tierney.sneed@warnermedia.com>; Vanessa Blum <vblum@alm.com>
**Cc:** Phil Fox <FoxP@dcodc.org>; Angela Thornton <thorntona@dcodc.org>
**Subject:** [EXT] Public Specification of Charges (Clark)

 **External Email:** Use caution with links and attachments.

Lawrence K. Bloom
Senior Staff Attorney
Office of Disciplinary Counsel
515 Fifth Street, NW
Building A, Room 117
Washington, DC 20001
(202) 638-1501 ext. 1744

**Exhibit C**

**Subject: Reuters reporter question**

From: Thomas, David (Reuters) - To: hmacdougald@ccedlaw.com - Cc:  - Date: July 20, 2022 at 9:27 AM

To Harry MacDougald,

My name is David Thomas and I am a reporter with Reuters. I understand you are representing Jeffrey Clark during his investigation by the D.C. Office of Disciplinary Counsel. I believe my colleagues reached out to you in March about how former colleagues of Clark's are cooperating with the disciplinary counsel's investigation: https://www.reuters.com/world/us/exclusive-two-former-us-officials-help-ethics-probe-trump-ally-clark-source-says-2022-03-29/

I was wondering if you had any comment now regarding that investigation. If you could get back to me at your soonest convenience, I would greatly appreciate it.

Thank you.

David Thomas (he/him)
Legal News Reporter
Thomson Reuters
+1 646 823 0937
d.thomas@thomsonreuters.com
Twitter: @DaveThomas5150

This e-mail is for the sole use of the intended recipient and contains information that may be privileged and/or confidential. If you are not an intended recipient, please notify the sender by return e-mail and delete this e-mail and any attachments. Certain required legal entity disclosures can be accessed on our website: https://www.thomsonreuters.com/en/resources/disclosures.html

**Exhibit D**

# DISTRICT OF COLUMBIA COURT OF APPEALS

# BOARD ON PROFESSIONAL RESPONSIBILITY



RECEIVED

Aug 4 2022 8:21am

Board on Professional
Responsibility

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District
of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

Disciplinary Docket No.

2021-D193

## MOTION FOR EXTENSION OF TIME

Comes now Jeffrey B. Clark, Respondent in the above-entitled matter, and hereby moves for a 21-day extension of time within which to file his answer or responsive pleadings to the Specification of Charges filed against him by the Office of Disciplinary Counsel. Disciplinary Counsel opposes this request.

The answer or responsive pleadings are currently due on August 11, 2022, as the Charges were served on July 22, 2022. And Disciplinary Counsel had previously agreed with our computation that the current deadline is August 11. This Motion is thus timely filed under Rule 13.11 of the Rules of the Board of Professional Responsibility.

Respondent seeks a 21-day extension due to the need to coordinate the preparation of the answer or responsive pleadings and the overall response to the Charges among his counsel and in coordination with his employment obligations.

In particular, Charles Burnham has multiple briefing deadlines and several substantive hearings in the months of August and September; Robert Destro has multiple professional obligations prior to Labor Day, including a previously-scheduled speaking appearance in Pennsylvania from August 30-September 1, 2022. And Mr. Destro will need a block of prior time to prepare for that highly technical appearance.

Finally, Mr. Clark is still in the early days of new employment. He has several legal projects he is working on that were already interrupted by loss to access to computer devices this June when the Department of Justice Inspector General executed a search warrant and seized his electronic devices. DOJ has not responded to multiple requests to return the devices. As a result, Mr. Clark is without access to about one month's worth of work in progress on his existing projects for his new employer. Without the computers on which this work in progress resided, he has had to begin such work from scratch causing other internal deadlines to pile up.  Additionally, Mr. Clark's main desktop computer housed all of his files (including pleadings, research, correspondence, etc.) on this case at the investigative stage. ███████████████████████████████ ████████████████████████████ ██████████████████████ ████████████████████████████████ Mr. Burnham has

also repeatedly endeavored to see DOJ return the computer in question to Mr. Clark.

This is far from a simple matter due in part to the novel issues presented and the parallel Congressional and federal criminal investigations into the matters referred to in the Charges. █████████████████████████████

████████████████████████████████████████████████

The requested extension will not cause any undue delay in the progress of this case.

Disciplinary Counsel declined to agree to a 28-day extension. As a result, Respondent and his counsel worked together to reduce the requested extension to 21 days so as to compromise as best as possible with Disciplinary Counsel.

Wherefore, Respondent respectfully requests that he be granted a 21-day extension within which to file his answer or other responsive pleadings in this case. This would make the new deadline **September 1, 2022**.

Respectfully submitted this 3 day of August, 2022.

[Signatures on next page]

/s/ *Charles Burnham*

Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on August 3, 2022 served counsel for the

opposing party and the executive attorney by email addressed to:

| | |
|---|---|
| Hamilton P. Fox | James T. Phalen |
| Jason R. Horrell | Executive Attorney |
| D.C. Bar | Office of the Executive Attorney |
| Building A, Room 117 | 430 E. Street, NW Suite 138 |
| 515 5th Street NW | Washington, DC 20001 |
| Washington DC 20001 | casemanagers@dcpbr.org |
| foxp@dcodc.org | |

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

### Under Seal

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District
of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

RECEIVED

Aug 5 2022 4:30pm
Board on Professional
Responsibility

**Disciplinary Docket No.**

**2021-D193**

## REPLY IN SUPPORT OF MOTION FOR
## EXTENSION OF TIME

Comes now Jeffrey B. Clark, Respondent in the above-entitled matter, and submits this Reply in support of his motion for an extension of time to respond to the Specification of Charges filed against him.

Disciplinary Counsel attempts to justify his opposition to the motion for an extension of time with a diatribe against what he has chosen to portray as Mr. Clark's "dilatory tactics." In fact, any delay going back to service of the original letter of inquiry and subpoena for the production of documents stems directly from ODC's failure to respect the applicable procedural requirements. The attempt to blame Respondent mischaracterizes the facts. In seeking an extension Respondent did not address those topics or invite argument about them, but he is now obliged to respond.

This history will only be briefly reviewed here for it is recounted in detail with supporting affidavits in ██████████████████████████████████████████

## I.    PROCEDURAL BACKGROUND

    1.    THE FIRST SUBPOENA FOR DOCUMENTS AT THE INVESTIGATIVE STAGE

Disciplinary Counsel attempted to serve a subpoena for documents on the Respondent (the "First Subpoena"). Service of the First Subpoena was defective — and not because of any action by Respondent. It was (*i*) not personally served at all, (*ii*) was not accompanied by the required fee to pay for contingent attendance at ODC's offices if documents were not to be produced on grounds of privilege, (*iii*) the affidavit of service was not certified and signed by the serving adult, and (*iv*) personal service was never waived by counsel or Respondent. Additionally, Respondent did not receive a full copy of the First Subpoena and its attachments, albeit lacking proper service, until January 6, 2022, at which time Respondent, who was at the tail end of recovering from COVID-19, immediately set to work discussing the retention of counsel with his professional responsibility insurance carrier.██████████████████████████████████ Ethics counsel,

once retained and with approval of Respondent's insurer, also began to work on the myriad of legal defenses and issues involved in this case. On the return date of the First Subpoena, counsel for Respondent served ODC with extensive letters objecting to the subpoena. Disciplinary Counsel implies there was something untoward about objecting to the First Subpoena right on the return date, but such a complaint about a timely objection has no legal merit whatsoever. The whole point of the negotiated deadline of January 31, 2022 was that this was the date by which Mr. Clark, through his lawyers, would respond to ODC's subpoena. We do not understand how any obligation to respond sooner could be implied.

After Respondent objected to the First Subpoena on multiple grounds (*see* Letter #1 to ODC on Behalf of Respondent (Jan. 31, 2022) (LMQ Exhibit B, pdf p. 27)) and Letter #2 to ODC on Behalf of Respondent (Jan. 31, 2022) (LMQ Exhibit C, pdf p. 72)),



3



2.   THE SECOND SUBPOENA FOR DOCUMENTS AT THE
INVESTIGATIVE STAGE

Seeking to correct defective service of the First Subpoena, Disciplinary Counsel undertook to serve a Second Subpoena. Through counsel, Respondent agreed to accept service at home on February 28, 2021.  Disputes about the impact of the Second Subpoena on the pending DCCA case have not yet been resolved by that Court.

Apart from the defective service of the First Subpoena,

██████████████████████████████████

Obviously, responsibility for defective service of the subpoenas lies with Disciplinary Counsel, not Respondent.[4]

Disciplinary Counsel also grumbles that Respondent asserted a thoroughly researched and argued set of legal objections to the jurisdiction of the D.C. Bar over the conduct under investigation and to the enforceability of either the First or Second Subpoenas. The offense taken by Disciplinary Counsel is unwarranted, as it appears premised on a view that Respondent is somehow not entitled to defend himself. ODC's response would certainly have reflected criticism in very different terms, had the Respondent's objections been asserted without thorough legal support. ODC cannot place a lawyer under scrutiny in the impossible position of being damned if he does, and damned if he doesn't.

Disciplinary Counsel next accuses Respondent of "evading service" of the Specification of Charges. No evidence is offered to support this attempt to besmirch Respondent, and indeed it is false. Disciplinary Counsel made the same false

_____

██████████████████████████████████

accusation in an email to one of Respondent's attorneys on July 21, 2022 as follows: "I sent a process server to serve Clark yesterday. He refused to open the door and said he had to check with his lawyer. Are we really going to play this game? I can always apply to the Court for permission to serve him by alternative means." In response, Respondent's counsel informed Disciplinary Counsel that his story was not correct:

> 2. The only communication between Mr. Clark and the process server yesterday was by phone. When the process server declined to identify the papers that he was wanting to serve, Mr. Clark asked to speak with his counsel. There was no refusal to open a door and no communication through a closed door. The last time you wanted to serve something through a process server you coordinated it through me without any problem, so I don't know why you didn't go that route this time.

*See* Exh. A attached hereto, email chain between Mr. Fox and Mr. MacDougald, attached hereto; Exh. B attached hereto (Declaration of Jeffrey B. Clark). In fact, Mr. Clark was accompanied by two witnesses (whom we can produce to the Board if necessary) when he voluntarily accepted service by agreement on the morning of July 22, 2022 near his workplace on Capitol Hill in the District. Within an hour, Mr. Fox's office blasted a copy of the complaint to six national reporters. *See* Exh. C attached hereto, an email from a Reuters reporter forwarding an email from Lawrence Bloom of the Office of Disciplinary Counsel transmitting a copy of the Charges to six reporters, one at Bloomberg, two at CNN, two at Reuters, and one at

American Lawyer Media.[5]

After finishing his mistaken recounting of the facts, Disciplinary Counsel finally turns to taking up the grounds for the Motion for an Extension of Time. He belittles the complexity of the undertaking before Respondent and his counsel and belittles the obstacles imposed by the Department of Justice's seizure of Respondent's computer containing all of his work on this matter and all of his work for his new employer. Disciplinary Counsel cannot fairly trivialize the genuine problem these circumstances create for Respondent, nor should he attempt to exploit the situation. That is no way to responsibly conduct these proceedings.



---

[5] The attempt to serve Mr. Clark on July 20, 2022 – without any prior notice to counsel for Mr. Clark nor any attempt arrange for acceptance of service – came quite coincidentally the day before the highly publicized July 21, 2022 hearing of the January 6 Committee. The filing of the charges was reported in the national news on the day service was made. *See*, *e.g.* Google search results for "Jeffrey Clark Bar charges": https://tinyurl.com/2p85nzzn (Approx. 6.5 million results on August 4, 2022)..



Indeed, without explaining the timing for why he was asking, Reuters reporter David Thomas reached out to undersigned counsel, Mr. MacDougald (email reprinted in the footnote below), at 9:26 *am* EDT  the morning of July 20, 2022. This suggests that someone in ODC may have leaked to Mr. Thomas that service of public charges against Mr. Clark would be attempted later that same day.[6]

Disciplinary Counsel has now refused a routine courtesy in an effort to exploit Respondent's predicament and purported to justify it by groundlessly blaming Respondent for Disciplinary Counsel's own mistakes and ██████ choices. ODC's relations with the press are further cause for concern. This goes beyond the denial of a "courtesy" to opposing counsel—it is downright unfair. ████████████

---

[6] "To Harry MacDougald, My name is David Thomas and I am a reporter with Reuters. I understand you are representing Jeffrey Clark during his investigation by the D.C. Office of Disciplinary Counsel.  I believe my colleagues reached out to you in March about how former colleagues of Clark's are cooperating with the disciplinary counsel's investigation:    https://www.reuters.com/world/us/exclusive-two-former-us-officials-help-ethics-probe-trump-ally-clark-source-says-2022-03-29/ I was wondering if you had any comment now regarding that investigation. If you could get back to me at your soonest convenience, I would greatly appreciate it." *See* Exh. D, attached hereto.

█████████████████████████████████████████████████████

while there is a federal criminal investigation underway, in a controversy that is politically supercharged, in a jurisdiction that is extremely politically biased against Respondent. ████████████████████████████████████████

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████ The legal and strategic issues in this case are complex and momentous for the Respondent and precedential for the D.C. Bar as a whole, notwithstanding Disciplinary Counsel's attempt here to paint a simple extension request as if it were unethical conduct or sharp practice.

## CONCLUSION

The record shows that the delay about which Disciplinary Counsel complains was actually caused by clerical and procedural faults and strategic decisions that he made, not Respondent. It further shows that Disciplinary Counsel's smear of Respondent as trying to evade service of the Charges in this case is reckless and false, and furthermore was made after he was told by undersigned counsel that it was not true. Disciplinary Counsel has taken to blaming others for his own mistakes or tactical regrets. Mr. Clark (and we as his lawyers) are entitled to insist on full observance of both his procedural and substantive rights.

9

Respondent respectfully requests that under these circumstances he be granted an additional 21 days in which to respond to the Charges.

Respectfully submitted this 5th day of August, 2022.

/s/ *Charles Burnham*

Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1424 K Street, NW
Suite 500
Washington DC 20005
(202) 386-6920
charles@burnhamgorokhov.com

Robert A. Destro*
Ohio Bar #0024315
4532 Langston Blvd, #520
Arlington, VA 22207
202-319-5303
robert.destro@protonmail.com

*Motion for pro hac vice admission before DCCA in progress*

Harry W. MacDougald*
Georgia Bar No. 453076
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

* *Motion for pro hac vice admission before DCCA in progress*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party

with a copy of this ***Reply in Support of Motion for Extension of Time*** by email

addressed to:

> Hamilton P. Fox
> Jason R. Horrell
> D.C. Bar
> Building A, Room 117
> 515 5th Street NW
> Washington DC 20001
> foxp@dcodc.org

This this 5 day of August, 2022.

*/s/ Charles Burnham*
Charles Burnham
DC Bar No. 1003464
1424 K Street, NW
Suite 500
Washington DC 20005
(202)3866920

charles@burnhamgorokhov.com

11

**Subject: RE: [EXT]Re: Clark**

From: hmacdougald@ccedlaw.com - To: Phil Fox - Cc: Angela Thornton, Azadeh Matinpour, Jason Horrell - Date: July 21, 2022 at 12:34 PM

He'll be there, ████████████████████████████████

Regards,

-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956
Direct: 404-843-4109

From: Phil Fox <foxp@dcodc.org>
Date: July 21, 2022 at 12:22:00 PM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Angela Thornton <thorntona@dcodc.org>, Azadeh Matinpour <matinpoura@dcodc.org>, Jason Horrell <horrellj@dcodc.org>
Subject:  RE: [EXT]Re: Clark



I will agree to your terms, ████████████████████████████

---

**From:** Harry MacDougald <hmacdougald@ccedlaw.com>
**Sent:** Thursday, July 21, 2022 12:17 PM
**To:** Phil Fox <FoxP@dcodc.org>
**Cc:** Angela Thornton <thorntona@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>; Jason Horrell <horrellj@dcodc.org>
**Subject:** [EXT]Re: Clark

<span style="color:red">**Exhibit A**</span>

Phil:

1. ████████████████████████████████████████ Mr. Clark will accept service of your papers tomorrow morning at 9:15 AM in front of the Hunan Dynasty Restaurant at 215 Pennsylvania Ave., SW, Washington, DC 20003. We also require your assurance that press will not be there. Please let me know if these points are agreeable.

2. The only communication between Mr. Clark and the process server yesterday was by phone. When the process server declined to identify the papers that he was wanting to serve, Mr. Clark asked to speak with his counsel. There was no refusal to open a door and no communication

through a closed door. The last time you wanted to serve something through a process server you coordinated it through me without any problem, so I don't know why you didn't go that route this time.


-----
Harry W. MacDougald
Caldwell, Carlson, Elliott & DeLoach, LLP
Two Ravinia Drive
Suite 1600
Atlanta, Georgia 30346
404-843-1956

Direct: 404-843-4109


From: Phil Fox <foxp@dcodc.org>
Date: July 21, 2022 at 11:04:24 AM
To: Harry MacDougald <hmacdougald@ccedlaw.com>
Cc: Angela Thornton <thorntona@dcodc.org>, Jason Horrell <horrellj@dcodc.org>, Azadeh Matinpour <matinpoura@dcodc.org>
Subject: Clark


I sent a process server to serve Clark yesterday. He refused to open the door and said he had to check with his lawyer. Are we really going to play this game? I can always apply to the Court for permission to serve him by alternative means.

# DISTRICT OF COLUMBIA COURT OF APPEALS

# BOARD ON PROFESSIONAL RESPONSIBILITY

## <u>Under Seal</u>

In the Matter of

**JEFFREY B. CLARK**

**A Member of the Bar of the District of Columbia Court of Appeals**

**Bar No. 455315**

**Date of Admission: July 7, 1997**

**Disciplinary Docket No.**

**2021-D193**

## DECLARATION OF
## JEFFREY B. CLARK

Personally appeared before the undersigned officer, duly authorized to administer oaths, Jeffrey B. Clark, who, after being duly sworn, testified and stated as follows:

### 1.

My name is Jeffrey B. Clark.  I am over the age of 18, suffer no mental imparities, and have personal knowledge of the following:

### 2.

I am an attorney licensed to practice law in the District of Columbia since 1997. I am admitted to the bars of the U.S. Supreme Court, the U.S. Courts of Appeal for all Circuits, the U.S. District Court for the District of Columbia, as well as several

other Districts, and the Court of Federal Claims. I am the Respondent in the above-referenced matter.

3.

On the evening of July 20, 2022, I received a phone call from a man who stated he was trying to serve me with papers. I asked him who he was serving the papers for, and he identified the D.C. Bar. I asked him what the papers were exactly. He managed to note it was something from the Office of Disciplinary Counsel but it was clear that fully understanding the nature of the papers was something he could not do accurately. I then told him that I would like to speak to at least one of my lawyers before agreeing to accept service. I was still physically at work at my new job in the District of Columbia, which is in the Capitol Hill area, when this conversation took place — not at my home in Lorton, Virginia. I told him I would call him back depending on the advice I received from my lawyers.

4.

I have seen the filing by Disciplinary Counsel for the D.C. Bar in response to my Motion for an Extension of Time which states, in reference to service of the Specification of Charges, that "When a process server went to Mr. Clark's home to serve him with the petition and specification of charges, Mr. Clark refused to admit him." *See* Response, p. 3. This is not true. I had no communication with the first process server who called me on July 20 other than over the phone, as described

above. I never knew that day — nor do I know now — whether the process server actually went to my home. I was not at home when he called, so I would not have heard anyone ring the doorbell or knock on the door if he did do that before dialing me. Nor do I know what time the process server might have relayed to Mr. Fox that he went to my home, so I do not know if he had gone to my home before I left for work that morning or never went to my home at all. There was no note or card left at my door when I left for work on July 20 or when I got home that evening. When I saw certain email traffic between Mr. Fox and one of my lawyers wrongly asserting I had refused to answer the door to a process server, I asked my other family members if a man (or anyone) had knocked at the door that afternoon or evening and they had turned such a person away.  My family members all told me "no."  Nor did the first process server I spoke to by phone even tell me he had gone to my home or ask me to step outside my home in Virginia (I would have told him I was not there) or ask me to open the door to my home.  I got the distinct impression from the first process server I spoke to that he first wanted me to agree to accept service that night and tell him where to drive to for service purposes, but as noted, I insisted I wanted to speak to counsel first, so I did not give him a location.  In sum, even if the first process server did come to my house unbeknownst to me and my family at home without me at the time, I certainly did not refuse to admit the first process server to

my house. I never communicated with him at all except over the phone as described above.

5.

After consulting with my counsel starting the evening of July 20 and running into about midday on July 21, my lawyer, Mr. MacDougald, made arrangements with Mr. Fox for personal service on me, and I agreed to accept service on July 22, 2022. As a result, I met the second process server (who, based on his voice and manner of speech, seemed to be a different person than the first process server) at the agreed time and place, which was the morning of July 22 at a location on Capitol Hill.  I was then voluntarily served on July 22, consistent with the prior arrangements that were made on July 21. I had two interns from my place of employment with me at the time who are witnesses to this event.

6.

Had Disciplinary Counsel approached my counsel to arrange for service in the first instance, his baseless smear that I had attempted to evade service of the Charges could have and should have been avoided. At all prior times since I retained counsel for this matter, Mr. Fox or one of his subordinates have called or emailed counsel first before trying to contact me.  I do not know why Mr. Fox followed a different procedure as to a represented party in this instance.

4

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 4, 2022.

_____/s/ Jeffrey B. Clark_____
Jeffrey B. Clark

**Subject: FW: Public Specification of Charges (Clark)**

From: Lynch, Sarah N. (Reuters) - To: JEFFREY.B.CLARK@GMAIL.COM, hmacdougald@ccedlaw.com - Cc:  - Date: July 22, 2022
at 10:08 AM, Attachments: Spec. Jeffrey B. Clark.pdf

Jeff & Harry,

Do you have any response to these charges?
Please email if possible.
I am in court, covering the Bannon trial, so unable to take calls at this time.

Best,
Sarah

202 579 0289

---

**From:** Lawrence Bloom <blooml@dcodc.org>
**Sent:** Friday, July 22, 2022 10:01 AM
**To:** David McAfee <dMcAfee@bloombergindustry.com>; Katelyn Polantz
<katelyn.polantz@warnermedia.com>; Scarcella, Mike (Reuters) <Mike.Scarcella@thomsonreuters.com>;
Lynch, Sarah N. (Reuters) <Sarah.N.Lynch@thomsonreuters.com>; Tierney Sneed
<tierney.sneed@warnermedia.com>; Vanessa Blum <vblum@alm.com>
**Cc:** Phil Fox <FoxP@dcodc.org>; Angela Thornton <thorntona@dcodc.org>
**Subject:** [EXT] Public Specification of Charges (Clark)

 **External Email:** Use caution with links and attachments.


Lawrence K. Bloom
Senior Staff Attorney
Office of Disciplinary Counsel
515 Fifth Street, NW
Building A, Room 117
Washington, DC 20001
(202) 638-1501 ext. 1744

**Exhibit C**

**Subject: Reuters reporter question**

From: Thomas, David (Reuters) - To: hmacdougald@ccedlaw.com - Cc:  - Date: July 20, 2022 at 9:27 AM

To Harry MacDougald,

My name is David Thomas and I am a reporter with Reuters. I understand you are representing Jeffrey Clark during his investigation by the D.C. Office of Disciplinary Counsel. I believe my colleagues reached out to you in March about how former colleagues of Clark's are cooperating with the disciplinary counsel's investigation: https://www.reuters.com/world/us/exclusive-two-former-us-officials-help-ethics-probe-trump-ally-clark-source-says-2022-03-29/

I was wondering if you had any comment now regarding that investigation. If you could get back to me at your soonest convenience, I would greatly appreciate it.

Thank you.

David Thomas (he/him)
Legal News Reporter
Thomson Reuters
+1 646 823 0937
d.thomas@thomsonreuters.com
Twitter: @DaveThomas5150

This e-mail is for the sole use of the intended recipient and contains information that may be privileged and/or confidential. If you are not an intended recipient, please notify the sender by return e-mail and delete this e-mail and any attachments. Certain required legal entity disclosures can be accessed on our website: https://www.thomsonreuters.com/en/resources/disclosures.html

**Exhibit D**