# EXHIBIT B-2

# CALDWELL, CARLSON, ELLIOTT & DeLOACH, LLP

HARRY W. MACDOUGALD
MANAGING PARTNER

ATTORNEYS AT LAW
TWO RAVINIA DRIVE
SUITE 1600
ATLANTA, GEORGIA 30346

hmacdougald@CCEDlaw.com
www.CCEDlaw.com

TELEPHONE 404-843-1956
FACSIMILE 404-843-2737

January 31, 2022

Via Email foxp@dcodc.org Only

Hamilton P. ("Phil") Fox, III
Disciplinary Counsel
Office of the Disciplinary Counsel
Building A, Room 117
515 5th Street NW,
Washington, DC 20001

Re:  **Disciplinary Docket No. 2021-D193 (Disciplinary Counsel & Jeffrey Clark)**

## RESPONSE TO SUBPOENA DATED 11/22/21, REQUEST FOR DEFERRAL, AND RELATED ISSUES

Dear Mr. Fox:

Let me begin by thanking you on behalf of Mr. Clark for your patience during the month of December 2020 in communicating with him before he had counsel signed up for this matter, and as he battled COVID.  As he had noted for you by email, he did find it challenging to secure counsel for this matter and to submit it to his professional responsibility insurance carrier.  *See* Exhibit 1.  This is not the sort of bar complaint such insurers regularly see, as you can appreciate.  Mr. Clark is truly grateful for your accommodation.  It was very humane of you.

### 1.  **Response to Subpoena**

In keeping with his obligation as a Member of the Bar of the District of Columbia to cooperate with an investigation by Disciplinary Counsel, to the extent constitutional and other legal constraints permit (*see* D.C. Bar Rule XI, Section 8(a) ("An attorney under

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 2

investigation has an obligation to respond to Disciplinary Counsel's written inquiries in the conduct of an investigation, subject to constitutional limitations."), I am acting on Mr. Clark's behalf to report that in response to the subpoena and allegations (dated November 22, 2021[1]), and on advice of counsel, Mr. Clark hereby pleads the Fifth Amendment. And to be precise, recognizing that, like the January 6 Committee in the U.S. House of Representatives is insisting on a question-by-question invocation, you might do the same,[2] he specifically pleads that constitutional protection as follows in response to each of the five specific categories of documents (in turn corresponding to lines of questions) you seek. We do this as to the categories of documents/lines of questions as we discern them from the Attachment to Subpoena (though the categories of documents/lines of questions are not numbered in the Attachment):[3]

　　　　1.　　"Produce all documents and records (stored in hard copy or electronically), of which you were aware before January 4, 2021, that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state."

---

[1] On its own, the date of the subpoena is misleading as to the far shorter delta of time between the subpoena's receipt in some form and my response today. As you know, Mr. Clark did not receive the subpoena via email (which we do not consider service, to be clear, and please see below) *until January 6, 2022. See* Exhibit 1. You know that there were logistical problems in communicating the subpoena to Mr. Clark—logistical problems that afflicted both your Office and Mr. Clark's personal email address, where on each end the respective email software was diverting emails into spam boxes, etc. For instance, on January 10, 2021, you began an email by noting "Your emails are still going into the junk folder, and I did miss the one about pro hac representation. We are trying to figure out why and correct the situation." Exhibit 1. Your Office could have issued a new subpoena updating matters to the agreed-upon January 31, 2022 return date but I assume that to save time, you opted not to do so.

[2] *See In re Barber,* 128 A.3d 637, 640 (D.C. 2015) (Mr. Barber was "was free to invoke his Fifth Amendment right on a question-by-question basis ….").

[3] Today I am also sending in a separate document a response to your letter dated November 22, 2021 (similarly, this letter was not fully received via email by Mr. Clark until January 6, 2022). That letter should be deemed incorporated by reference into this letter. In includes various barriers and publicly available factual averments you would need to work through in order to proceed further. This letter focuses on the subpoena, our request for a deferral, and closely related matters.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 3


• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

2. "Specify what information of election fraud came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department had found no evidence of fraud on a scale that could have affected the results of the presidential election."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

3. "Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

4. "Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [sic] and Natural Resources Division to investigate allegations of election fraud."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 4

5.      "Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President."

• On the advice of counsel, Mr. Clark asserts his Fifth Amendment privilege against self-incrimination.

Note as well, as a general matter, that you are requesting at least some and likely many categories of documents that are in the possession of the Department of Justice. You can contact DOJ to request such documents going to or coming from Mr. Clark. It would seem incumbent on your Office to seek these documents from DOJ first before pursuing a subpoena path directed at Mr. Clark, a former government official who resigned from federal service more than a year ago on January 14, 2021. *See, e.g., Freeman v. Seligson*, 405 F.2d 1326 (D.C. Cir. 1968) (per curiam) ("[W]e are unable to tell what, if any, consideration was given to possible resort to other sources for at least some of the material. From what does appear, many of the documents sought are exclusively under the Secretary's control, and others are obtainable from third parties, if at all, only at great inconvenience. But we think that, particularly with so large a demand as the subpoena here makes, a determination on good cause requires that all reasonable alternatives be explored.").[4]  You can check with DOJ after written notice to us that you are doing so, but Mr. Clark believes that while he was able to see a subset of documents he requested to see pursuant to DOJ regulations relating to a congressional inquiry, he is not authorized on his own authority to share those documents with your Office.

When we spoke on Friday June 27, 2022, you scoffed at the prospect that Mr. Clark might assert his Fifth Amendment rights, and "promised" me that you would "ratchet up" the disciplinary sanction if he did. It is improper to make a verbal threat to retaliate

---

[4] "[A] division of this court [i.e., the District of Columbia Court of Appeals, the highest local court in the District] is normally bound by decisions of the D.C. Circuit rendered before February 1, 1971[.]" *Thoma v. Kettler Bros., Inc.*, 632 A.2d 725, 729 n.9 (D.C. 1993). Additionally, consistent with that, I located the *Freeman* precedent from the Westlaw database entitled "All District of Columbia Local Cases."

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 5

for the exercise of constitutional rights when your own rules expressly incorporate constitutional limits on your investigative and disciplinary authority. It is even more improper to do so in writing in the email you sent me later that evening. Such an approach violates the Due Process Clause *by penalizing* the exercise of procedural rights. *See Ex Parte Young*, 209 U.S. 123 (1908). You cannot run the Bar's disciplinary system in a fashion that would penalize Mr. Clark for exercising his rights, just as *Ex Parte Young* faulted a state law regime for making it "difficult, if not impossible, for the company to obtain officers, agents, or employees willing to carry on its affairs except in obedience to the act and orders in question." *Id.* at 145.

The Fifth Amendment protects an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. An innocent person has the right to claim the Fifth Amendment Privilege if the information requested could conceivably supply a "link in the chain" leading to prosecution. As the Supreme Court held in *Ohio v. Reiner,* the Fifth Amendment "protects the innocent as well as the guilty." 532 U.S. 17, 18 (2001). It is a "safeguard against heedless, unfounded, or tyrannical prosecutions." *Quinn v. United States*, 349 U.S. 155, 162 (1955).

The right against self-incrimination applies to proceedings before the Office of Disciplinary Counsel. *See*, e.g., *In re Artis,* 883 A.2d 85, 103 (D.C. 2005) ("Given the allegations in this case, we find no error in the Board's decision recognizing respondent's right to assert his Fifth Amendment privilege"); *In re Burton,* 472 A.2d 831, 845-46 (D.C. 1984) ("The hearing committee in this case appropriately allowed Respondent to exercise his Fifth Amendment right not to testify, and the committee made it clear that it was *drawing no adverse inference* based on Respondent's failure to testify… or his invoking his Fifth Amendment privilege.") (internal quotations and brackets omitted) (emphasis added); DC Bar Rule XI (8)(a) ("An attorney under investigation has an obligation to respond to Disciplinary Counsel's written inquiries in the conduct of an investigation, *subject to constitutional limitations*.") (emphasis added).

The Fifth Amendment privilege can apply to a production of documents as well as to statements. As the DC Circuit has stated:

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 6

> [T]he act of production communicates at least four different statements. It testifies to the fact that: i) documents responsive to a given subpoena exist, ii) they are in the possession or control of the subpoenaed party, iii) the documents provided in response to the subpoena are authentic; and iv) the responding party believes that the documents produced are those described in the subpoena.

*United States v. Hubbell*, 167 F.3d 552, 567-68 (D.C. Cir. 1999). When asserting a Fifth Amendment "act of production" privilege, creating a log documenting such assertion would itself defeat the privilege. *See*, e.g. *SEC v. Coldicutt*, 2017 U.S. Dist. LEXIS 88401 (C.D. CA 2017) ("[T]he involuntary act of producing a more detailed privilege log could have a testimonial aspect").

While we stoutly deny that Mr. Clark has committed any criminal acts, his Fifth Amendment privileges are nevertheless clearly implicated here because of statements made by Members of the January 6 Committee and in light of the cottage industry among partisan pundits and legal commentators trying to dream up theories upon which he might be criminally prosecuted in order to try him in the press echo chamber. Some of these pundits and commentators are closely aligned with the Chief of Staff of the January 6 Committee. Here is a non-exhaustive set of examples:

- On December 1, 2021, Chairman Bennie Thompson said on the *Rachel Maddow Show* that Mr. Clark's invocation of his Fifth Amendment rights meant that "in some instances you are part and parcel guilty to what occurred." *See* Tim Hains, *Jan. 6 Committee Bennie Thompson: If You Plead the Fifth, You're "Part and Parcel Guilty,"* REAL CLEAR POLITICS, *available at* https://www.realclearpolitics.com/video/2021/12/02/january_6_committee _chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_p arcel_guilty.html#.

- Norm Eisen, former Chief Counsel to the House Committee prosecuting the first impeachment of President Trump, wrote an article with Danya Perry and Joshua Perry that in one breath says that Mr. Clark's "fear of

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 7

incrimination could well be justified," and that "we don't discount the possibility that Mr. Clark might face prosecution for his reported conduct" and in another that the Committee "should explore whether there's a sufficient basis for Clark to invoke — or whether this is just another manipulation." *See* https://www.washingtonpost.com/outlook/2021/12/03/clark-eastman-fifth-amendment/. Mr. Eisen and January 6 Committee Chief of Staff Ms. Amerling are previous collaborators in other Democrat political messaging campaigns. *See also* https://www.acslaw.org/wp-content/uploads/2018/04/Smear-Campaign-cover.png.

- David Corn, a notorious smear merchant in the Russiagate Hoax, is another associate of Ms. Amerling in partisan Democrat endeavors. He wrote in *Mother Jones* that Mr. Clark faced a reasonable prospect of criminal prosecution according to Norm Eisen:

  Corn: Could Jeffrey Clark be prosecuted for trying to push DOJ officials to falsely declare the election corrupt? Under what laws? And would there be any criminal liability for Trump, who is clearly a co-conspirator?

  Eisen: Yes and yes, depending on how the investigation evolves. For instance, 18 USC § 610 makes it "unlawful for any person to intimidate, threaten, command, or coerce" a federal employee to "engage in...any political activity." Prosecutors could decide Trump and Clark conspired to violate that statute. While there are not a lot of precedents, no president has ever gone this far into possible illegality before in American history.

  https://www.motherjones.com/politics/2021/12/heres-why-a-former-trump-ally-may-plead-the-fifth-before-the-1-6-committee/ (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 8

- Lawrence Tribe and Dennis Aftergut, *What Does Jeffrey Clark Have to Hide – And What Are Congress and AG Garland Going to Do About It?*, *available at* https://thehill.com/opinion/judiciary/580643-what-does-jeffrey-clark-have-tohide- and-what-are-congress-and-ag-garland (last visited Jan. 31, 2022).

- Glenn Kirschner, *DOJ Officials Thwarted Trump's Coup. Next Step: A Criminal Investigation.* *available at* https://www.msnbc.com/opinion/doj-officialsthwarted-trump-s-coup-next-step-criminal-investigation-n1276610 (last visited Jan. 31, 2022);

- On August 5, 2021 an editorial from Harvard law professor Laurence H. Tribe, University of Michigan law professor Barbara McQuade and University of Alabama law professor Joyce White Vance appeared in the Washington Post entitled *Here's a Roadmap for the Justice Department to Follow in Investigating Trump*. The editorial argued that Trump and "members of his inner circle" should be investigated for criminal offenses including Obstruction of an Official Proceeding (18 U.S.C. § 1512), *available at* https://www.washingtonpost.com/opinions/2021/08/05/heres-roadmap-justicedepartment- follow-investigating-trump/ (last visited Jan. 31, 2022).

- On January 15, 2022, formerly influential commentator Bill Kristol tweeted as follows: "The forged electoral certificates show coordination across seven states. Those fake certificates were key to the plan of the Eastman memo and to the Jeffrey Clark DOJ draft letter to Georgia. The conspiracy involved fraud and force. At the head of the conspiracy: Donald Trump." *available at* https://twitter.com/BillKristol/status/1482343171103277065 (italics added) (last visited Jan. 31, 2022).

- On December 1, 2021, the January 6 Committee voted to refer Mr. Clark to the Department of Justice for prosecution for criminal contempt of Congress.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 9

It should be obvious to even the most casual observer that statements such as these necessitate a Fifth Amendment response to any official inquiry, including a subpoena from the January 6 Committee.  It is equally obvious that the same considerations and others would apply to the subpoena you issued as Disciplinary Counsel. The letter from Senator Durbin that apparently prompted your inquiry openly accused Mr. Clark of criminal conduct. As Senator Durbin wrote, "Mr. Clark appears to have violated Rule 1.2(e)'s prohibition against 'counsel[ing] a client to engage, or assist[ing] a client, in conduct the lawyer knows is criminal or fraudulent." The Bar's investigation thus has as its genesis an accusation of criminal misconduct by an individual U.S. Senator who is also the Chairman of the Senate Judiciary Committee. *Cf. Artis*, 883 A.2d at 103 (evaluating Fifth Amendment assertion in light of "the allegations in this case.")

The subject matters covered by the Bar's subpoena relate directly to the subject matters of the various suggestions that Mr. Clark has criminal liability or should be criminally investigated or prosecuted. For example, the subpoena requests documentation of irregularities in the 2020 election, internal Justice Department correspondence relating to the election, details of conversations with other individuals about the election and other matters. Answers to such queries, though seemingly innocuous in themselves, could very easily supply a "link in the chain" leading to a "heedless, unfounded or tyrannical prosecution[]."

Claiming the protection of Fifth Amendment is not, as a matter of law, an "obstruction" of the Bar's investigation.  Further, an as argued in both letters dated today, my opinion is that the entire investigation into the internal deliberative processes of the Department of Justice is *ultra vires*.  The Fifth Amendment is unfortunately necessary under the circumstances because it offers available protection against a "heedless, unfounded or tyrannical prosecution[]." Should the Fifth Amendment concerns be definitively resolved, I am sure that Mr. Clark will consider offering substantive responses, subject to the other formal objections asserted in this letter and the accompanying letter of even date should the investigation reach that point.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 10


2.  **Request for Deferral**

I hereby also respectfully request that you seek to defer this investigation under D.C. Board Rule (hereafter "Board Rule __") 4.1 because likely all portions (or, at the very least, some portions) of Senator Durbin's charges are currently being investigated by several other entities, including possibly but not limited to:

- the Senate Judiciary Committee, which the Senator Durbin complaint itself evidences and which your November 22 cover letter (emphasis added) recognizes at page 2 is merely an "*interim* report";

- the House Select Committee to Investigate the January 6th Attack on the United States Capitol, *see especially* Business Meeting, *available at* https://january6th.house.gov/legislation/business-meetings/business-meeting-report-recommending-house-representatives-cite-0 (Dec. 1, 2021);

- the Inspector General of the Justice Department, *see* OIG Press Release, *available at* https://oig.justice.gov/news/department-justice-office-inspector-general-announces-initiation-investigation (Jan. 25, 2021).

- The special grand jury criminal investigation, involving former President Trump's election-related activities, being conducted by Fulton County, Georgia. *See In Re: Request for Special Purpose Grand Jury*, Order Approving Request for Special Purpose Grand Jury Pursuant to O.C.G.A. § 15-12-100, *et seq.*, Superior Court of Fulton County, Atlanta Judicial District, No. 2022-EX000024 (entered Jan. 24, 2022);[5] and

- a host of lawsuits involving various persons and entities related to the Dominion, *et al.* voting machines, *see, e.g.*, Jan Wolfe & Helen Coster, *Dominion Sees No Chance of Settling Suits Against Pro-Trump Lawyers Giuliani, Powell*, REUTERS,

---

[5] By referencing this proceeding, there is no acquiescence in Fulton County jurisdiction over Mr. Clark. He retains all of his jurisdictional defenses. Board Rule 4.1 does not require the existence of jurisdiction in a related pending matter over a bar member in order for it to provide proper grounds for deferral.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 11

> *available    at*    https://www.reuters.com/legal/government/dominion-sees-no-chance-settling-suits-against-pro-trump-lawyers-giuliani-powell-2022-01-25/ (Jan. 25, 2022).[6]

The following table compares the 5 categories of documents in your subpoena to the 18 categories in the January 6 Committee subpoena:

| Items in This Subpoena | Items in the J6 Subpoena[7] |
|---|---|
| [1] "Produce all documents and records (stored in hard copy or electronically), of which you were aware before January 4, 2021, that contain evidence of irregularities in the 2020 presidential election and that may have affected the outcome in Georgia or any other state." | "7. From November 3, 2020, through January 20, 2021, all documents and communications provided to you relating in any way to purported election irregularities, election-related fraud, or other election-related malfeasance."<br><br>"8. All documents and communications relating in any way to specific allegations of voter fraud in |

---

[6] Admittedly, no document I am aware of shows Mr. Clark taking a public position on Dominion voting machines while he served in the Justice Department (and to my knowledge not even after he left on January 14, 2021). But the unsent letter to Georgia officials, which Mr. Clark is alleged to have drafted and is one of the focal points of your subpoena and of Senator Durbin's complaint, was also not made public by Mr. Clark. That means, as I cover in more detail in the accompanying separate letter from me dated today, that this investigation should be terminated. Your Office's seems to be proceeding on the theory that even confidential pre-decisional draft documents that were reportedly first batted around by a group of federal lawyers and then discussed with the President, but rejected and never sent or otherwise acted upon, can give rise to a properly founded bar discipline case. Under such a limitless theory, there is no necessary demarcation that would make those extraneous voting machine lawsuits unrelated for purposes of the deferral rule, even though Mr. Clark made no claims in a public forum about those machines. The same breadth you apply to your conception of the Office of Disciplinary Counsel's investigative and prosecutorial authority must also be applied in assessing whether other litigation or investigations are sufficiently related, and thus would provide grounds for deferring this matter, under Board Rule 4.1.

[7] *See* Exhibit 2, Subpoena to Mr. Clark from the January 6 Committee.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 12

| Items in This Subpoena | Items in the J6 Subpoena[7] |
|---|---|
| | Georgia, Pennsylvania, Michigan, Arizona, or any other states." |
| [2] "Specify what information of election fraud came to your attention following the announcement of Attorney General Barr on December 1, 2020, that the Department had found no evidence of fraud on a scale that could have affected the results of the presidential election." | "5. All documents and communications relating in any way to a November 9, 2020, memorandum from Attorney General William Barr concerning investigation of voter fraud allegations."<br><br>"6. From November 3, 2020, through January 20, 2021, all documents provided to you for reviewing, assessing, or reporting on the security of election systems in the United States."<br><br>"9. All documents and communications relating in any way to alleged interference with the tabulation of votes by machines manufactured by Dominion Voting Systems." |
| [3] "Produce any file or collection of materials or correspondence, written or electronic, relating to any efforts that you made between the November 3, 2020, presidential election and January 4, 2021, that relate in any way to any efforts you made to persuade officials of the United States Department of Justice to intervene in the certification by any state, specifically including Georgia, of the results of that election." | "2. All documents and communications relating in any way to a draft letter (including previous drafts of the letter) from the Department of Justice to state officials regarding the convening of a special legislative session, delay in certification of election results, or any other matters concerning the fall 2020 election."<br><br>"17. All documents and communications relating in any way to state legislatures' selection, or potential selection, of alternate sets of electors to cast electoral votes in the fall 2020 election." |
| [4] "Provide the results of any legal research that you conducted, had conducted, or received before January 4, 2021, that relate to the authority of the | "1. Communications referring or relating in any way to plans, efforts, or discussions regarding the Department of Justice's involvement in |

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 13

| Items in This Subpoena | Items in the J6 Subpoena[7] |
|---|---|
| United States Department of Justice to intervene in the certification by any state of the results of a presidential election, including the circumstances under which the Department is authorized to intervene, the quantum of proof necessary for such an intervention, the officials within the Department whose responsibility it is to initiate such an intervention, and the form that such intervention should take. This information should include any research that addresses the responsibility of the Assistant Attorney General of the Civil Division or the Assistant Attorney General of the Environmental [sic] and Natural Resources Division to investigate allegations of election fraud." | investigating allegations of election fraud in the 2020 Presidential election." <br><br>"2. All documents and communications relating in any way to a draft letter (including previous drafts of the letter) from the Department of Justice to state officials regarding the convening of a special legislative session, delay in certification of election results, or any other matters concerning the fall 2020 election." <br><br>"4. All documents and communications relating in any way to the possibility of the Department of Justice filing documents in the United States Supreme Court regarding allegations of election fraud and/or the certification of the results of the election." <br><br>"18. All documents and communications relating in any way to Congress's or the Vice President's role and authority when counting electoral votes." |
| [5] "Provide all written policies and guidelines of the Department of Justice, of which you were aware and that were in effect between November 3, 2020, and January 4, 2021, relating to the circumstances in which lawyers at the Department of Justice were permitted to be in direct contact with officials of the White House or the Executive Office of the President." | "12. All communications with former President Trump, former Chief Staff to the President Mark Meadows, or other individual who worked in the White House complex during the Trump Administration, including any employee or detailee, relating in any way to allegations of fraud in the fall 2020 election." |

You will no doubt see in the above table *substantial overlap* between the items you have subpoenaed and those that the January 6 Committee have subpoenaed, further supporting the wisdom of deferring this Bar inquiry.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 14

Overall, within the meaning of Board Rule 4.1(a), there is thus a "pendency of a related ongoing criminal or disciplinary investigation or upon related criminal or civil litigation where there is a substantial likelihood that the resolution of the related investigation or litigation will help to resolve material issues involved in the pending disciplinary matter." *See also generally* D.C Bar Rule XI, Section 19(d).  Note that your November 22, 2021, cover letter to Mr. Clark explicitly concedes that there are "*parallel Congressional investigations*."  Letter from Phil Fox to Jeffrey Clark, at 3 (Nov. 22, 2021) (emphasis added).  Accordingly, it would seem hard for your Office to now maintain that those investigations, which are in "parallel" and many of which began far earlier, are not a proper basis for a Board Rule 4.1 finding that the resolution of those other matters "will help to resolve material issues involved in the pending disciplinary matter."  As a result, it is appropriate to defer this case pending the resolution of those other matters.

Nevertheless, I do see that, in a January 10, 2022 email to Mr. Clark about the January 31, 2022 agreed-on deadline for responding to your letter and subpoena, you stated the following: "We are not going to be receptive to arguments that any production should be put off awaiting any action by the January 6 committee or the Department, and we will assess any such arguments in the context of your obligation as a member of the Bar to respond to our inquiries. This office is an arm of the Court, and we are not going to defer to a congressional inquiry or a dispute with the Department."  Exhibit 1.

Respectfully, I think your January 10 statement is directly contrary both to the letter and spirit of Board Rule 4.1(a), especially in light of your concession that there are "parallel Congressional investigations."  Under that Board Rule, you should neutrally evaluate whether this deferral request should be granted using the criterion in the rule. If you disagree with my request, please explain in a response to this letter why Board Rule 4.1(a) does not fit this situation quite well, especially given that we are dealing here not with just one related matter pending elsewhere, but *several such matters, multiplying the utility of awaiting the resolution of all of those matters, or at least some of them.*

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 15

Additionally, speed should not be a factor, especially if the accelerated timetable is desired by the January 6 Committee.[8]  Nothing in Board Rule 4.1 indicates that it is a relevant factor that parties in related investigations or matters want your Office to move quickly to advance their own objectives through your investigation, assuming it is and remains independent. (By contrast, the fact that other entities want to move your Office along quickly reveals that they are trying to weaponize bar processes against Mr. Clark, something that you should steadfastly resist as part of your duty to do substantial justice and to maintain the separation of powers between the legislative and judicial branches of the federal government.)  Considering such a factor would thus be improper and outside the bounds of Board Rule 4.1.

We understand that requests for deferral are routinely granted even where doing so entails substantial delay. We certainly believe that Mr. Clark should be entitled to the same treatment as others in this regard. We therefore hope that upon reflection you will agree with the deferral request to put this inquiry on hold until at least some of those matters are concluded.  If you now agree, please refer my request on Mr. Clark's behalf for a deferral to the appropriate "Contact Member" or let me know the name and address of that person and I will direct this deferral request to that person, noting your non-opposition to it.

4.  **Other Related Issues Supporting Deferral or Withdrawal of the Subpoena**

*Your Office's Subpoena Power Cannot Be Used as a Substitute for a Senate Subpoena Power That Under Senate Rules There Is Not Enough Power To Wield.* The complaint you have opted to docket against Mr. Clark comes directly from Senator Durbin, current Chair of the Senate Judiciary Committee, in his individual capacity; not from the Senate Judiciary Committee itself.  The Committee has its own rule governing

---

[8] It seems curious that while this response was coming due on January 31, 2022 and just a few days ago, on January 27, 2022, the January 6 Committee contacted another of Mr. Clark's lawyers, Mr. Charles Burnham, for the first time in weeks, to seek to rapidly schedule a second deposition for Mr. Clark, which would inherently fall *after* the response to your subpoena was due. And then, *just the next day*, on January 28, 2022, DOJ contacted me about providing a redacted version of a document we have long been seeking for the very purpose of preparing for that deposition. This is quite an alignment of stars.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 16

subpoenas, which, if properly followed, could have issued its own subpoena for these documents. But the Committee has not done so because Rule IX of Rules of Procedure of the United States Senate Committee on the Judiciary provides as follows:

> The Chair of the Committee, *with the agreement of the Ranking Member or by a vote of the Committee*, may subpoena the attendance of a witness at a Committee or Subcommittee hearing or Committee deposition, or the production of memoranda, documents, records, or any other materials. Any such subpoena shall be issued upon the signature of the Chair or any other Member of the Committee designated by the Chair.

*Available at* https://www.judiciary.senate.gov/about/rules (last visited Jan. 31, 2022) (emphasis added). These Rules carry constitutional imprimatur. *See* U.S. Const. art. I, sec. 5 ("Each House may determine the Rules of its Proceedings ….").

No Senate Judiciary Committee subpoena has ever been issued to Mr. Clark. Under the text of Senate Judiciary Committee Rule IX, that must be because the Ranking Member, Senator Grassley did not concur in sending such a subpoena and because Senator Durbin knew that with a total of 22 Members on the Committee, evenly divided between the two political parties, he could not secure a majority of votes to issue a subpoena. Senator Durbin turned instead to your Office.

In light of these facts and these aforementioned sources of federal law, your Office should regard the issue as being preempted, pursuant to the Supremacy Clause. The Senate Judiciary Committee is part of the federal government, to which your Office is subordinate. Nor is the District of Columbia able to cloak its action in any doctrine of federalism; the District of Columbia is subject to direct federal control. Instead, pursuant to the duly prescribed processes of the U.S. Senate, the even divide in the Senate logically precludes the issuance of a subpoena by your Office. This is representative democracy at work, *i.e.*, respecting the ability of the Senate to act or not act as its balance of power lies.

Your Office is thus obligated to respect, as the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, the inability of the Senate Judiciary Committee to issue a subpoena to Mr. Clark. Allowing Senator Durbin (and perhaps his fellow Democrat Committee

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 17

Members)[9] to functionally acquire the power to subpoena, simply by finding a willing local bar entity to issue the subpoena instead, is a flat-out circumvention of the inability of the Senate Judiciary Committee to muster the votes necessary to issue a subpoena to Mr. Clark. And circumvention is precisely what conflict preemption doctrine is designed to prevent. *See, e.g., Engine Mfrs. Assn. v. South Coast Air Quality Management Dist.*, 541 U. S. 246, 255 (2004) (invalidating attempted evasion by California of commitments of authority to a federal agency). The Senate cannot blow hot and cold with its rules; either they are followed consistently or they are not. Thus, if the Senate's rules on hearing testimony were permissibly applied in a way that somehow allows you to receive testimony against Mr. Clark (something, to be clear, we reject because the applicable D.C. rules contemplate an *independent* trial-like process and on Bill of Attainder grounds), then the Senate's subpoena rules (and the limitations thereof) must similarly be observed. Or, by contrast, if the Senate's rule on subpoenas is to be ignored, then the testimony that came in pursuant to other portion(s) of Senate rules must similarly be ignored.[10]

In any event, as an independent matter, the Senate's rules and its authority cannot be supplemented by the devices of local law when the stopping points of those Rules and authority would be exceeded. Otherwise, the majority voting requirement of Senate Judiciary Committee Rule IX would be rendered a nullity.

At the very least, there is no prudent reason for your Office to break the Senate tie by allowing Senator Durbin, in effect, to wield your Office's subpoena power by either

---

[9] Note as well, however, that the October 7, 2021 letter that was sent to you to serve as a complaint is signed by and purports to speak only for Senator Durbin. There is no indication in it that a Senate Judiciary Committee vote of any kind was held before the October 7 letter was sent. This is an independent violation of the Senate Judiciary Committee Rules because there is no indication that the very serious matter of sending an accusation to your Office against Mr. Clark was supported by any other members. *See* Senate Judiciary Committee Rule III (Quorums), *available at* https://www.judiciary.senate.gov/about/rules (last visited Jan. 31, 2022). The Durbin letter obviously threatens Mr. Clark's livelihood, his reputation, and thus the health and integrity of his family as well. It is possible that even fellow Democrat Senators may have recoiled from impugning Mr. Clark, had they been asked before Senator Durbin sent his letter.

[10] However, I fully reserve Mr. Clark's constitutional rights to argue that the Senate Judiciary Committee was exceeding its actual sphere of powers to investigate facts only for the purpose of legislating.

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 18

remote control or because of a preference that might exist within your Office's personnel
to side with Senator Durbin's views on disputed issues in the administration of the 2020
presidential election.  That would be both abuse of prosecutorial discretion for an
improper political end and the wading into a deep political divide in the guise of merely
policing the ethics rules.  Indeed, since there does not appear to have ever been an ethics
case like this one, where a member of one branch of the federal government belonging to
one political party complains about confidential internal legal deliberations between and
among members of the opposite political party inside another branch of the federal
government, extreme caution should be exercised.  And that level of caution should be
heightened further when the situation involves advice to the President as well.  And if
that protective approach is properly followed, this subpoena should be withdrawn or at
least deferred pending the other actions pointed to above. Will the D.C. Bar next
investigate Supreme Court law clerks who write drafts or propound arguments in
confidential internal discussions that are rejected by the Justice for whom they clerked
where a single Senator complains about that position, even though the Justice did not
actually adopt it?  As you are aware, sometimes the Justices' internal papers are released
or leak and, on the logic that you seem to be entertaining, their clerks could thus be
investigated years later.   *See* Board Rule 19.1 ("Investigations, petitions, and the
application of sanctions are not subject to any statute of limitations.").

   ***Federal Supremacy in the Context of Bar Disciplinary Rules***. As set forth in the
Office of Legal Counsel Opinion dated August 2, 1985 and entitled *State Bar Disciplinary
Rules as Applied to Federal Government Attorneys,*[11] any local bar's assertion of disciplinary
authority over federal government attorneys that interferes with or penalizes the
performance of authorized federal responsibilities trenches upon the Supremacy Clause.
"The purported imposition of exclusive disciplinary jurisdiction by state courts upon
federal lawyers acting in the scope of their federal authority is subject to the overriding
requirements of the Supremacy Clause. Rules promulgated by state courts or bar
associations that are inconsistent with the requirements or exigencies of federal service
may violate the Supremacy Clause." *Id.*

---

[11] *Available at* https://www.justice.gov/file/23741/download (emphasis added) (last visited Jan. 31, 2022).

CALDWELL, CARLSON,
ELLIOTT & DeLOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 19


*Other Objections.* Mr. Clark also expressly reserves his right, acknowledged in Board Rule 2.9(a), to assert and claim, at the appropriate time, that Disciplinary Counsel's subpoena and each of the related requests for information, dated November 22, 2021, "seek[] privileged information, seeks information that exceeds constitutional limitations or is otherwise improper," including because, but not limited to, the fact that the requests and questions are vexatious, unduly burdensome, not reasonably calculated to lead to the discovery of information relevant to the investigation, and are otherwise improper under the circumstances and under the applicable D.C. Bar Rules, Board Rules, and Rules of the Superior Court of the District of Columbia. The requests and questions posed above are unreasonable under the circumstances. They amount to the equivalent of interrogatory discovery, which is impermissible in this context; are overbroad, vague and burdensome; involve information available from other sources, and present an excessive monetary burden. *See generally In re Artis*, 883 A.2d 85 (D.C. 2005). Board Rule 2.9(a). This rule also imposes a mandatory duty on you to consult with us at an appropriate time before proceeding further. I also note the obvious point that since you agreed to a January 31, 2022 response date concerning your letters, any time periods associated with this process begin no earlier than today, and since the subpoena has not been served, in reality even later.

I recognize that that Board Rule specifically involves requests for information by you, whereas here you have opted to proceed by way of a Board Rule 3.14 subpoena (something that itself is curious as it attempts to use the bigger tool first). However, as a matter of the structure of the Board Rules and the fact that constitutional issues exist here, whether you had opted to proceed via Board Rule 2.9(a) or via Board Rule 3.14, the point remains that request for information, including a subpoena, is invalid if it seeks to intrude into confidential internal legal deliberations undertaken within the federal sphere, especially to counsel the President, the sole head of the Executive Branch.

The questions posed above thus also raise novel, complex and difficult executive privilege, separation of powers, Fifth and Sixth Amendment, and professional responsibility issues. Without duplicating the points covered in my other letter dated today, consider briefly just the issue of executive privilege. *See, e.g., Trump v. Thompson*, No. 21A272 (Jan. 19, 2022) (statement of Justice Kavanaugh respecting the denial of the

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 20

application for an injunction pending appeal) (observing that "If Presidents and their
advisers thought that the privilege's protections would terminate at the end of the
Presidency and that their privileged communications could be disclosed when the
President left office (or were subject to the absolute control of a subsequent President who
could be a political opponent of a former President), the consequences for the Presidency
would be severe."). The majority in *Trump v. Thompson* were also very cautious to
recalibrate the D.C. Circuit's apparent view to the contrary as mere dicta. *See generally*
D.C. Bar Rule XI, Section 8(a) ("An attorney under investigation has an obligation to
respond to Disciplinary Counsel's written inquiries in the conduct of an investigation,
*subject to constitutional limitations*.") (emphasis added).

Additionally, Senator Durbin was clearly *not the client of Mr. Clark here*. As such,
the complaint he made to your Office cannot possibly waive any attorney-client privilege
binding Mr. Clark. This is not the typical situation in which a complainant approaches
you to grieve against his lawyer, or possibly seeks help in drafting a complaint, and thus
may need to disclose his confidential information to you to explain why he is
complaining. This is instead an atypical situation in which a highly partisan member of
one chamber of the legislative branch of the federal government is complaining about
internal legal advice given inside Executive Branch of the federal government by a
member of the opposite political party. As far as I am aware, there has never been a past
disciplinary case like this one, which is *extremely novel* and for that reason alone raises
serious due process issues of fair notice. *See In re Ruffalo*, 390 U.S. 544 (1968) (invalidating
a disbarment order because the lawyer had no notice that his conduct— hiring a part-
time FELA investigator who worked for a railroad—might later be considered by some
lawyers as an offense warranting a disbarment order); *id.*, 390 U.S. at 556 (White &
Marshall, J.J. concurring in the result) ("I would hold that a federal court may not deprive
an attorney of the opportunity to practice his profession on the basis of a determination
after the fact that conduct is unethical if responsible attorneys would differ in appraising
the propriety of that conduct.").

I do not go into detail on the constitutional and other privilege issue here because
my separate letter today does so and also incorporates my prior communications on
executive privilege and other matters with the January 6 Select Committee. All of these

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 21


issues, though, also support my request that Disciplinary Counsel seek deferral of this investigation under Board Rule 4.1.

*Unperfected Service of the Subpoena.* Regarding the subpoena itself, one last issue. If you opt not to withdraw the subpoena or defer consideration of this matter pursuant to Board Rule 4.1, please address service of the subpoena. Pursuant to D.C. Bar Rule XI, Section 18(a), you can issue a subpoena at the investigation stage. But that Bar Rule incorporates D.C. Superior Court Civil Rule 45 by reference. And Superior Court Civil Rule 45(b) provides how service is to be accomplished. More specifically, Superior Court Civil Rule 45(b)(1) states that "[s]erving a subpoena requires delivering a copy to the named person, and, if the subpoena requires that person's attendance, tendering the fees for one day's attendance and the mileage allowed by law." Service in accord with the applicable rules has not yet occurred. Mr. Clark did agree by email to respond by today (which he is making good on in my two letters) but that is not the same as receiving formal service. Nor did Mr. Clark specifically waive his right in writing to insist on formal service.

*Confidentiality.* It was troubling to see in your cover letter dated November 22, 2021, your statement to Mr. Clark that you will be "sending a copy of [his] response to the complainant [i.e., Senator Durbin] for comment." Presumably this would have also included any documents produced by Mr. Clark. We submit that such a disclosure is neither "necessary" under the Bar Rules, nor permitted under Rule XI and the DC Rules of Professional Conduct.

I therefore include as an attachment to this letter a D.C. Bar Ethics Opinion that discusses the confidentiality and conflict of interest obligations of Bar Counsel. In cases such as this one, giving anyone in Congress a copy of such materials, is the functional equivalent of a "mass public communication" especially because the leak potential increases astronomically, thus converting this confidential bar investigation into a trial in the press. We respectfully submit that any breach of the confidentiality requirement of D.C. Bar Rule XI, Section 17 by you or anyone in your Office will constitute "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding." D.C. Rules of Professional

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 22

Conduct 3.6(c); 3.8(f).  *See* D.C. Bar Legal Ethics Opinion No. 358, at n.6 Exhibit 3 (Jan. 1, 2011).  In your response to this letter, please confirm that you understand these restrictions.  Tempting trial by media (and in this instance an especially ravenous media feasting on breathless and constantly hyped moral panic over 2020 election controversies) is improper under Ethics Opinion No. 358 and D.C. Rules of Professional Conduct 3.6(c) and 3.8(f) (the latter applying as you serve in the role of a "chief prosecutor," *see* Office of Disciplinary Counsel, Purpose and Mission, *available at* https://www.dcbar.org/attorney-discipline/office-of-disciplinary-counsel/purpose-and-mission (last visited Jan. 31, 2022)).

*The Real Ethics Issues Here, If Any Were Within Your Office's Jurisdiction, Are the Anonymous Leaks, Likely Made by One or More <u>Other</u> Federal Lawyers (Not Mr. Clark), That Form the Genesis of Senator Durbin's Complaint.*  It is unfortunate for the state of the Republic to be saying this, but the complaint filed by Senator Durbin is a clear attempt to weaponize the D.C. Bar Rules against Mr. Clark, to play politics, and to besmirch Mr. Clark's stellar reputation.  Stellar at least until anonymous leakers (likely lawyers violating their own professional responsibility, obligations and other duties of confidentiality) attempted to paint themselves as heroes opposing former President Trump in a *New York Times* narrative that began to be spun in late January 2021.  *See* Katie Benner, *Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General,* New York Times (Jan. 22, 2021), *available at* https://www.nytimes.com/2021/01/22/us/politics/jeffrey-clark-trump-justice-department-election.html.

If anything should be done as to the ethics rules in this situation, you should be investigating who at the Justice Department (or who elsewhere in the federal government that might be lawyers) leaked to the *New York Times*.  Trying to penetrate into the advice Mr. Clark gave to his colleagues in the Department of Justice and to the President of the United States under the shield of confidentiality is not an inquiry within the scope of D.C. Bar Rule XI, and thus not a matter your Office should be pursuing.  Local bar counsel should not be trying to oversee or to regulate the superior federal government's confidential internal deliberations.  Nor do they possess legal authority under our Constitution to do so.

CALDWELL, CARLSON,
ELLIOTT & DELOACH, LLP

Phil Fox, Esq.
January 31, 2022
Page 23

Respectfully,

Caldwell, Carlson, Elliott & DeLoach, LLP

Harry W. MacDougald

Enclosures
cc:     Jeffrey Bossert Clark (w/ enclosures)

Redacted

| | |
|---|---|
| **From:** | Phil Fox <FoxP@dcodc.org> |
| **Sent:** | Monday, January 10, 2022 12:12 PM |
| **To:** | Jeffrey Clark |
| **Cc:** | Jason Horrell; Azadeh Matinpour; Angela Thornton |
| **Subject:** | FW: [EXT]RE: 1st part of BLTR with attachments |

FYI

-----Original Message-----
From: Angela Thornton <thorntona@dcodc.org>
Sent: Monday, January 10, 2022 12:08 PM
To: Phil Fox <FoxP@dcodc.org>
Subject: RE: [EXT]RE: 1st part of BLTR with attachments

I'm counting 541 - close enough.

-----Original Message-----
From: Phil Fox <FoxP@dcodc.org>
Sent: Monday, January 10, 2022 11:48 AM
To: Angela Thornton <thorntona@dcodc.org>
Subject: FW: [EXT]RE: 1st part of BLTR with attachments

Will you confirm the total number of pages that we sent to him?

-----Original Message-----
From: Phil Fox
Sent: Monday, January 10, 2022 10:27 AM
To: Jeffrey Clark <Redacted>
Cc: Angela Thornton <thorntona@dcodc.org>; Jason Horrell <HorrellJ@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>
Subject: RE: [EXT]RE: 1st part of BLTR with attachments

Your emails are still going into the junk folder, and I did miss the one about pro hac representation.  We are trying to figure out why and correct the situation.

First, with respect to the representation issue, there is an opinion from the Committee of Unauthorized Practice of the D.C. Court of Appeals that essentially says a non-D.C. lawyer can represent you without formal pro hac admission up until the time the case goes before the Court of Appeals.  That means, he can represent you during the investigation, at any hearing before a hearing committee, should one occur, and at the intermediate appellate level before the Board on Professional Responsibility.  Only if exceptions are taken to a Board report and/or the Court otherwise hears the case does he have to obtain pro hac admission.  This recently occurred with a lawyer from Tennessee who represented a former AUSA before a hearing committee and the Board without receiving pro hac admission.  When the matter went before the Court, where it is now pending, he applied for pro hac admission, which the Court promptly granted.

January 31 is fine, but that is a final deadline.  We are not going to be receptive to arguments that any production should be put off awaiting any action by the January 6 committee or the Department, and we will assess any such arguments in the context of your obligation as a member of the Bar to respond to our inquiries. This office is an arm of the Court, and we are not going to defer to a congressional inquiry or a dispute with the Department. You need to produce what you

EXHIBIT 1

1

have by January 31.  If there is additional information that you believe is relevant and that you cannot produce, you can produce something akin to a privilege log, identifying the documents generically and explaining why you cannot produce them.

We will double check and get back to you on the total number of pages that we sent you.

-----Original Message-----
From: Phil Fox <FoxP@dcodc.org>
Sent: Monday, January 10, 2022 10:09 AM
To: Phil Fox <FoxP@dcodc.org>
Subject: FW: [EXT]RE: 1st part of BLTR with attachments
Importance: High


-----Original Message-----
From: Jeffrey Clark <Redacted>
Sent: Monday, January 10, 2022 7:19 AM
To: Phil Fox <FoxP@dcodc.org>
Cc: Jason Horrell <horrellj@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>; Angela Thornton <thorntona@dcodc.org>
Subject: RE: [EXT]RE: 1st part of BLTR with attachments
Importance: High

Mr. Fox,

 (1) I think there is a way to add me in your email program as a trusted recipient, which I think should solve the junk folder issue on your end going forward.

 (2) Please also check your junk folder to see if there is an email from me earlier on Friday morning than you sent the email below (11:01 am vs. 11:14 am) asking whether my non-DC-admitted prospective counsel needs to be pro hac-ed in to interact with your office.  Or if you did see that email, please let me know whether my lawyer for this proceeding can take over corresponding with you now or whether he needs to take some pro-hac-type step first.  Relatedly, can you confirm that the total package I have runs 542 pages?

 (3) Given your position on timing and the original timing delta of about three weeks to respond from when I would have the Bar correspondence in hand, I would propose to respond, including attached documents, by Monday 1/31/22 at 5 pm.  Since I could not submit a claim to my insurer without having the document in hand, Friday is the day I submitted that claim and that is obviously relevant to how I will pay for counsel for this matter.

 (4) I reserve all of my legal rights in connection with responding and will take up any points of disagreement with your email below, such as my counsel's position concerning the relevance of the documents we are seeking from DOJ that DOJ is resisting providing and the degree of overlap between this proceeding and the January 6 Select Committee proceeding.

 Thank you.

Respectfully submitted,

 Jeff Clark

From: Phil Fox <FoxP@dcodc.org>
Sent: Friday, January 7, 2022 11:14 AM
To: Jeffrey Clark <Redacted>
Cc: Jason Horrell <horrellj@dcodc.org>; Azadeh Matinpour <matinpoura@dcodc.org>; Angela Thornton <thorntona@dcodc.org>
Subject: Re: [EXT]RE: 1st part of BLTR with attachments


For some reason your emails are ending up in our junk folder.


You are going to need to respond to our inquiry and subpoena this month. I am not willing to wait for you to resolve whatever scheduling issues you have with the Congressional committee. Our issues are much narrower than their issues; we are concerned only about the Rules of Professional Conduct. Although I don't understand the problem with our getting you all the documents, the vast bulk were the Congressional report and the attachments, which I am confident you have had for months and with which you are undoubtedly thoroughly familiar. I await your explanation of the issues that you are having with the Department, but the subpoena only calls for documents in your possession. The Department has been very cooperative, quickly providing Touhey letters, and we will assist you in getting any documents that you reasonably need if we can. Given the more narrow nature of our inquiry, it is not clear what those might be. But if we cannot quickly agree upon a time for your response and your document production to occur this month, we will move to compel a response and to enforce the subpoena.


Get Outlook for iOS <https://aka.ms/o0ukef>

_____

From: Angela Thornton <thorntona@dcodc.org <mailto:thorntona@dcodc.org> >
Sent: Friday, January 7, 2022 9:52:30 AM
To: Phil Fox <FoxP@dcodc.org <mailto:FoxP@dcodc.org> >
Cc: Jason Horrell <horrellj@dcodc.org <mailto:horrellj@dcodc.org> >; Azadeh Matinpour <matinpoura@dcodc.org <mailto:matinpoura@dcodc.org> >
Subject: FW: [EXT]RE: 1st part of BLTR with attachments


A response from Clark.  (again in junk folder)


From: Jeffrey Clark <Redacted> <mailto:Redacted >>
Sent: Thursday, January 6, 2022 9:23 PM
To: Angela Thornton <thorntona@dcodc.org <mailto:thorntona@dcodc.org> >
Cc: Phil Fox <FoxP@dcodc.org <mailto:FoxP@dcodc.org> >
Subject: [EXT]RE: 1st part of BLTR with attachments

Ms. Thornton,

(1) Thanks, yes, I can confirm I now believe that today, for the first time, I have the letter and subpoena with its attachments and thus have the full document.

Just to confirm with you, though, given our various past logistics problems (on both ends now, it seems), the whole doc, which consists of (a) an email from you (which again I first received only tonight), (b) the ODC letter, (c) subpoena, (d) attachment to subpoena (with the letter and both subpoena documents also received as of today for the first time), (e) a Regulation Counsel one pager, (f) an email from Sara Zdeb to ODC Info  (g) a letter from Senator Durbin, and (h) the Senate Judiciary Committee report runs, when all assembled, to a total of 542 pages.  Please confirm that total page number is correct so that I know I'm not missing anything at this point.

Thank you again.

(2) Mr. Fox, I will endeavor to get this to my ethics counsel as soon as I can.  Someone had agreed to represent me within the last few weeks but has strangely been silent since then.  He is a law professor with ethics rule expertise and it's possible he's gearing up for the new semester or is tied up on other client matters he works on.  But it wouldn't be the first time that in this high-profile matter a prospective lawyer has initially shown interest and then backed out.

Also, tomorrow I will send you an email forwarding some details about the latest as to a dispute I'm having with the Justice Department about access to certain documents.  I will also need to coordinate any response sent to ODC on my behalf by counsel for that purpose in light my next deposition to the January 6 Select Committee, as there is substantial overlap between their inquiry and yours.  In light of the fact that the Select Committee process has been underway for some time, I believe that before responding to this inquiry, I should first be permitted to complete my second deposition.  And at the moment, likely in light of the DOJ issue, that second deposition has not been rescheduled after being postponed due to my run-in with COVID.

After coordinating with my J6 counsel and ethics counsel, and explaining how my pending requests to DOJ impact things, ethics counsel for me will propose a revised response date for the subpoena, given that I just received the subpoena today.

Thank you.

Jeff Clark

From: Angela Thornton <thorntona@dcodc.org <mailto:thorntona@dcodc.org> >
Sent: Thursday, January 6, 2022 10:36 AM
To: <span style="background:gray">Redacted</span>    <mailto <span style="background:gray">Redacted</span> >
Subject: FW: 1st part of BLTR with attachments


The following file(s) can be downloaded via SendThisFile:

*        2021-D193 BLetter with attachments part 1 (002).pdf

Download Link: https://www.sendthisfile.com/WVPkz8QjV9TwpeLhh6GXOXM9
<https://www.sendthisfile.com/WVPkz8QjV9TwpeLhh6GXOXM9>


_____



Mr. Clark, per your email I am sending, again, the 1st part of the complaint with ODC's opening letter and written complaint with the 1st few attachments or appendixes A-B.  A second email will follow with attachment or appendix C, only.  I apologize for the delay but your emails to  me are all going into your spam folder.  I will keep an eye out for your emails in the future.


Thank you

Angela

5

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*   Jeffrey B. Clark
c/o Robert Driscoll, Esq., McGlinchey, Stafford, PLLC

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: October 29, 2021                        Time: 10:00 a.m.

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC 20515

Date: October 29, 2021                        Time 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:

Date:                        Time

*To*  any authorized staff member or the United States Marshals Service

to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 13th    day of  October             , 20 21 .

*Chairman or Authorized Member*

Attest

*Clerk*

EXHIBIT 2

# PROOF OF SERVICE

Subpoena for Jeffrey B. Clark
        c/o Robert Driscoll, Esq., McGlinchey, Stafford, PLLC

Address 1725 Pennsylvania Avenue, NW, Suite 420

Washington, DC 20004

before the Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name) _____

Title _____

Manner of service _____

Date _____

Signature of Server _____

Address _____

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress

### Select Committee to Investigate the January 6th Attack on the United States Capitol

October 13, 2021

VIA US and ELECTRONIC MAIL

Jeffrey Bossert Clark, Esq.
c/o Robert Driscoll, Esq.
McGlinchey Stafford PLLC
1725 Pennsylvania Avenue, NW, Suite 420
Washington, DC 20004
rdriscoll@mcglinchey.com

Dear Mr. Clark:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce documents by October 29 and appear for a deposition on October 29.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures rules, or regulations.

The Select Committee's investigation has revealed credible evidence that you attempted to involve the Department of Justice in efforts to interrupt the peaceful transfer of power. As detailed in a report issued by the Senate Judiciary Committee, you proposed that the Department send a letter to state legislators in Georgia and other states suggesting that they delay certification of their election results and hold a press conference announcing that the Department was investigating allegations of voter fraud.[1] These proposals were rejected by Department leadership as both lacking a factual basis and inconsistent with the Department's institutional role.[2] The report further indicates that you engaged in unauthorized investigation of allegations of voter fraud and failed to abide by the Department's policy on contacts with the White House.[3] As a result of your efforts to prompt this Departmental action, the President considered installing you as Acting Attorney General. While he did not ultimately make that personnel change, your

---

[1] "Subverting Justice: How the Former President and his Allies Pressured DOJ to Overturn the 2020 Election," Majority Staff Report of the Senate Judiciary Committee, Issued October 7, 2021 at p. 19.

[2] *Id.* at 22-23.

[3] *Id.*

Jeffrey B. Clark, Esq.
Page 2

efforts risked involving the Department of Justice in actions that lacked evidentiary foundation and threatened to subvert the rule of law. Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 if you have questions or wish to discuss this matter.

Sincerely,

Bennie G. Thompson
Chairman

Jeffrey B. Clark, Esq.
Page 3

## **SCHEDULE**

In accordance with the attached Definitions and Instructions, you, Jeffrey B. Clark, are hereby required to produce, all documents and communications in your possession, custody, or control   including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items.  If no date range is specified below, the applicable dates are for the time period April 1, 2020-present.

1. Communications referring or relating in any way to plans, efforts, or discussions regarding the Department of Justice's involvement in investigating allegations of election fraud in the 2020 Presidential election.

2. All documents and communications relating in any way to a draft letter (including previous drafts of the letter) from the Department of Justice to state officials regarding the convening of a special legislative session, delay in certification of election results, or any other matters concerning the fall 2020 election.

3. From November 3, 2020, through January 20, 2021, communications relating in any way to a possible press conference or other public statement by the Department of Justice regarding investigations of allegations of election fraud.

4. All documents and communications relating in any way to the possibility of the Department of Justice filing documents in the United States Supreme Court regarding allegations of election fraud and/or the certification of the results of the election.

5. All documents and communications relating in any way to a November 9, 2020, memorandum from Attorney General William Barr concerning investigation of voter fraud allegations.

6. From November 3, 2020, through January 20, 2021, all documents provided to you for reviewing, assessing, or reporting on the security of election systems in the United States.

7. From November 3, 2020, through January 20, 2021, all documents and communications provided to you relating in any way to purported election irregularities, election-related fraud, or other election-related malfeasance.

8. All documents and communications relating in any way to specific allegations of voter fraud in Georgia, Pennsylvania, Michigan, Arizona, or any other states .

Jeffrey B. Clark, Esq.
Page 4

9.  All documents and communications relating in any way to alleged interference with the tabulation of votes by machines manufactured by Dominion Voting Systems.

10. All documents and communications relating in any way to alleged interference in the fall 2020 election by foreign governments, organizations, or individuals.

11. Any documents and communications relating in any way to foreign influence in the United States 2020 Presidential election through social media narratives and disinformation.

12. All communications with former President Trump, former Chief Staff to the President Mark Meadows, or other individual who worked in the White House complex during the Trump Administration, including any employee or detailee, relating in any way to allegations of fraud in the fall 2020 election.

13. All communications with Representative Scott Perry or other Members of Congress relating in any way to allegations of fraud in the fall 2020 election, or to delaying or preventing the certification of the election of Joe Biden as President.

14. All communications with attorneys representing President Trump or the Trump re-election campaign relating in any way to litigation involving the fall 2020 election.

15. All communication with the Trump re-election campaign relating in any way to the fall 2020 election.

16. All communications with Professor John Eastman relating in any way to the fall 2020 election.

17. All documents and communications relating in any way to state legislatures' selection, or potential selection, of alternate sets of electors to cast electoral votes in the fall 2020 election.

18. All documents and communications relating in any way to Congress's or the Vice President's role and authority when counting electoral votes.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.    In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.    Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.    In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.    The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.    Electronic document productions should be prepared according to the following standards:

   a.    If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b.    All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH,
   PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME,
   SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE,
   ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE,
   FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED,
   DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER,
   NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.      Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.      Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.      When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.      The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.      The pendency of or potential for litigation shall not be a basis to withhold any information.

11.      In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.      Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.      If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.      In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.      If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.      If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.   This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.   All documents shall be Bates-stamped sequentially and produced sequentially.

19.   Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
      (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.   The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.      The term "communication" means each manner or means of disclosure or
        exchange of information, regardless of means utilized, whether oral, electronic,
        by document or otherwise, and whether in a meeting, by telephone, facsimile,
        mail, releases, electronic message including email (desktop or mobile device), text
        message, instant message, MMS or SMS message, message application, through a social
        media or online platform, or otherwise.

3.      The terms "and" and "or" shall be construed broadly and either conjunctively or
        disjunctively to bring within the scope of this request any information that might
        otherwise be construed to be outside its scope. The singular includes plural number,
        and vice versa. The masculine includes the feminine and neutral genders.

4.      The term "including" shall be construed broadly to mean "including, but not limited
        to."

5.      The term "Company" means the named legal entity as well as any units, firms,
        partnerships, associations, corporations, limited liability companies, trusts,
        subsidiaries, affiliates, divisions, departments, branches, joint ventures,
        proprietorships, syndicates, or other legal, business or government entities over
        which the named legal entity exercises control or in which the named entity has any
        ownership whatsoever.

6.      The term "identify," when used in a question about individuals, means to
        provide the following information: (a) the individual's complete name and title;
        (b) the individual's business or personal address and phone number; and (c)
        any and all known aliases.

7.      The term "related to" or "referring or relating to," with respect to any given
        subject, means anything that constitutes, contains, embodies, reflects, identifies,
        states, refers to, deals with, or is pertinent to that subject in any manner
        whatsoever.

8.      The term "employee" means any past or present agent, borrowed employee,
        casual employee, consultant, contractor, de facto employee, detailee,
        assignee, fellow, independent contractor, intern, joint adventurer, loaned
        employee, officer, part-time employee, permanent employee, provisional
        employee, special government employee, subcontractor, or any other type of
        service provider.

9.      The term "individual" means all natural persons and all persons or entities
        acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# Ethics Opinion 358

# Subpoenaing Witness When Lawyer for Congressional Committee Has Been Advised that Witness Will Decline to Answer Any Questions on Claim of Privilege; Legal Ethics Opinion 31 Revisited.

D.C. Legal Ethics Opinion 31 (1977) concluded that it was a violation of the former Code of Professional Responsibility for a congressional staff lawyer to require a witness to appear before a congressional committee when the committee has been informed that the witness will invoke the self-incrimination privilege as to all substantive questions "and the sole effect of the summons will be to pillory the witness." The committee declines a request to vacate Opinion 31 but notes that under the D.C. Rules of Professional Conduct, as under the former Code of Professional Responsibility, a violation occurs only where the summons serves no substantial purpose "other than to embarrass, delay, or burden" the witness.

### Applicable Rules

- Rule 3.4 (Fairness to Opposing Party and Counsel)
- Rule 3.5 (Impartiality and Decorum of the Tribunal)
- Rule 3.8 (Special Responsibilities of a Prosecutor)
- Rule 4.4 (Respect for Rights of Third Persons)
- Rule 5.2 (Subordinate Lawyers)
- Rule 8.4 (Misconduct)

### Inquiry

### The Request

The Legal Ethics Committee ("Committee") has received a request ("Request") to vacate Legal Ethics Opinion No. 31 ("Opinion 31" or "the Opinion"), which the Committee rendered in 1977 under the former D.C. Code of Professional Responsibility ("D.C. Code"). The Request explains that witnesses subpoenaed to appear before congressional committees have on occasion interpreted Opinion 31 as concluding that compelling the public appearance of a witness who had declared that he would

EXHIBIT 3

assert his self-incrimination privilege in response to all questions constituted a per se violation of the D.C. Code. Based on this interpretation, some witnesses have refused to appear before Congress.

The Request asserts that various legal authorities "establish that there are legitimate reasons for a congressional committee and its staff to summon a witness even when the witness indicates in advance an intent to invoke the Fifth Amendment privilege." Among these, according to the Request, are the committee's right to evaluate the privilege assertion, the possibility that the witness will waive or not assert the privilege, the possibility that the committee will agree to hear the witness in executive session, and the possibility that the committee will immunize the witness's testimony under 18 U.S.C. § 6005.

The Request also states that Opinion 31 did not take into account the Supreme Court's 1976 decision in *Baxter v. Palmigiano*, 425 U.S. 308 (1976), which the Request asserts permits the finder of fact in a civil proceeding to draw an adverse inference from a witness's invocation of the privilege.[1] According to the Request, this law "make[s] absolutely clear that, given the inferences that can appropriately be drawn in civil contexts from a refusal to testify [on self-incrimination grounds], there are legitimate reasons for attorneys for congressional committees to call witnesses even if it appears such witnesses plan to assert the Fifth Amendment privilege." The Request concedes that calling a witness solely to harass or embarrass that person "is not appropriate."

Finally, the Request notes that the Opinion was decided under the now–superseded D.C. Code and states that—

> [a]lthough the ethical considerations against calling a witness solely to harass remain [under the D.C. Rules of Professional Conduct], Opinion No. 31's apparent assumption that there can be no legitimate purpose for calling a witness who has indicated he or she will assert the Fifth Amendment privilege simply cannot stand in light of the clear legal authority set forth above.

**D.C. Legal Ethics Opinion No. 31**

In Opinion 31, the Committee described the inquiry before it as follows:

> We have been asked to advise whether it is proper for a congressional committee whose chairman, staff and several members are attorneys to require a witness who is a "target" of a pending grand jury investigation to appear at televised hearings to be questioned when the committee has been notified in advance that the witness will exercise his constitutional privilege not to answer any questions.

Op. 31. The Opinion began its analysis by conceding that "[i]t is *not per se improper* . . . to cause a witness to be summoned in furtherance of a legitimate legislative function of Congress, even though the resultant attending publicity will be damaging to the witness' reputation and possibly prejudicial to him in a future criminal trial." *Id.* (emphasis added). The Opinion continued, however, that "the inquiring power of a congressional committee is limited to obtaining information in aid of Congress'

legislative function" and that "[t]here is no congressional power to expose for the sake of exposure." *Id.*

Acknowledging that this Committee's jurisdiction is confined to rendering opinions on the applicability of the ethics rules to the conduct of staff attorneys acting in their capacities as attorneys, the Opinion stated that "the inquiry before us poses the issue whether it is ethical to summon a witness [before a congressional committee] when it is known in advance that no information will be obtained *and the sole effect of the summons will be to pillory the witness*." Op. 31 (emphasis added).

The Opinion discussed rulings and standards to the effect that calling a witness in a criminal proceeding, when it is known that the witness will invoke, across the board, his privilege against self-incrimination, constitutes prosecutorial misconduct.[2] Analogizing to those authorities, the Opinion concluded that such conduct by a lawyer for a congressional committee "appears to be in conflict with at least the spirit of" D.C. Disciplinary Rule ("DR") 7-106(C)(2). That rule barred a lawyer from asking a witness before a tribunal any question "that [the lawyer] has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness." D.C. Code DR 7-106(C)(2) (superseded 1991). The Opinion concluded that although a congressional committee arguably is not a "tribunal," the principle that an attorney should not ask a witness questions that are "intended to degrade" him was applicable and that a question to which the inquiring lawyer knows the response will be the witness's invocation of his privilege against self-incrimination is by definition irrelevant. *Id.*

Opinion 31 also considered whether such conduct would constitute "conduct . . . prejudicial to the administration of justice," in violation of D.C. Code DR 1-102(A)(5). A majority of the committee concluded that "the language of this standard is too vague to permit its application as a disciplinary rule," Opinion 31 n. 3, though a few months later, the District of Columbia Court of Appeals upheld the rule against a claim of unconstitutional vagueness, *In re Keiler*, 380 A.2d 119, 126 (D.C. 1977).[3]

**Discussion**

The D.C. Rules of Professional Conduct ("D.C. Rules" or "Rules") superseded the D.C. Code effective January 1, 1991.[4] Several provisions of the Rules are relevant to the issue presented by the Request.

Rule 4.4(a) states that "a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person." The comments observe that it is not possible to catalog all the third-party rights that the rule might implicate. D.C. Rule 4.4, cmt. [1].

Rule 8.4(d) prohibits a lawyer from "engag[ing] in conduct that seriously interferes with the administration of justice." Comment [2] states that this prohibition is intended to include conduct proscribed by the similarly worded provision of the D.C. Code, which was DR 1-102(A)(5).[5] Comment [3] to Rule 8.4, which was among the 2007 amendments to the Rules, states that "offensive, abusive, or harassing conduct that seriously interferes with the administration of justice" violates Rule 8.4(d).

Moreover, at least one ethics opinion issued under the D.C. Rules admonishes lawyers not to harass opponents. D.C. Op. 258 n. 4 (1995).[6]

Filing a frivolous lawsuit violates Rule 4.4, *Attorney Grievance Comm'n v. Richardson*, 712 A.2d 525 (Md. 1998), and Rule 8.4(d), *Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Ronwin*, 557 N.W.2d 515 (Iowa 1996). Unjustified personal attacks on opponents violate both rules. *In re Golden*, 496 S.E.2d 619 (S.C. 1998); *In re Vincenti*, 704 A.2d 927 (N.J. 1998). Moreover, the misuse of official authority by a prosecutor—a position akin to counsel for an investigative congressional committee—violates Rule 8.4(d). *In re Christoff*, 690 N.E. 2d 1135 (Ind. 1997).

Finally, a violation of Rule 8.4(d) "does not have to be affiliated specifically with the judicial decision-making process; the conduct simply must bear on the administration of justice." *In re Mason*, 736 A.2d 1019, 1023 (D.C. 1999). Moreover, "'conduct that is prejudicial to the administration of justice' can be equated to 'conduct unbecoming a member of the bar.'" *Id.* (quoting *In re Solerwitz*, 575 A.2d 287, 292 (D.C. 1990)); *see In re Keiler*, 380 A.2d 119 (D.C. 1977) (finding violation of predecessor to Rule 8.4(d) where lawyer conducted sham arbitration proceeding).

Opinion 31 does not establish a *per se* rule that compelling a witness to testify before a congressional committee when it is known in advance that the witness will invoke the Fifth Amendment privilege violates the ethics rules. Opinion 31 provides that an attorney violates the ethics rules only when he knows that summoning a witness to appear (1) will provide no information to the committee *and* (2) is intended merely to degrade a witness. Specifically, the Opinion states that the issue is "whether it is ethical to summon a witness when it is known in advance that no information will be obtained *and the sole effect of the summons will be to pillory the witness*." The Opinion further notes that "DR 7-106(C)(2) prohibits only questions that the lawyer has no reasonable basis to believe are relevant *and that are 'intended to degrade' as well*." Op. 31 (emphasis added).

The Request has not persuaded us that the revised Rules of Professional Conduct, or other governing law, require us to vacate the Opinion. First, the Request concedes the critical point that calling a witness solely to harass or embarrass that person is not appropriate. We agree and conclude, as we did in Opinion 31, that such conduct violates the Rules.

Second, the Request suggests that the Opinion assumes that there can be no legitimate purpose for calling a witness before Congress when it is known that the witness will assert the privilege. We do not read Opinion 31 as making that assumption. The Opinion asserts that where an attorney has some question whether the witness will assert the privilege, there is no need to test that claim of privilege in public and the claim can be resolved by calling the witness in executive session. We do not read the Opinion to mean, however, that the *only* legitimate purpose for calling a witness is to determine whether he will assert the privilege.

Third, the Request relies heavily on the Supreme Court's decision in *Baxter*, which held that an adverse inference properly may be drawn from an inmate's silence at his disciplinary

proceedings. *Baxter*, 425 U.S. at 320. *Baxter* and its progeny allow fact-finders to draw an adverse inference in civil proceedings from the invocation of the Fifth Amendment privilege. It is not clear, though, how that rule alters the threshold ethical question presented in Opinion 31. The Request asserts that this case law undermines "Opinion No. 31's apparent assumption that there can be no legitimate purpose for calling a witness who has indicated he or she will assert the Fifth Amendment privilege." As explained above, however, that assertion is based on a misreading of the Opinion. Only where the sole purpose of proceeding is to degrade the witness is there a violation of the Rules of Professional Conduct.

Opinion 31 correctly asserted that when an attorney causes a witness to be called for the sole purpose of harassing or degrading that witness, that attorney violates our rules. *See* Rules 4.4, 8.4(d). Similarly, a lawyer would violate Rule 8.4(d) by engaging in abuse or harassment of the witness. Further, such conduct by a staff lawyer might constitute assisting another in violating the rules. *See* D.C. Rule 8.4(a). In addition to participation in the hearing itself, such related activities as preparing subpoenas also could subject a lawyer to sanctions, though we note that Rule 5.2 protects a subordinate lawyer who acts at the direction of a supervising attorney so long as there is a reasonable argument that calling the witness is permitted by the Rules. *See* D.C. Rule 5.2 & com. [2].[7]

## Conclusion

 The Request correctly observes that there may be legitimate reasons for a congressional committee to summon a witness who expresses an intention to assert her privilege against self-incrimination. Because the Opinion is consistent with that fact and because the Rules of Professional Conduct are violated only if there is no substantial purpose in calling a witness other than embarrassment, burden, or delay, we decline to vacate Opinion 31.

Published: January 2011

---

1. The Request cites Rad Services v. Aetna Casualty & Surety Co., 808 F. 2d 271, 275-77 (3d Cir. 1986), Brink's Inc. v. City of New York, 717 F.2d 700, 707-10 (2d Cir. 1983), and In re Vitamin Antitrust Litigation, 120 F. Supp. 2d 58, 68 (D.D.C. 2000), as progeny of Baxter.

2. United States v. Coppola, 479 F.2d 1153, 1160 (10th Cir. 1973); San Fratello v. United States, 340 F.2d 560, 564 (4 Cir. 1965); United States v. Tucker, 267 F.2d 212, 215 (3d Cir. 1959); see ABA Project on Standards for Criminal Justice ¶ 5.7(c) (unprofessional to call witness under such circumstances "for the purpose of impressing upon the jury the fact of the claim of privilege").

3. The Opinion also concluded that such conduct violated several D.C. Ethical Considerations ("ECs"). These were D.C. EC 7-10, which called upon lawyers to treat persons involved in the legal process with consideration and to avoid inflicting needless harm, D.C. EC 7-14, which exhorted government lawyers not to harass parties, and D.C. EC 7-25, which said that a lawyer should not ask a witness a question "solely for the purpose of harassing or embarrassing him." Under the D.C. Code, the Ethical Considerations were "aspirational in character," whereas the Disciplinary Rules were mandatory. D.C. Code Preliminary Statement. The Code added, though, that an agency applying the Disciplinary Rules "may find interpretive guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations." Id. The D.C. Rules of Professional Conduct, which superseded the D.C. Code in 1991, do not contain "aspirational" guidelines akin to the Code's

Ethical Considerations.

4. There have been a number of subsequent changes to the D.C. Rules but aside from the new comment [3] to Rule 8.4, which took effect February 1, 2007, none is material to this opinion.

5. As noted above, when this committee issued Opinion 31, a majority of the members found the language of the predecessor provision "too vague to permit its application as a disciplinary rule," D.C. Ethics Op. 31 n. 3 (citing D.C. Code DR 1-102(A)(5)), but the D.C. Court of Appeals subsequently upheld the cited Code provision against a vagueness challenge, see In re Keiler, 380 A.2d at 126.

6. Instructive, though not literally applicable, are Rules 3.4, 3.5, and 3.8. Rule 3.4(e), whose predecessor rule Opinion 31 applied by analogy to the conduct at issue here, prohibits a lawyer from, "[i]n trial, allud[ing] to any matter that the lawyer does not reasonably believe is relevant." Rule 3.5(d) prohibits a lawyer from engaging in "conduct intended to disrupt any proceeding of a tribunal." A congressional committee ordinarily is not a "tribunal" because it is not adjudicatory in character. See D.C. Rule 1.0(n) (defining "tribunal"). Such a committee might be a tribunal, though, when deliberating and voting on whether to recommend to its house of Congress that a witness be cited for contempt of Congress. See id.

 Comment [2] to Rule 3.8, which sets forth special responsibilities of prosecutors, permits public release of an indictment but condemns—

 extrajudicial comment by a prosecutor that serves unnecessarily to heighten public condemnation of the accused without a legitimate law enforcement purpose before the criminal process has taken its course. When that happens, even if the ultimate trial is not prejudiced, the accused may be subjected to unfair and unnecessary condemnation before the trial takes place. Accordingly, a prosecutor should use special care to avoid publicity, such as through televised press conferences, which would unnecessarily heighten condemnation of the accused.

7. We express no opinion on the propriety of a witness invoking an opinion of this committee as a basis for refusing to comply with a congressional subpoena.

